**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
GARRICK CALANDRO, AS           )
ADMINISTRATOR OF THE ESTATE OF )
GENEVIEVE CALANDRO,            )
                               )
            Plaintiff,         )
                               )    Civil Action
v.                             )    No. 15-10533
                               )
SEDGWICK CLAIMS MANAGEMENT     )
SERVICES,                      )
                               )
            Defendant.         )
_____)
```

**MEMORANDUM AND ORDER**

April 25, 2017

Saris, C.J.

**INTRODUCTION**

Plaintiff Garrick Calandro, as administrator of the estate of Genevieve Calandro, alleges that Sedgwick Claims Management Systems, Inc. ("Sedgwick") violated Massachusetts General Laws Chapter 176D ("Chapter 176D") and Massachusetts General Laws Chapter 93A ("Chapter 93A") by failing to make any kind of reasonable attempt both pre-judgment and post-judgment to settle the negligence and wrongful death case involving his mother who died at a nursing home. Defendant Sedgwick has moved for summary judgment on the ground that it did make a prompt, fair, and

1

equitable settlement offer within the "safe harbor" provided by Chapter 93A. After hearing, Defendant's Motion for Summary Judgment (Docket No. 65) is **DENIED.**

## FACTUAL BACKGROUND

The facts below are interpreted in the light most favorable to the non-moving party and are undisputed except where stated.

On August 12, 2011, Plaintiff filed a wrongful death action against the Radius Group ("Radius") alleging that his 92 year-old mother's death was caused by negligence on August 16, 2008 at a nursing home. Radius, the nursing home operator, was under a liability insurance policy issued by Pacific Insurance Company.[1] The policy is an occurrence policy in the amount of $1 million covering the period from June 1, 2008 to June 1, 2009. Pacific Insurance Company is a member of the Hartford Insurance Group ("Hartford").

Hartford engaged Sedgwick to be a third party administrator ("TPA") for the underlying wrongful death case. As a TPA, Sedgwick was authorized to handle claims under Hartford's policies and provide claims adjusting and administrative services. Mary Blair was Sedgwick's claim handler and supervisor for the underlying wrongful death claim. Ms. Blair's settlement

---

[1] There were five or six Radius entities, four of which were covered by the liability insurance policy.

authority was capped by Hartford at $125,000. She needed to get authority from Hartford to settle above that amount.

While the case was pending, Plaintiff made the following settlement demands:

1. October 12, 2011: $500,000;
2. November 12, 2013: $500,000;
3. March 2014: $1,000,000;
4. July 3, 2014: $1,000,000.

In early July 2014, a co-defendant physician settled with Plaintiff for $250,000.

The case went to trial. On July 21, 2014 the jury returned a verdict of $1,425,000 in compensatory damages and made a finding of gross negligence. On July 22, 2014, following additional testimony, the jury awarded Plaintiff $12,514,605 in punitive damages. On July 31, 2014, Hartford offered to settle for $1 million, Plaintiff rejected this offer. On August 1, 2014, the Court entered judgment in the amount of $14,447,906.51 including pre-judgment interest and costs.

On September 30, 2014, Plaintiff sent a demand letter under Chapter 93A section 9 to Sedgwick demanding $40 million. Sedgwick received the letter on October 2, 2014 and responded to the letter on October 30, 2014 by offering $1,990,197. This offer represented the $1,425,000 compensatory award, prejudgment interest entered in the amount of $504,966, post-judgment interest through November 1, 2014 of $58,375 on the compensatory

award, and the costs awarded to Plaintiff of $1,856. Plaintiff rejected this offer and filed this suit on December 5, 2014.

In November of 2014, Hartford settled with Plaintiff for $16 million, reflecting the $1 million policy limit and an additional $15 million. Of the total, $1,425,000 is acknowledged to be for the compensatory damages in the underlying suit. Hartford obtained releases for the Radius entities and itself. It did not obtain a release for Sedgwick.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once such a showing is made, "the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial," come forward with facts that demonstrate a genuine issue. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010) (citing Celotex, 477 U.S. at 324).

## II. Chapter 93A Framework

### a. The Statute

An insurance company commits an unfair claim settlement practice if it "[f]ail[s] to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). "[A]ny person whose rights are affected by another person violating the provisions of [176D, § 3(9)(f)]" is entitled to bring an action to recover for the violation under Chapter 93A section 9. Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067, 1075 (Mass. 2012) (citing Mass. Gen. Laws ch. 176D, § 3(9)(f)).

Chapter 93A section 9(3) contains the following provision relating to the calculation of damages:

> At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of [ch. 93A, § 2] or that the

5

> refusal to grant relief upon demand was made in bad
> faith with knowledge or reason to know that the act or
> practice complained of violated [ch. 93A, § 2]. <u>For
> the purposes of this chapter, the amount of actual
> damages to be multiplied by the court shall be the
> amount of the judgment on all claims arising out of
> the same and underlying transaction or occurrence,
> regardless of the existence or non-existence of
> insurance coverage available in payment of the claim.</u>

The underlined portion of the statute was inserted by the 1989 amendment in response to state caselaw which "limited those damages subject to multiplication under c. 93A to loss of use damages, measured by the interest lost on the amount the insurer wrongfully failed to provide the claimant. This amendment greatly increased the potential liability of an insurer who wilfully, knowingly or in bad faith engages in unfair business practices." <u>Clegg v. Butler</u>, 676 N.E.2d 1134, 1142 (Mass. 1997).

Section 9(3) also provides that a person receiving a demand letter may, within thirty days of receipt of the letter, make a written tender of settlement. If the plaintiff rejects the offer, a defendant can "limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the <u>injury actually suffered</u> by the petitioner." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added). Defendant refers to this limitation on recovery as a "safe harbor." The meaning of the term "injury actually suffered" in the safe harbor provision is disputed by the parties.

**b. The Rhode to Recovery**

The key case on point is Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067 (Mass. 2012), which involved the calculation of multiple damages under Chapter 93A for post-judgment unfair insurance settlement practices in personal injury actions. In Rhodes, plaintiffs suffered catastrophic injuries in a tractor-trailer crash. At trial the plaintiffs secured judgment of $11.3 million. Prior to trial, the plaintiffs had made settlement demands on the primary and excess insurers. More than eight months after the jury verdict, the insurers and the plaintiffs settled the tort action, and the appeals were dropped. Before the settlement, though, plaintiffs brought a separate action against the primary insurers, the excess insurer and its claims administrator, AIGDC. The plaintiffs alleged willful and knowing violations of Chapters 93A and 176D both before the underlying tort action and after judgment entered. Post judgment, AIGDC offered $7 million, (substantially less than the judgment amount) to resolve all claims. The trial judge called this offer "insulting."

The Supreme Judicial Court concluded that the plaintiffs were entitled to recover damages under Chapter 93A on account of the defendants' post-judgment violation -- i.e., the pathetic post-judgment offer of settlement. Specifically, it held that the calculation of multiple damages was based on the underlying

7

judgment in the plaintiffs' tort action, stating: "Under the plain language of the 1989 amendment, if a defendant commits a wilful or knowing c. 93A violation that finds its roots in an event or transaction that has given rise to a judgment in favor of the plaintiff, then the damages for the c. 93A violation are calculated by multiplying the amount of the judgment." Id. at 1078. The Supreme Judicial Court stated that "nothing in the text of c. 93A, § 9, states that damages are to be calculated differently in the case of a postjudgment rather than a prejudgment failure to effectuate settlement, and it is clearly the case that if knowing or wilful prejudgment conduct causes injury, the proper measure of damages would be the underlying tort judgment." Id. at 1079. It declined to address whether the pre-judgment insurance settlement violation before the verdicts in the tort case caused injury to plaintiffs because, it reasoned, plaintiffs may not recover twice for pre- and post-judgment violations. Id. at 1071, 1077.

The Supreme Judicial Court rejected the argument that multiplying the amount of the judgment in the tort action created a "grossly excessive" award of punitive damages under the Fourteenth Amendment due process clause. It held:

> Under c. 93A, the award of punitive damages is significantly circumscribed. The judge may only award them if the defendant acted willfully or knowingly, and the award must be between two and three times compensatory damages included in a judgment on any

8

> claim arising from the same and underlying transaction or occurrence. G.L. c. 93A, § 9(3).

Id. at 1081 (emphasis added). If a judge finds that an insurer's conduct is wilful and knowing, the plaintiff is entitled to an award of multiple damages based on the judgment only, not "compensatory damages for loss of the use of funds." Id. at 1082.

In sum, in cases involving personal injury claims under insurance policies where the insurer fails to effectuate a prompt settlement after liability has become clear, the judgment in the underlying tort action is the amount that is to be multiplied where an insurer is determined to have engaged in wilful or knowing misconduct even though it "does not represent the actual damages incurred by the claimant as the result of the insurer's unfair or deceptive act or practice of unreasonably delaying in settling the claim." Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066, 1080 (Mass. 2014). The Court could find no cases analyzing the proper method of calculating damages for a claim of unfair insurer settlement claims practices where the underlying tort judgment includes both compensatory and punitive damages.

### c. Safe Harbor

Defendant claims its post-judgment settlement offer of $1,990,197 in response to the Chapter 93A demand letter was

9

reasonable and therefore cabins its chapter 93A liability under the safe harbor provision. Defendant's argument rests on its view of section 9(3) that an offer is reasonably related to the "injury actually suffered" if it reflects the plaintiff's loss of use of the money awarded. Because it made its offer within thirty days of receipt of the demand letter, Defendant argues that its liability is limited to the amount offered.

Plaintiff responds that if an insurer commits a willful or knowing Chapter 93A violation either pre- or post-judgment, it is liable for damages calculated by multiplying the amount of the full judgment in the underlying litigation, not by calculating the injury actually suffered under the loss-of-use of money standard. The underlying judgment, he argues, is the benchmark for evaluating the reasonableness of the settlement offer in the separate Chapter 93A litigation. Thus, in his view, the safe harbor protects Defendant only if it offered the full amount of the underlying judgment of $14 million.

Defendant's argument presents a novel question. In this case, judgment entered in the underlying litigation, thus triggering the 1989 amendment. As such, in the typical case involving insurers' unfair settlement practices, "actual damages" are "taken to be the amount of the judgment for the purpose of the bad faith multiplication." R.W. Granger & Sons v. J&S Insulation, Inc., 754 N.E.2d 668, 682 (Mass. 2001).

10

Defendant argues that it is entitled to the more limited loss-of-use of money measure of damages because it offered a settlement within the statutory safe harbor of thirty days of the demand post-judgment which provides a separate standard for evaluating "injury actually suffered." However, that interpretation would essentially vitiate the 1989 amendment to the same statutory section by failing to punish an insurer for pre-judgment misconduct in claims settlement practices. It is also inconsistent with the holdings in Rhodes and Auto Flat that the actual injury suffered for the purpose of calculating damages post-judgment is taken to be the amount of the judgment. If Defendant's interpretation were correct, insurers could engage in egregious claims settlement practices and simply wait until after judgment to offer the amount of judgment plus interest. Thus an insurer would have an incentive to delay settlement to force a claimant to take a lower offer. Here Defendant cites no cases that the settlement offered in the "safe harbor" must be reasonable under a loss-of-use standard measure once judgment has entered. That said, even though the judgment is the appropriate benchmark, it is unclear whether in the safe harbor period an insurer need only offer the portion of the judgment that reflects compensatory damages, costs, and interest. Must the offer also include the punitive damages portion of the judgment? Even assuming the answer is yes, the

Court must determine whether multiplying a judgment that includes punitive damages implicates due process concerns.

   **d. Claim of Pre-Judgment Misconduct**

Interpreting the facts in the light most favorable to Plaintiff, a reasonable factfinder could easily find that Defendant engaged in a willful and knowing pre-judgment violation of Chapter 93A and, as such, Plaintiff would be entitled to damages in multiplication of the compensatory damages of the judgment.

Defendant received Plaintiff's claim on August 17, 2011. At the time the suit was filed, Plaintiff made an initial demand of $500,000. Docket No. 73, Ex. 15, SED00706. The complaint alleged a wrongful death and included an allegation of gross negligence. Defendant, through Ms. Blair, set up a paper claims file, set a reserve for the claim in the amount of $85,000, assigned Lawrence Kenney as counsel in the case and directed Kenney to hire an investigator. Ms. Blair did not consider making a settlement offer at that time.

After the complaint was filed and discovery was ongoing, Ms. Blair provided Hartford with an update on the claim. On August 16, 2013, she informed Hartford that she was having trouble locating witnesses and a portion of Ms. Calandro's medical chart, but maintained that a reserve of $85,000 was still appropriate. On August 21, 2013, Ms. Blair discussed the

12

pending claim on a call with Kenney. Ms. Blair's handwritten notes from the phone call suggest Defendant was planning to withhold the identity of two nurses involved in the underlying wrongful death case because "of their conflicting versions and the lack of the incident report and internal investigation report." Docket No. 73, Ex. 15, SED00441.

Plaintiff made a second settlement demand of $500,000 on November 13, 2013 during the deposition of co-defendant Dr. Wahl. No immediate response was made to this demand. Dr. Wahl's adjuster emailed Kenney on January 14, 2014 following up on a previous unanswered email he sent to Kenney regarding joint settlement of the case. Kenney responded sixteen days later stating that Ms. Blair was willing to work with Dr. Wahl's insurer on a fifty-fifty basis and could contribute up to $200,000 if necessary, but would prefer a lower amount. Docket No. 73, Ex. 15, SED01015. Ms. Blair was copied on that email and in response asked Kenney to conduct a "trial analysis" report to send to Hartford so she could get additional settlement authority.

On February 7, 2014, Kenney emailed Ms. Blair his trial analysis report, finding that "[d]efending this case on liability will be very difficult," and estimated the likely verdict range to be "$300,000-$500,000." Docket No. 73, Ex. 15, SED01002. He also wrote, "[i]t is very likely if not assured

13

that there will be an award against our insured at least and probably against both your insured's [sic] and the defendant physician." Docket No. 73, Ex. 15, SED00997-01003. Ms. Blair stated during her deposition that she did not request any additional settlement authority from Hartford at that time. On February 7, 2014, Dr. Wahl's insurer made a joint offer to settle for $275,000, Defendant contributing $125,000. Plaintiff did not accept that offer.

On April 8, 2014, Plaintiff advised Defendant that he withdrew his initial demand of $500,000 and had a new joint demand of $1,000,000. Docket No. 73, Ex. 15, SED00951-952. In that letter, Plaintiff also suggested Defendant may be engaging in unfair settlement practices under Chapters 176D and 93A due to its failure to settle the case in a reasonable time.

The case went to trial in July 2014. On July 7, 2014, Ms. Blair requested an increase in settlement authority to $300,000, which was granted. Docket No. 73, Ex. 15, SED01162-64. Ms. Blair never made an offer to settle with Plaintiff for $300,000. On July 15, 2014, Ms. Blair sent an email to update Hartford on the status of the case: "I am not going to attend tomorrow's motion hearing or the impaneling, but I will however attend the trial proceedings. Plaintiff's counsel has known me for many years and I do not want to be available with settlement authority (Do I

still have $250K?) until after the trial starts." Docket No. 73, Ex. 15, SED01396.

Under such facts, a reasonable factfinder could find that Sedgwick engaged in unfair settlement practices that compelled Plaintiff into litigation. Plaintiff originally filed the complaint almost three years before the case went to trial. The only offer Sedgwick made to settle the case was in a joint resolution with Dr. Wahl for $275,000. Even though Ms. Blair was given settlement authority of $300,000, she never made an offer to settle at that amount even when Kenney's trial analysis suggested that defending the case on liability would be "very difficult" and estimated a verdict range of $300,000-$500,000. The record could reasonably support a conclusion that Defendant knowingly and willfully forced Plaintiff into unnecessary litigation when liability was reasonably clear.

### e. Business of Insurance

Defendant claims it is not subject to Chapter 176D because it is not engaged in the "business of insurance." The Court finds this argument to be without merit. Defendant was hired by an insurer in this case to settle claims. In Rhodes, the TPA that was responsible for handling the administration of plaintiff's claims on behalf of the excess insurer was determined to be liable along with the excess insurer for violations of Chapter 93A. 961 N.E.2d at 1075 n.4. To be sure,

the Supreme Judicial Court was not faced with a challenge to the TPA's liability under the statute. Still, Plaintiff has the better argument that Sedgwick is in the "business of insurance." Because Defendant is a TPA responsible for handling the administration of Plaintiff's claims on behalf of the insurer, Hartford, Defendant is subject to Chapter 176D.

Defendant claims an entity is only subject to Chapter 176D liability when it "interposes" itself between the claimant and an insurer in an effort by the insurer to "evade its statutory duties imposed by G.L. c. 176D by delegating its work." Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 391 (Mass. 2004) (citing Miller v. Risk Mgmt. Found. Of the Harvard Med. Insts., Inc., 632 N.E.2d 841, 845-46 (Mass. App. Ct. 1994)). Defendant tries to argue that since Defendant and Hartford are independent entities, and Defendant's settlement authority was limited by Hartford, Defendant cannot truly interpose itself between the claimant and the insurer and therefore is not regulated by Chapter 176D.

Nowhere in the Miller opinion did the court rely on the fact that the claims administrator was a subsidiary of the insurance company to reach its decision. Instead, the Miller Court stated that "Risk Management, as claims negotiator and potential settler, has been interposed between the insurer CRICO and the claimant, and nothing seems more appropriate than to

16

apply to it the standards of fair dealing expressed in c. 176D § 3(9)." 632 N.E.2d at 846.

Defendant is a TPA. It was hired by Hartford to negotiate and settle claims on its behalf, and its role was to interpose itself between the insurer and the claimant. As such, it is subject to Chapter 176D. See Miller, 632 N.E.2d at 846 (finding liability when the claims negotiator interposed itself between the insurer and the claimant); Cf. Bingham v. Supervalu, Inc., 806 F.3d 5, 11-12 (1st Cir. 2015) (finding that unlike a TPA, the Defendant, did not "interpose" itself between the claimant and the insurer).

## ORDER

Defendant Sedgwick's Motion for Summary Judgment (Docket No. 65) is **DENIED.**

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge