1               IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS

2

3   GARRICK CALANDRO, as          )
   Administrator of the Estate of   )
4   Genevieve Calandro,          )
                           )
5            Plaintiff     )  CA No. 15-10533-PBS
                           )  Pages 2-1 - 2-111
6      -VS-                )
                           )
7   SEDGWICK CLAIMS MANAGEMENT      )
   SERVICES, INC., et al,       )
8                           )
           Defendants     )
9

10

                   **BENCH TRIAL - DAY TWO**

11

12        BEFORE THE HONORABLE PATTI B. SARIS
         UNITED STATES CHIEF DISTRICT JUDGE

13

14

15

16

17                 United States District Court
                 1 Courthouse Way, Courtroom 19
                 Boston, Massachusetts  02210
18                October 31, 2017, 9:10 a.m.

19

20

21

22                  LEE A. MARZILLI
             OFFICIAL COURT REPORTER
23          United States District Court
         1 Courthouse Way, Room 7200
24            Boston, MA  02210
             (617)345-6787
25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JANIE HANNA | | | | |
| By Mr. David: | | 2-4 | | |
| By Mr. Hoey: | | | 2-12 | |
| MARY BLAIR | | | | |
| By Mr. Hoey: | 2-19 | | | |
| By Mr. David: | | 2-89 | | |
| By Mr. Hoey: | | | 2-134 | |
| LAWRENCE KENNEY | | | | |
| By Mr. Keenan: | 2-146 | | | |

| EXHIBITS | PAGE |
|---|---|
| 1-71 | 2-4 |
| A-for ID | 2-54 |
| 72 | 2-66 |
| 73, 74 | 2-105 |
| 75 | 2-120 |

1    A P P E A R A N C E S:

2         DAVID J. HOEY, ESQ., Law Office of David J. Hoey, P.C.,
     352 Park Street, Suite 105, North Reading, Massachusetts,
3    01864, for the Plaintiff.

4         DON C. KEENAN, ESQ., Keenan Law Firm,
     148 Nassau Street, N.W., The Keenan Building, Atlanta,
5    Georgia, 30303, for the Plaintiff.

6         JOHN VAIL, ESQ., Center for Constitutional Litigation,
     P.C., 777 Sixth Street, N.W., Washington, DC, 20001, for the
7    Plaintiff.

8         ALLEN N. DAVID, ESQ. and JANE A. HORNE, ESQ.,
     Peabody & Arnold, LLP, Federal Reserve Plaza,
9    600 Atlantic Avenue, Boston, Massachusetts, 02210-2261,
     for the Defendant Sedgwick Claims Management Services, Inc.

10
     ALSO PRESENT:  Daniel T. Landry, Esq., Law Office of
11                  David J. Hoey, P.C.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2          THE COURT:  Okay, let's get this woman home.
3          MR. DAVID:  I think we have the inevitable minor
4    things.  There are a couple more exhibits that have been added,
5    69 through 71.  They're in all of the books.  The law clerks
6    have copies.
7          THE COURT:  Okay.
8          MR. DAVID:  And I think Ms. Molloy asked that we move
9    that the Exhibits 1 through 71 be accepted into evidence.
10         THE COURT:  Fine.
11         MR. DAVID:  Fine?
12         (Exhibits 1-71 received in evidence.)
13         THE CLERK:  Ma'am, you're still under oath.
14                         JANIE HANNA
15   having been previously duly sworn, was examined and testified
16   further as follows:
17         THE COURT:  Good, we're going to move this along now.
18         MR. DAVID:  I'll be brutally efficient.
19   CONTINUED CROSS-EXAMINATION BY MR. DAVID:
20   Q.   Good morning, Ms. Hanna.
21   A.   Good morning.
22   Q.   Yesterday before we broke you were talking about a
23   conversation you had with Becky Shingleton after the verdict,
24   which was on I think July 24, 2014.
25   A.   Okay.
```

1   Q.   Do you remember that testimony?

2   A.   Yes.

3   Q.   And you were asked, I think by the Court, whether that was

4   in writing.

5   A.   Right.

6   Q.   Okay.  And your answer was that it was?

7   A.   Yes.  I sent her an email.

8   Q.   Okay, let me show you what is Joint Exhibit 69.

9        MR. DAVID:  You have a hard copy in front of you?

10        THE COURT:  I just read it.  I'm fine.

11   Q.   Exhibit 69?

12   A.   Okay, I'm there.

13        (Discussion off the record.)

14   Q.   Is that the email you're referring to?

15   A.   Yes.

16   Q.   And you were expressing concern about the verdict to Becky

17   Shingleton?

18   A.   Correct.

19   Q.   And her response?

20   A.   I mean, her response was that Mary had been great and had

21   done everything she needed to do, and she wasn't

22   second-guessing any of the decisions; it was just a completely

23   unexpected, unpredictable verdict.

24   Q.   After the verdict, Hartford came and audited the Calandro

25   file; is that right?

1    A.    Yes, they came, yes.

2    Q.    Do you remember when that was?

3    A.    Early September Becky Shingleton went to our Boston office

4    and audited the Calandro file as well as several of the other

5    files.

6    Q.    Could you turn to Exhibit 70 in your book, please.

7    A.    Okay.

8    Q.    And did you inquire of Ms. Shingleton after the audit what

9    the results were?

10   A.    Yes.  I sent her an email.

11   Q.    And given the size of the verdict, you had some concern?

12   A.    Well, I wanted to make sure she was going to the office to

13   audit the files, and just my managerial responsibilities, it

14   would be natural for me to follow up to insure, was everything

15   okay, any concerns, any questions?  So that would just be

16   routine inquiry.

17   Q.    What was her response to your inquiry about the results of

18   the audit?

19   A.    That Mary and Pat were awesome, they were great, and no

20   concerns were voiced.

21   Q.    Had Becky Shingleton or has Becky Shingleton to this day

22   ever expressed any concern about shortcomings in the handling

23   of the case to you?

24   A.    No.

25   Q.    And I think the Judge asked you yesterday whether Hartford

1    is still a client of Sedgwick?

2    A.    Yes, they are.

3    Q.    Has Sedgwick changed any of its claims-handling practices

4    with respect to the so-called special claims since the Calandro

5    verdict?

6    A.    No.

7    Q.    Now, you were asked yesterday by Mr. Hoey and also

8    Judge Saris some hypothetical questions.  Do you remember

9    those?

10   A.    Yes.

11   Q.    Let me change some of the assumptions, and let's focus on

12   the issue of investigation because investigation is one of the

13   things under the service requirements in the master agreement

14   that Sedgwick is required to do, correct?

15   A.    Right.  We facilitate the hiring of Bistany or the outside

16   adjuster that would investigate.

17   Q.    And who is Mr. Bistany?

18   A.    Bistany, that's the adjusting company.  Philip Bistany I

19   believe is his name.

20   Q.    Phil Bistany?

21   A.    Yes.

22            THE COURT:  Can you spell that?

23            MR. DAVID:  B-i-s-t-a-n-y.

24            THE COURT:  And who is he now?

25            MR. DAVID:  He is an investigator.  I trust that his

1    reports will come into evidence in due course.

2            THE WITNESS:  At The Hartford, that's who was retained

3    on several of those cases, in particular Calandro, to

4    investigate the case.

5            THE COURT:  Hired by Hartford?

6            THE WITNESS:  Sedgwick facilitates the hiring, but

7    it's paid by The Hartford and --

8            THE COURT:  But you hire him, you pick him?

9            THE WITNESS:  I don't know the history.  I know he had

10   been investigating their cases for quite some time, but I don't

11   know initially, but, I mean, The Hartford would have to have

12   approved initially when he came on board.

13   Q.   Just assume that Mary Blair directs defense counsel to

14   hire a Hartford-approved investigator who produces two reports,

15   the first within two weeks of being retained, and that the

16   investigator locates whatever documents and witnesses could be

17   found.  Now, based on those assumptions, do you have an opinion

18   whether Sedgwick would have discharged its obligation to

19   investigate under the service requirements in the master

20   agreement?

21           MR. HOEY:  Objection.

22           THE COURT:  Overruled.

23   A.   Yes, they would.

24   Q.   And what's your opinion?

25   A.   As far as if Sedgwick did what they should have done?

1    Q.    Yes.

2    A.    That they followed the instructions, The Hartford

3    directives.  They facilitated hiring the outside adjuster, and

4    the adjuster did provide investigative reports to assist in

5    determining the liability or exposure on the case.

6    Q.    One of the other obligations of Sedgwick under service

7    requirements is to retain counsel, correct?

8    A.    Correct.

9    Q.    Now, I want you to assume that Mary Blair retained counsel

10   off of a Hartford-approved panel, and that this lawyer had

11   handled 65 to 75 nursing home cases and had tried well over 100

12   jury trials, including eight to ten nursing home cases to

13   verdict.  Do you have an opinion whether selecting that type of

14   counsel would comply with Sedgwick's obligations under the

15   service requirements with respect to retaining counsel?

16   A.    Yes, it would comply with the requirements.

17   Q.    And the final area has to do with settlement, and you were

18   asked about that.  Now, I want you to assume that defense

19   counsel, the same defense counsel we just described a minute

20   ago, had evaluated the case at a total verdict value, all

21   defendants, assuming full liability, of between $300,000 and

22   $500,000.  Assume also that the codefendant doctor settles out

23   just before trial for $250,000, and assume that Mary Blair has

24   settlement authority from Hartford of $250,000, with the caveat

25   or the instruction to use it if the opportunity for settlement

arises.  And assume that Ms. Blair directed defense counsel to
make the offer.  And assume that the offer was made before
trial.  And assume that Ms. Blair makes a note of the offer,
and also assume that she tells Hartford, who makes a note that
the offer had been made.  Under these circumstances, with a
total amount of either settlements or offers of $500,000, do
you have an opinion whether Sedgwick has complied with its
obligations under the service agreement to facilitate the
resolution of the case?

A.   Yes.  Under those circumstances, we definitely would have
complied.

Q.   Okay, can you explain why.

          THE COURT:  And excuse me.  And when was the -- I
maybe missed this -- when was the $250,000 offered?  Was it
pretrial?

          MR. DAVID:  Before trial.

          THE COURT:  Before trial.  How long before trial?

          MR. DAVID:  We can build into the assumption that it
is made -- three days before trial?

          THE COURT:  What if it was three days before trial?

          MR. DAVID:  I think the evidence will be that it was
made on July 14.  The evidence and the trial started on the
17th.

          THE COURT:  And when did the doctor offer the
$250,000?

```
 1              MR. DAVID:  Unclear.  Sometime in early July.

 2              THE COURT:  July, though?

 3              MR. DAVID:  We don't know the date.  It's in July

 4     probably.

 5              THE COURT:  In July.

 6              MR. DAVID:  July, 2014.

 7              THE COURT:  So assuming it was three days before

 8     trial.

 9     A.    Did we meet our obligation, is that what you're asking?

10     Q.    That's what I'm asking.

11     A.    Okay, yes.  I mean, the settlement value is between

12     $300,000 and $500,000.  That's what defense counsel has

13     estimated.  That's the upper end of the evaluation on the case.

14     An offer of $250,000 combined with codefendants, I mean, we've

15     offered the maximum potential jury --

16              THE COURT:  In addition to -- do you mean combined

17     with?

18              THE WITNESS:  Combined.

19              THE COURT:  $250,000 plus $250,000?

20              THE WITNESS:  It's my understanding, and correct me if

21     I'm wrong, it's that --

22     Q.    Just based on hypotheticals.

23     A.    Hypotheticals.  If you're saying the settlement value is

24     $300,000 to $500,000 for the entire case and the codefendant

25     has settled out for $250,000, the maximum exposure remaining,
```

1    based on counsel's assessment, is another $250,000.  So if

2    Sedgwick extended an offer of the maximum potential value in

3    the case, yes, we would be in compliance.

4         MR. DAVID:  I think that's all I have.  Thank you very

5    much.

6         THE COURT:  Excuse me, Counsel.  Where is that

7    notation in The Hartford file, you said?  What's the exhibit

8    number?

9         MR. DAVID:  It was Exhibit 34, Page 2, about halfway

10   down under the heading "Settlement efforts."

11        THE COURT:  Exhibit 34, Page 2?

12        MR. DAVID:  I think I'm right about that.

13        THE COURT:  Oh, so you're referring to the "We tried

14   to match that amount" language?

15        MR. DAVID:  Pardon me?

16        THE COURT:  You're referring to the "We tried to

17   match --"

18        MR. DAVID:  Yes, unbeknownst to us.

19        THE COURT:  All right, I just wanted to know what

20   you're referring to.  Okay, I've seen that before.  All right.

21        MR. HOEY:  Thank you.

22   REDIRECT EXAMINATION BY MR. HOEY:

23   Q.  Mrs. Hanna, if you know, what, if anything, did Mary Blair

24   do to verify that Mr. Kenney had eight to ten nursing home

25   verdicts?

```
1    A.    I don't know specifically what she did to verify that.

2    Q.    Do you know that to be accurate?

3    A.    Personally, I do not know that to be accurate.

4    Q.    Okay.  Now, if Sedgwick had caused the identification of

5    the two nurse witnesses not to be disclosed, does that meet the

6    contract obligations in the TPA agreement?

7          MR. DAVID:  I object to that.  That's beyond the scope

8    of my cross.

9          MR. HOEY:  Well, he talked about the investigation --

10          THE COURT:  Wait.  Let me -- overruled.

11   A.    Could you ask the question again.

12   Q.    If Sedgwick caused the identification of the two witnesses

13   not to be disclosed, does that meet the contract obligations

14   with the client?

15   A.    Well, I don't --

16          THE COURT:  You need to clarify.  Not to be disclosed

17   to whom?

18          MR. HOEY:  I'm sorry.

19   Q.    Not to be disclosed to plaintiff's counsel or plaintiff,

20   does that meet the contract obligations?

21          MR. DAVID:  Objection.

22          THE COURT:  I'll allow it as a hypothetical.

23   A.    I don't know how Sedgwick could decide whether or not to

24   disclose witnesses when defense counsel is the attorney on the

25   case handling the case for The Hartford.  It wouldn't be
```

1    Sedgwick's control as to whether or not those witnesses are

2    disclosed.

3    Q.   If they did, if Sedgwick did, would that be in violation

4    of the contract between the client and Sedgwick?

5             MR. DAVID:  Objection.

6             THE COURT:  Sustained.

7    Q.   You mentioned that Hartford conducted an audit of the

8    Calandro file at some point post-verdict.

9    A.   Correct.

10   Q.   An audit is not the same as a peer-review review or a

11   quality assurance review, is it?

12   A.   I don't know how The Hartford categorizes their reviews.

13   I know Becky Shingleton wanted to review the Radius files

14   including Calandro, so she went to their office and did an

15   open-file review of all of the cases.

16   Q.   But you understand that working in the insurance industry,

17   that there is such committees called peer review and quality of

18   assurance committees, right?  Does Sedgwick even have a peer

19   review or quality assurance committee?

20   A.   We don't have a committee per se, but we do have a

21   department.  It's called Total Performance Management, which

22   includes our auditing processes.

23   Q.   Okay, so did Sedgwick do their own audit or peer review or

24   quality assurance on the Calandro case?

25   A.   I'm not aware.  I wasn't involved with the Calandro file.

1    Q.    And, lastly, Mrs. Hanna, you mentioned that from those

2    email communications, or whatever communications you had with

3    Becky Shingleton, that Hartford was happy with Mary?

4    A.    Correct.

5    Q.    And there wasn't any shortcomings, I think you said,

6    shortcomings by Mary, in Hartford's view; is that right?

7    A.    Generally overall or Calandro?  Can you be specific?

8    Q.    In the Calandro case.

9    A.    Okay, as far as Calandro, no, I'm not aware of any

10   concerns by The Hartford.

11   Q.    But you are aware that Hartford has sued Sedgwick in

12   New York court alleging that as a result of the mismanagement

13   of the Calandro case?  You're aware of that case, aren't you?

14   A.    I'm aware, yes.

15   Q.    So in essence Hartford is not happy with Sedgwick or Mary

16   Blair's performance in the Calandro case?

17          MR. DAVID:  Objection.

18   Q.    Are you aware of that?

19          THE COURT:  Overruled.

20   A.    I can't testify to Hartford's -- I mean, that's not for me

21   to answer.

22   Q.    You're aware of the suit?

23   A.    I'm aware there's a lawsuit.

24   Q.    And do you understand the allegations in that lawsuit by

25   Hartford against Sedgwick?

```
1    A.    Yes.
2    Q.    Okay.  And what is your understanding of the allegations
3    of Hartford against Sedgwick?
4            MR. DAVID:  Objection.
5    A.    They have --
6            THE COURT:  Overruled.
7    A.    They have concerns regarding the handling of the matter.
8            THE COURT:  What do they say those -- what are the
9    allegations of the concerns?
10           THE WITNESS:  I don't know specifically.
11           THE COURT:  Did it have to do with the settlement
12   situation, whether or not an offer of settlement was made in a
13   timely way?
14           THE WITNESS:  Do we have the complaint?  The only
15   specific thing I --
16           THE COURT:  You don't know?
17           THE WITNESS:  I don't remember specifically what's
18   alleged in the complaint.
19           THE COURT:  This is the first I've heard of that
20   lawsuit.
21           MR. HOEY:  Okay, your Honor, well, we could ask the
22   Court to take judicial notice of it, and I can bring the copy
23   in, if that would help the Court.
24           THE COURT:  Yes.  Do you know if there's been a
25   deposition in that case?
```

1          MR. HOEY:  There has of certain individuals, correct.

2     I do not know --

3     Q.   Have you been deposed in that case?

4     A.   Yes.

5          MR. KEENAN:  Your Honor, may it please the Court, this

6     afternoon's witness, Attorney Kenney, was deposed in that case

7     and in this case.

8          THE COURT:  And is it this overlapping issue about

9     whether a meaningful settlement offer?

10         MR. KEENAN:  It is.  It is the very issues that are

11    before your Honor today, failing to communicate, failing to

12    investigate, everything.

13         MR. HOEY:  Fiduciary duty, breach of contract, TPA

14    agreement.

15         THE COURT:  All right, all right, all right.

16         MR. HOEY:  I'm sorry.

17         MR. DAVID:  I think the best evidence is the

18    complaint, and --

19         THE COURT:  Yes, the complaint, I'll --

20         MR. HOEY:  I'll bring it in.  That's all, your Honor.

21    Thank you.

22         THE WITNESS:  Am I free?

23         THE COURT:  Thank you.  And I have to apologize.  It

24    did take an additional 20, 25 minutes, but you had to stay.

25    You're welcome to leave now.  Thank you.

```
 1              (Witness excused.)

 2         MR. HOEY:  The next witness will be Ms. Mary Blair.

 3         THE COURT:  So as we're waiting for her, this has hit

 4    me.  Maybe you've told me before and I just didn't remember.

 5    So whatever I rule on this case, fact-finding, potentially has

 6    collateral estoppel effects for the New York case, is that

 7    right?  Or what are we calling it these days, issue preclusion?

 8         MR. DAVID:  Depending on the specific issues, there is

 9    that possibility.

10         THE COURT:  And it also has implications with respect

11    to whether there's an offset or not, so there's a lot riding on

12    this in addition to the --

13         MR. DAVID:  I haven't thought through the offset

14    implications, but your Honor's latter comment is certainly

15    correct; there is a lot riding.

16         THE COURT:  All right, thank you.

17         MR. HOEY:  Except, your Honor, the New York case, it's

18    different parties.  The only party in common is Sedgwick in

19    this case to the New York case.

20         THE COURT:  I don't know.  I'm just thinking out loud,

21    law school exam, okay?

22         All right, come on up, Ms. Blair.

23                        MARY BLAIR

24    having been first duly sworn, was examined and testified

25    further as follows:
```

```
 1              THE CLERK:  You can be seated.  Could you please state
 2    and spell your name for the record.
 3              THE WITNESS:  Mary Blair.
 4    DIRECT EXAMINATION BY MR. HOEY:
 5    Q.   Good morning, Mary.
 6    A.   I'm just going to reach down to get my glasses out of my
 7    purse.
 8              THE COURT:  And, also, is there a cup there,
 9    Maryellen?
10              THE CLERK:  Yes, there is a cup.  Do you want water?
11              THE WITNESS:  Yes.
12              THE COURT:  That's because there have been one too
13    many witnesses here who have poured themselves a pitcher of
14    water, and they have it all end up in their lap, so
15    Maryellen --
16              THE WITNESS:  Thank you, Maryellen.  Okay, good
17    morning, David.
18              MR. HOEY:  Hi, Mary.
19    Q.   Mary, how long have we known each other?
20              MR. DAVID:  Your Honor, I don't want to sound stuffy
21    and formal, but Ms. Blair is I think entitled to be called
22    Ms. Blair rather than Mary.
23              THE COURT:  That's fine.  She called him David, but
24    that's fine, we can go with Ms. Blair.  That's fine, although
25    it does give me a sense that you've known each other over many
```

1  years.  How long have you known each other?

2        THE WITNESS:  Probably fifteen years.

3        MR. HOEY:  Fifteen or slightly a little bit more.

4  Q.  Mary, how would you like me to address you?  I could do

5  Ms. Blair.  I could do Mary.

6        THE COURT:  Well, you know what, I'll make that rule.

7  Why don't we call her Ms. Blair.

8        MR. HOEY:  Fine.

9  Q.  So we've known each other for about over fifteen years,

10 Ms. Blair, right?

11 A.  Yes.

12 Q.  And over that time period, we've had many nursing home

13 cases that we've resolved together, right?

14 A.  Yes.

15 Q.  Okay.  You know, we know that you have been in the claims

16 handling business since about 1988, I think.

17 A.  More like 1990.

18 Q.  Okay.  And you started with The Hartford down in

19 Connecticut, if I recall, right?

20 A.  Correct.

21 Q.  Okay.  And you moved on to the subsidiary of Hartford for

22 about a ten years' time span?

23 A.  That's about right.

24 Q.  Is that right?  And then on to Sedgwick where you stayed

25 until you retired recently?

1    A.    Correct.

2    Q.    Okay.  So in the 2011 and 2014 time frame, you were

3    employed by the Sedgwick claims services as one of their claims

4    adjusters, right?

5    A.    Yes.

6    Q.    And so since February of 2011 to the time of your

7    retirement -- was it March, I think?

8    A.    March 24, 2017.

9    Q.    Congratulations.

10   A.    At 6:00 o'clock at night.

11   Q.    After putting in how many years in the business?

12   A.    Close to thirty.

13   Q.    Close to thirty?

14         THE COURT:  Can we start at the very beginning.  Where

15   are you from?

16         THE WITNESS:  Peabody, Massachusetts.

17         THE COURT:  And did you go to Peabody High?

18         THE WITNESS:  No.  I went to Beverly High.

19         THE COURT:  Beverly High.  And then did you go to

20   college?

21         THE WITNESS:  Yes.

22         THE COURT:  Where did you go?

23         THE WITNESS:  I was graduated from Suffolk University.

24         THE COURT:  And you got a BA?

25         THE WITNESS:  Yes.

1          THE COURT:  And then any further education?

2          THE WITNESS:  No.

3          THE COURT:  And then you went right from there into

4    the insurance industry?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  And you live in the Boston area

7    now?

8          THE WITNESS:  I live in Peabody, yes.

9    Q.   While at Sedgwick, your official title I believe was

10   Professional Liability Claims Supervisor?

11   A.   Correct.

12   Q.   And your responsibilities in that position were to oversee

13   all the older cases and the new incoming reports.  What does

14   that mean?

15   A.   Well, the older cases were already legacy cases, I think

16   we call them, that had been incurred since 1999 when the

17   program started, and then we were getting numerous other

18   reports.  I should probably be specific that we -- I was not

19   only handling Massachusetts but forty other states.

20   Q.   That was my next question.  I understand that you had

21   claims in approximately forty other states.  So, Mary, in the

22   2011-2014 time frame, approximately how many claims or cases

23   were you working on at any given year?

24   A.   In a year's time, probably 250.

25   Q.   And, Mary, were most of those cases nursing home cases?

1    A.    Yes.

2    Q.    Were they exclusive nursing home cases, or did you have

3    some other types of claims?

4    A.    As far as there's -- I had nursing home general liability,

5    say if a guest fell.  It wasn't on the professional policy.

6    Q.    But it dealt with the nursing home property?

7    A.    Yes.

8    Q.    All right.  And how long have you been adjusting nursing

9    home claims?

10   A.    Since about 2000, the millennium.

11   Q.    And that's around the first time we met, 1999, 2000, I

12   believe?

13   A.    Yes.

14   Q.    Now, being a claims handler and adjuster, particularly to

15   nursing home cases, you know that year after year there is a

16   nursing home verdict across this country that is in the 8 and 9

17   figures every year?  You knew that, right?

18   A.    Yes.

19   Q.    And you also know, if you kept track of the statistics --

20   do you keep track of the statistics in the nursing home

21   industry?

22   A.    No.

23   Q.    But you know that nursing home neglect was a national

24   crisis between 2000 and about 2010, correct?

25   A.    I -- I really don't know.

1    Q.    Okay.  Now, in respect to the Calandro file, I understand

2    that you assigned yourself to be the claims adjuster to that

3    file when it came in?

4    A.    Yes, I did.

5    Q.    And you were also the supervisor over that claim?

6    A.    Yes.

7    Q.    For that case file.  But Jane Hanna was your manager?

8    A.    Correct.

9    Q.    Now, as far as I understand it, you were the only person

10   with any decision-making ability for Sedgwick who was working

11   on the Calandro file for the Calandro file, correct?

12   A.    I was the lead on Calandro file.

13   Q.    And you in essence, when operating the Calandro file, are

14   stepping into the shoes of Hartford for negotiating, possibly

15   settling, investigating, adjusting, and managing that file,

16   correct?

17   A.    Yes.

18   Q.    Hartford was your client, Sedgwick's client, and you were

19   assigned that duty of investigating the claim for Hartford,

20   correct?

21   A.    Yes.

22   Q.    Finding defense counsel to defend the claim for Hartford,

23   correct?

24   A.    Correct.

25   Q.    Negotiating the claim, which would include making offers

1   at their direction, correct?

2   A.   Yes.

3   Q.   And, Mary, not to jump ahead, but if you did not administer

4   the claim for Hartford or completely investigate the claim, or

5   make no offers of money approved by the client to be offered,

6   that would be a breach of the agreement between Hartford and

7   Sedgwick, correct?

8         MR. DAVID:  Objection.

9         THE COURT:  Overruled.  Just assume those facts.  It's

10  not admitting them.

11  A.   Yes.

12  Q.   Now, in addition, would that also be an unfair practice to

13  Hartford, the insured, and the claimant?

14        MR. DAVID:  Objection.

15  Q.   In your experience.

16        THE COURT:  As you understand the law.

17        THE WITNESS:  Yes, I understand.

18        THE COURT:  Overruled.  As you understand the law, if

19  you were not to -- I would break it down because I think those

20  are different things.

21        MR. DAVID:  Your Honor, my objection was in part that

22  it's essentially a legal question.  But I think the focus on

23  the three parties, we're only concerned with one party here,

24  and that is the claimant.  Whatever the relationship or

25  obligations were to --

```
 1              THE COURT:  Yes, I think that's a fair concern
 2    because, as I understand, it's being litigated in New York too.
 3    So I think the issues here are vis-a-vis the Calandro family,
 4    not vis-a-vis Hartford.  So I think that's a fair objection.  I
 5    thought it was because it was a question of law, but I see what
 6    you're saying.
 7              Let's break it down with respect to --
 8              MR. HOEY:  I'm just going to move on to another piece.
 9              THE COURT:  Okay.
10    Q.   Mary -- I'm sorry -- Ms. Blair -- it's going to be hard
11    for me to do that.
12    A.   Thank you.
13    Q.   Ms. Blair, the Calandro claim --
14              THE COURT:  Well, can I say this, because it's clear
15    you know each other, how many cases have you been through
16    together?
17              MR. HOEY:  Since 1999?
18              THE COURT:  No.  I'm going to ask you.
19              THE WITNESS:  I'd say about two dozen.
20              THE COURT:  So twenty-four cases you've worked on with
21    Mr. Hoey together?
22              THE WITNESS:  Right.
23              THE COURT:  And have any of them been a problem until
24    this one?
25              THE WITNESS:  No.
```

```
1    Q.   But there are others that have gone to verdict?
2             THE COURT:   Have there --
3    A.   Not with -- with your office.
4    Q.   I thought there was the 2000 case in Barnstable.
5    A.   Yeah, Maguire -- I forget whether it was Maguire.   No,
6    uhm -- oh, that could be.   I don't recall, but --
7             THE COURT:   So of the two dozen, maybe there was one
8    other that had gone --
9             THE WITNESS:   Right, correct, your Honor.
10            THE COURT:   All the others have been settled?
11            THE WITNESS:   Yes.
12   Q.   All right, so, Ms. Blair, the Calandro claim was not the
13   only case you worked on with the Radius defendants, is it?
14   A.   That's correct.
15   Q.   So in fact there were approximately 22 to 24 other claims
16   regarding Radius during that time period, either pending or
17   closed, around the 2011-2014 time period?
18   A.   Yes.
19   Q.   And so you knew that --
20            THE COURT:   Can I go back.   So that's Radius, those
21   nursing homes, did it include the employees of the nursing
22   homes?
23            THE WITNESS:   No, it didn't.   They were strictly
24   Radius management.
25            THE COURT:   Management, and the corporate entities?
```

1          THE WITNESS:  And the subsidiaries, yes.

2    Q.   But you understand, Mary, that when a nursing home

3    complaint is filed against the nursing home management company,

4    its owners, operators, or the licensee, the actual nursing home

5    that's providing the hands-on care, the allegations are of

6    those of the people working in the nursing home, right?  Do you

7    understand vicarious liability?

8    A.   Yes.

9    Q.   Okay.

10   A.   The -- just repeat what the question is.

11   Q.   Through the employees and staff members who are negligent

12   and where the corporate entities could be liable for vicarious

13   liability?

14   A.   Yes.

15          THE COURT:  And let me ask you, the doctor in the

16   case, Calandro, was he on staff?

17          THE WITNESS:  No, he wasn't.

18          THE COURT:  Was he hired by staff to provide services?

19          THE WITNESS:  No.

20          THE COURT:  So that was totally privately retained by

21   the Calandro family?

22          THE WITNESS:  Yes.

23          THE COURT:  I just didn't know.

24   Q.   Ms. Blair, you understand that when someone is admitted to

25   a nursing home, as you assess so many nursing home cases, that

1    when they go to the nursing home, that new resident or patient,

2    depending on their admission, is assigned a doctor?  They don't

3    have a choice as to who the doctor in the nursing home is going

4    to be for them?  You understand that, correct?

5    A.    Actually, I don't recall, uhm, for back in 2008, 2007,

6    that period of time.

7    Q.    So in this case there was a doctor, Dr. Wahl, who was also

8    the facility's medical director.  Do you remember that?

9    A.    I recall that for a brief period he was the medical

10   director.

11   Q.    Okay.  So as the medical director, he is under the control

12   of the nursing home's management and ownership?  You understand

13   that?

14              MR. DAVID:  Objection.

15              THE COURT:  Overruled.  Just what your understanding

16   was at the time.

17   A.    He was, uhm, uhm, I'd say strictly for his -- his

18   recommendations on operating the facility.

19   Q.    The medical director is part of the management team of a

20   nursing home.  You knew that?

21   A.    He is part of the team.

22   Q.    He just so happened to be in this case assigned to

23   Mrs. Calandro as her primary care physician while she was in

24   the nursing home, but he was also the medical director of the

25   nursing home at the time; isn't that correct?

1    A.   Yes.

2         THE COURT:  Now, I just want to make sure I

3    understand.  So, in your view, did your coverage include

4    negligence by the doctor?

5         THE WITNESS:  No.

6         THE COURT:  Dr. Wahl?

7         THE WITNESS:  Excuse me.  Only on a medical director,

8    there's coverage for any breaches in his, uhm, role or scope as

9    a medical director.

10        THE COURT:  So when someone wears two hats --

11        THE WITNESS:  Right.  Otherwise, for his professional

12   liability, he has his own coverage.  He's not covered under the

13   nursing home.  So as a medical director, if he breached

14   something in the medical director's --

15        THE COURT:  So when he settled out for $250,000 --

16   under his own carrier, is that right?

17        THE WITNESS:  Yes.

18        THE COURT:  -- you viewed that as wiping -- did you

19   view that as wiping clean your responsibility for his

20   negligence?

21        THE WITNESS:  Yes.

22   Q.   Now, Mary -- Ms. Blair -- I'm sorry -- you understood that

23   as wiping out his negligence as the primary care physician to

24   Mrs. Calandro, correct?

25   A.   Yes.

1    Q.    You didn't wipe it out as to his negligence in his role as

2    the medical director of the Radius Danvers Nursing Home,

3    correct?

4    A.    Yes.

5    Q.    And do you recall whether there was allegations against

6    the doctor in his role as the medical director at the Radius

7    facility at the time?

8    A.    I don't recall.

9    Q.    So going back, you mentioned that you had 22 to 24 other

10   claims and lawsuits regarding the Radius defendant during that

11   time period, either pending or closed.  So you were aware at

12   that time that the allegations in those complaints against the

13   Radius nursing homes, and particularly the Danvers one,

14   involved that the Radius facilities were struggling with

15   quality of care, correct?

16   A.    No.

17   Q.    No?

18   A.    I didn't assume that.

19   Q.    You didn't assume that.  You knew from those lawsuits and

20   those complaints that the allegations against those Radius

21   nursing homes, including the Danvers one, was that they were

22   struggling with providing quality of care?

23   A.    Well, I think the word "struggling" is, you know,

24   difficult to answer something that vague.

25   Q.    Okay, then I'll take the word "struggling" out.

1    A.    Okay.

2    Q.    They were having difficulties providing quality of care to

3    residents in their nursing homes?  Was that the gist of all

4    those cases?

5             MR. DAVID:  Objection.

6             THE COURT:  Overruled.

7    A.    Uhm, yeah, I -- I can't say for sure.

8    Q.    So within those 22 to 24 cases, do you recall that those

9    allegations of negligence involved, many of them, that the

10   nursing home was providing below-average quality of care,

11   according to their Department of Public Health survey results?

12   A.    Again, I -- I -- I'm not definite on what it is.  You're

13   indicating that the allegations coming from plaintiff's

14   counsel, and yet those cases settled; and when they settled,

15   there's not full -- they could have just been negotiated to

16   resolve the case.  I'm not --

17   Q.    Part of your investigation into these cases, nursing home

18   cases, is to obtain the DPH, the Department of Public Health,

19   survey results?  In Massachusetts we call them a "report card

20   score."  You obtain those as part of your investigation,

21   correct?

22   A.    Usually, yes.

23   Q.    Okay.  In the Calandro case, did you obtain the Department

24   of Public Health survey results in the Calandro case?

25   A.    I don't recall.  Our DPH report is what you're saying, did

1    they -- I don't recall that they surveyed the facility.

2    Q.    But, Mary, you testified in your deposition that you

3    normally, as part of your investigation, you obtain copies of

4    the DPH reports as part of your investigation process, correct?

5    A.    Yes.

6    Q.    And that you would get or seek the help of a defense

7    counsel to obtain those DPH reports so you can determine what

8    the quality-of-care level of the nursing home is at the time

9    that the lawsuit was filed, correct?

10   A.    Yes.

11   Q.    Okay.  And do you have any specific memory in this case

12   whether you obtained those Department of Public Health reports

13   or had counsel obtain them for you in the Calandro case?

14   A.    I don't have specific recollection on that.

15   Q.    So in your analysis, or investigation, I should say, into

16   the Calandro case, did you take into consideration whether in

17   fact the nursing home was understaffed?  Is that part of your

18   investigation?

19   A.    No.

20   Q.    Did you take into consideration as part of your

21   investigation as to whether the nursing home staff was

22   supervised when they were providing care to Mrs. Calandro?

23   A.    Yes.

24   Q.    You did.  And how did you do that?

25   A.    By looking through the records for the people who were

1    dealing with Mrs. Calandro from the time of her admission.  As

2    you know, the facility was, uhm, on the brink of a sale and

3    closing down, so we could obtain certain records at the time

4    looking for, uhm, even with the posting of, uhm, if there was

5    any survey or DPH tags, I guess they call them.

6    Q.    And you did that?

7    A.    Yes.

8    Q.    That's what you're saying.  Where are those notes in your

9    investigation notes?

10   A.    They're not in there.

11   Q.    As part of your investigation, you used Phil Bistany

12   services?

13   A.    Yes.

14   Q.    You've used them for a long time?

15   A.    Yes.

16   Q.    Okay.  And he's someone of your choice?

17   A.    Yes.

18   Q.    You selected him and found him and used him for the

19   investigations?

20   A.    Yes.

21   Q.    Okay.  Also as part of your investigation, did you

22   determine whether the staff at the Radius facility were

23   trained?

24   A.    Yes.

25   Q.    You did?  How did you do that?

A.   By looking at their employment credentials, were they CNAs

or LPNs or RNs.

Q.   And, Mary, would that be looking at their personnel file?

     THE COURT:  First of all, it's Ms. Blair, but, second

of all, I don't want to be litigating -- let's just deal with

the issues that directly involve your client.  I have a sense

that we're sort of litigating a second case.

     MR. HOEY:  I made it specific to Calandro, but part of

the allegations in the case is investigation, whether she did

an adequate, thorough, and complete investigation to determine

what the liability and value of the case would be.

     THE COURT:  Well, at some point, did you concede

liability?

     THE WITNESS:  We stipulated as to a breach of duty.

     THE COURT:  And what was that on the basis of?

     THE WITNESS:  Uhm, that there was no causation for the

death of Mrs. Calandro.

     THE COURT:  No, what was the basis for deciding there

was no liability?

     THE WITNESS:  Oh, I see what you mean.  We were not

able to provide proof of some of the reports that were there.

The records, some of the records could not be located, and to

avoid a default, we stipulated.

     THE COURT:  And when did you decide that you were

liable?

```
 1              THE WITNESS:  Oh, sorry.  Uhm, we -- I think it was
 2    probably in February --
 3              THE COURT:  February.
 4              THE WITNESS:  -- of 2014.
 5              THE COURT:  All right.  So in February you decided,
 6    "There's no chance we're going to win this," either with
 7    respect to negligence or causation?
 8              THE WITNESS:  Yes.
 9              THE COURT:  All right, and that was based on your
10    investigation to that point?
11              THE WITNESS:  Yes.
12              THE COURT:  And so at that point, what did you view
13    your duty as as the adjuster?
14              THE WITNESS:  Well, I did do an evaluation or an
15    assessment of what the damages were.  Also I took into
16    consideration that there was a codefendant on this case, spoke
17    with them on this.
18              THE COURT:  But not a codefendant like a usual
19    codefendant, right, because he was also in your employ?
20              THE WITNESS:  As a medical director.
21              THE COURT:  Yes.  So at that point, did you as the
22    adjuster make an assessment about what the worth of the case
23    was?
24              THE WITNESS:  Yes.
25              MR. HOEY:  Thank you.
```

1   Q.   Ms. Blair, one last question because you mentioned

2   something about the death of Mrs. Calandro.  Did you have

3   defense counsel take the deposition of the doctor who filled

4   out the death certificate in the Calandro case?

5   A.   No.

6   Q.   Now, you're not aware that there was a post-verdict

7   autopsy done by Sedgwick or Hartford, are you?

8   A.   No.

9   Q.   Mary, in the exhibit binder, can you please turn to

10  Exhibit No. 4.

11  A.   Okay, I have it.

12  Q.   Now, this is a 90-day status report?

13  A.   Yes.

14  Q.   And it's from you to -- who's Antinik Thompson?

15  A.   She's a Hartford Insurance consultant.

16  Q.   So she's with Hartford?

17  A.   Yes.

18  Q.   So this 90-day report is from you to Hartford?

19  A.   Yes.

20  Q.   Okay.  And you had an obligation to do 90-day reports in

21  this case at the direction of Hartford?

22  A.   Yes.

23  Q.   And from October of 2011 up until July of 2014 when the

24  case was tried, that would come out to about nine 90-day

25  reports?  Is that about right?

1   A.   I'd have to say "yes."

2   Q.   Okay, but this is the only one that we have.  Are there

3   eight others?

4   A.   Yes.  I think there are some handwritten ones in here.

5   Q.   Ninety-day reports, or are those just your notes to the

6   file?

7   A.   I think there's some that says 90-day reports in my

8   handwriting.  Do you want me to try to find it?

9   Q.   No.

10  A.   Okay.

11  Q.   We start under the "Status" section here.  It says

12  "Calandro, age 94"?

13  A.   Yes.

14  Q.   And do you know that now to be incorrect?

15  A.   Yes.

16  Q.   What was her age at the time of her passing?

17  A.   Ninety-one.

18  Q.   Later on, the second paragraph, you mention that you have

19  filed for a medical malpractice tribunal?

20  A.   Yes.

21  Q.   Okay.  And do you recall what the results of the tribunal

22  were?

23  A.   Yes.

24  Q.   What were they?

25  A.   That there was a decision that there was significant

 1    evidence to raise the question of liability.

 2    Q.    Okay.  And do you know when that was?

 3    A.    Uhm, it says here May 7, 2013.

 4    Q.    So May 7 of 2013, the plaintiff had passed the tribunal at

 5    that time?

 6    A.    Yes, as to both defendants.

 7    Q.    So going down under "Action plan," what does the first

 8    sentence say?

 9    A.    "One of the issues that we have had is locating witnesses

10    at the facility."

11    Q.    Okay.  And why was that a problem?

12    A.    Because they were transferring into a sale or I think to

13    another -- another nursing home type of facility, management

14    company.

15    Q.    If you go on to the second part of the next sentence, it

16    says --

17              THE COURT:  I'm not seeing.  What is the date of this?

18              MR. HOEY:  It's up at the top.  It says August 16 of

19    2013.

20              THE COURT:  All right, thank you.

21    Q.    Continuing in the "Action plan," Ms. Blair, it says, "We

22    have been able to locate two former nurse employees who were

23    interviewed in January of 2012, and we hope to have them

24    continue to be cooperative."  Do you see that?

25    A.    Yes.

1  Q.   Do you know who those two nurses were?

2  A.   I don't recall their names.  They were former employees.

3  Q.   And you also go on to say --

4       THE COURT:  Well, what did they tell you?

5       THE WITNESS:  They had conflicting versions of whether

6  or not there was any eye witnesses to the incident for

7  Mrs. Calandro falling out of her wheelchair.  They had gone on

8  to other employment, both nurses.  One nurse said, "I think I

9  made out a report indicating that Mrs. Calandro had fallen and

10 received a contusion to the left side of her head."  The other

11 nurse said, "I never saw that report."  So neither one of them

12 could agree that it was ever memorialized in any kind of a

13 report.

14      THE COURT:  And this was having to do with the fall?

15      THE WITNESS:  Yes.

16 Q.   Did it have to do with anything else, Mary, about whether

17 the facility was understaffed at the time, or whether they had

18 trouble with their supervisor, or anything else that you

19 recall?

20 A.   No.

21      THE COURT:  Did you ever take down witness statements

22 from these nurses?

23      THE WITNESS:  We did not take actual statements, but

24 we did interview both of them.

25      THE COURT:  Did your investigator take notes?

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  And were those turned over?

 3              THE WITNESS:  Those were turned over, uhm, by

 4   Mr. Bistany.

 5              THE COURT:  To whom?

 6              THE WITNESS:  I think to Larry Kenney, defense

 7   counsel.

 8              THE COURT:  Do you know whether they were then

 9   disclosed in any way in the litigation?

10              THE WITNESS:  They were not disclosed.

11              THE COURT:  Whose decision was that?

12              THE WITNESS:  That was a joint decision by myself and

13   Mr. Kenney.

14              MR. HOEY:  It's almost a quarter of my outline, your

15   Honor.

16              THE COURT:  Done.

17              MR. HOEY:  Well, sort of.  A couple more points.

18   Q.   Speaking of, would you please turn to Exhibit 4.

19   A.   4, that's the one I'm already on.

20   Q.   Oh, I'm sorry.  Exhibit 1.

21   A.   1, okay.  Yes.

22   Q.   So is this your note?

23   A.   Yes.  That's my handwriting.

24   Q.   To the file?

25   A.   Yes.
```

1    Q.   Was this note shared with defense counsel, or is it just
2    your note to the file?
3    A.   It's just my note to the file.
4    Q.   Okay.  Can you please go to the third paragraph and read
5    it to the record, please.
6    A.   "As far as the two LPNs are concerned, we do not want to
7    offer them as witnesses because of their conflicting versions
8    and the lack of the incident report and internal investigation
9    report."
10   Q.   The Court had already asked you whether statements were
11   given, and you said "no," but that you interviewed.  Were you
12   part of the interview, or was it just Mr. Bistany?
13   A.   It was just Mr. Bistany.
14   Q.   Was defense counsel present for those interviews?
15   A.   No.
16   Q.   And you were aware that the plaintiff in the case had
17   served interrogatories and requests for production of documents
18   seeking the identification of people who had knowledge of what
19   happened?  You knew that?
20   A.   Yes.
21   Q.   And you mentioned that Mr. Kenney was in agreement with
22   you to not want to offer these two LPNs as witnesses in the
23   case, correct?
24   A.   Yes.
25   Q.   Mary, we're going to go to No. 68.

```
1              MR. HOEY:  Your Honor, I'm not sure that you have it
2     in your book.
3     Q.   Ms. Blair, is there a No. 68 in your book?
4              THE COURT:  Disputed -- is it still disputed?
5              MR. HOEY:  No.
6              THE CLERK:  It came in as 68.
7              THE COURT:  I don't need another one.  I think I've
8     got one here, all right.
9     Q.   Ms. Blair, what is this?
10    A.   It's a training outline from Sedgwick.
11    Q.   Related to what?
12    A.   93A, 176D.
13    Q.   And have you been trained on this subject?
14    A.   Yes.
15    Q.   Is it true that you should have disclosed those witnesses
16    to the plaintiff in the case?
17             MR. DAVID:  Objection.  There's a story here.
18             THE COURT:  Well, then you'll pull it out in your
19    exam.  Should you have, in your view, based on your training?
20             THE WITNESS:  Should I have recognized that?
21             THE COURT:  Yes.
22             THE WITNESS:  Is that the question?
23             THE COURT:  Which page are you on now?  What page?
24    Excuse me.
25             MR. HOEY:  I'm sorry, your Honor.  I had asked her
```

1    whether she was trained in this document, and then she said

2    "yes."  And then I asked her whether the disclosing of the

3    witnesses is something that she should have done.

4            THE COURT:  But is there a page you wanted to direct

5    her to?

6            MR. HOEY:  Not yet.

7            THE COURT:  Oh, I'm sorry.

8    A.   Yes, I was aware.

9    Q.   And so is not disclosing witnesses, is that something

10   that's commonly not done, in your experience?

11           MR. DAVID:  Objection.

12           THE COURT:  Overruled.

13   A.   It's not -- it was done on this case.  Uhm, you're saying

14   commonly done on cases.

15   Q.   Is it commonly done in cases?

16   A.   No.

17   Q.   No, but it was done in this case?  So, Mary, Ms. Blair --

18   I'm going to put a reminder up here.

19   A.   Get a little, like, nameplate.

20   Q.   Mary, Ms. Blair, in your 30 years of being in the

21   business, is the non-disclosing of witnesses that you know are

22   adverse to the insured's position consistent with the training

23   you received by Sedgwick?

24   A.   No.

25   Q.   When you wrote that note, you knew that you were

 1    withholding witnesses at the time?

 2              MR. DAVID:  Objection.

 3              THE COURT:  Overruled.

 4              MR. DAVID:  Your Honor, could I be heard?

 5              THE COURT:  No.  Just what her view is, her

 6    understanding.  Your understanding is that when you jointly

 7    engaged in that decision, did you think it went against your

 8    training?

 9              (Witness pausing.)

10              THE WITNESS:  No.

11    Q.   But, Ms. Blair, what you were doing at that time was, you

12    were making a conscious decision to not offer these witnesses

13    at the time of trial; isn't that true?

14    A.   Yes.

15    Q.   Will you please turn --

16              THE COURT:  Excuse me.  Did plaintiff's attorneys

17    submit interrogatories or other -- well, interrogatories or any

18    deposition questions that asked you for all witnesses with

19    knowledge of the incident?

20              THE WITNESS:  Yes, they did.

21              THE COURT:  So did you understand that you weren't

22    complying with that discovery request?

23              THE WITNESS:  Yes, that I understood.

24              THE COURT:  Then why didn't you?

25              THE WITNESS:  Because it was a mutual decision between

1  defense counsel's advice to me, and I believed that we had

2  reasonable reasons through Larry Kenney that it was not

3  recommended that we should do that as a strategy on this case.

4        THE COURT:  So a decision was made not to respond to a

5  discovery request?

6        THE WITNESS:  That, I don't know if we did not respond

7  or not.

8        THE COURT:  So to your knowledge --

9        THE WITNESS:  Attorney Kenney will know.

10 Q.  Let's move ahead a little bit, Ms. Blair, to Exhibit 50.

11        THE COURT:  Let me ask you this, and it's a little

12 awkward here because you start -- I could take judicial notice

13 of it.  Is it on the docket somewhere in Superior Court, the

14 interrogatory asking for witnesses?

15        MR. HOEY:  It's going to come out in Mr. Kenney's

16 testimony, but the docket entries would be that there was an

17 extension to the discovery moved to February of 2014 for them

18 to answer interrogatories and respond to certain requests for

19 production of documents.  They never did --

20        THE COURT:  No, you're not listening to my question.

21 My question is, was there a specific question in the

22 interrogatories or in a deposition asking for the names of any

23 percipient witness?

24        MR. HOEY:  People with knowledge, yes, there is.

25        THE COURT:  People with knowledge.  I would like that.

```
 1          MR. HOEY:  Yes, I believe we have it.

 2          THE COURT:  Not this second, but I would like that.

 3          MR. HOEY:  Well, we have it.  I can hand it up.  All

 4     the interrogatories are here and all the defendants except

 5     Dr. Wahl.

 6          THE COURT:  I'm biting off more than I --

 7          MR. DAVID:  Are there responses in there?

 8          MR. HOEY:  He did not respond to the --

 9          THE COURT:  Excuse me.  Are the responses in here?

10          MR. HOEY:  No.  There wasn't --

11          THE COURT:  I tell you what, I don't need to take them

12     now.  I'm not going to read them now.  I'm listening to her.

13     Why don't you prepare a packet for me.

14          MR. DAVID:  Mr. Kenney objected to answering

15     interrogatories because they were served late under Superior

16     Court Rule 30.  He objected to every one of them.  They never

17     moved to compel answers.  That's the reason.  Nothing was -- no

18     interrogatories were answered.

19          MR. HOEY:  Your Honor, we did move to compel, and we

20     got an extension to the discovery to February of 2014 so they

21     could be done.  That's what the documents --

22          THE COURT:  Were they ever answered?

23          MR. HOEY:  No.

24          THE COURT:  Did you not move to compel again?  The

25     answer is "no," all right, so it leaves it --
```

```
 1              MR. HOEY:  Your Honor, the answer is "I don't recall."
 2              THE COURT:  All right, so check it out.  Check it out.
 3   Q.   Okay, Ms. Blair, can we go to Exhibit 50.
 4   A.   Yes, I have that.
 5   Q.   And this is a letter that I wrote to Larry Kenney dated
 6   April 8 of 2014.  Do you see that?
 7   A.   Yes.
 8   Q.   Did you forward this letter -- well, first of all, did
 9   Mr. Kenney forward this letter to you?
10   A.   Yes.
11   Q.   Okay.  Did you forward this letter off to Hartford?
12              (Witness examining document.)
13   A.   I don't think so.
14   Q.   Did you forward this letter to anyone in Sedgwick's
15   organization?
16   A.   No.
17   Q.   If you go to the second paragraph, the last sentence --
18              THE COURT:  So when it says -- all right, go ahead, go
19   ahead.  I'm just asking, when it says "Low joint offer of
20   $275,000," was that $250,000 from the doctor and the rest from
21   you?
22              THE WITNESS:  Uhm, well, I contributed $125,000, and
23   the doctor's carrier put in, it would be $150,000, for a global
24   offer of $275,000.
25              THE COURT:  And this is after you decided you were
```

 1   liable?

 2          THE WITNESS:  Yes.

 3   Q.   Towards the bottom, Mary, it says, "Leads me to believe

 4   that the adjusters here may not have all the information or

 5   have not fully investigated these claims and the possible

 6   outcome, and their offers may amount to unfair settlement

 7   practices in violation of Chapter 176D and 93A.  I don't want

 8   to have to do this because," right, I say, "This is not

 9   something I wish to pursue since I value my relationship with

10   you and Mary, but I will certainly do it against Joe Pacheco,

11   which will then leave me no choice but to include Sedgwick."

12          And you did not forward this letter to anyone within

13   the Sedgwick organization at that time?

14   A.   I did not.

15          THE COURT:  Did you send it to Hartford?

16          THE WITNESS:  No.

17          THE COURT:  Why?

18          THE WITNESS:  Uhm, I think at the time I was

19   considering trying to get something definite as far as

20   negotiating, and this letter came in, and that's how the

21   negotiations were going with plaintiff's counsel.

22          THE COURT:  By that point, had you received the value

23   of the case was $300,000 to $500,000?

24          THE WITNESS:  Yes.

25          THE COURT:  So why didn't you just offer what you

1    thought the value of the case was, the $300,000, and then --

2              THE WITNESS:  I think prior to this letter, the

3    $500,000 demand was taken off the table.

4              THE COURT:  But you thought the value of the case was

5    between $300,000 and $500,000?

6              THE WITNESS:  A verdict value, yes, and that

7    included --

8              THE COURT:  You knew you were liable.

9              THE WITNESS:  Yes.

10             THE COURT:  So why didn't you offer the $300,000?

11             THE WITNESS:  Because I thought that also half of that

12   should have gone to the codefendant.

13             THE COURT:  That's a different issue, but why wasn't

14   there a global offer of $300,000?

15             THE WITNESS:  Uhm, I believe the $275,000 was the

16   closest that we came to negotiating it.  We didn't put out a

17   $300,000 offer because we got no feedback that it was rejected.

18             THE COURT:  You got the feedback it was rejected?

19             THE WITNESS:  Yes.

20             THE COURT:  The $275,000?

21             THE WITNESS:  Right.

22             THE COURT:  So then why didn't you offer more?

23             THE WITNESS:  Because in the meantime, I believe that

24   the plaintiff's counsel was negotiating separately with the

25   doctor, and they settled for $250,000.

1          THE COURT:  I see, so at that point --

2          THE WITNESS:  And the doctor -- you know, my

3     contribution then meant really nothing because it was a

4     contribution.  Now I'm off on my own, and that's when I -- you

5     know, we tried to get another offer out, but it wasn't as of

6     April 8.

7     Q.   Ms. Blair, when did you learn about how much the doctor

8     settled for?

9     A.   Uhm, it was confidential, and we learned about it, I

10    think, in July.

11    Q.   Not until July?

12    A.   Right.

13    Q.   So in April you had no idea what the doctor was

14    negotiating, or May or June?

15    A.   Yeah.

16    Q.   But the letter does reflect, to your recollection, that

17    the plaintiff's demand was a onetime demand of $500,000 at the

18    time of Dr. Wahl's deposition, which was months prior?

19    A.   You acknowledged the $500,000 was the onetime.

20    Q.   Well, since we're on Exhibit 50, you can jump to the end,

21    and this letter is dated April 8 of 2014, the second-to-last

22    paragraph where it says, "Therefore, I must make this same

23    $1 million demand on your clients."  So now I have on behalf of

24    the plaintiff offered the policy demand, correct?

25    A.   Yes, to -- to me.

1   Q.   And did you relay that policy demand to Hartford?

2   A.   No.

3   Q.   Did you relay that policy demand to the insureds, Radius

4   Healthcare?

5   A.   No.

6   Q.   Now, Ms. Blair, do you recall --

7        THE COURT:  Is that your usual practice, not to tell

8   people about a letter like this?

9        THE WITNESS:  No, it's not.

10        THE COURT:  So why did you do it here?

11        THE WITNESS:  Here I think it was -- the case was

12   moving at such an odd speed with two defendants who aren't

13   really communicating well with us, and two different

14   plaintiff's attorneys, Mr. Hoey and Mr. Sobczak, that it seems

15   that it was moving along enough at the time that we thought

16   that $1 million demand was going to -- was to both parties and

17   would be -- we'd continue then to negotiate.  I at the time did

18   not even feel that this was a case of $1 million.

19   Q.   Ms. Blair, do you know why I demanded the policy of

20   $1 million at this point in time, April 8 of 2014?

21   A.   No.

22   Q.   Had anything changed in the case?  Was any new information

23   provided to the plaintiff's counsel that you know of that would

24   have made this demand go from $500,000 to $1 million?  Do you

25   recall?

1  A.    No.

2  Q.    Do you recall the date in which you through counsel, Larry

3  Kenney, provided the plaintiff with a complete copy of the

4  insurance policy for this case revealing that there was

5  $1 million of coverage?

6  A.    I don't know the date.

7         MR. HOEY:  May I approach, your Honor?

8         THE COURT:  Yes.

9  Q.    Take a moment to read that.

10         (Witness examining document.)

11  Q.    Ms. Blair, does that help you refresh your recollection as

12  to when the insurance policy disclosing $1 million of coverage

13  was produced to the plaintiff in this case?

14  A.    Yes.  It's April 4, 2014.

15  Q.    And April 4 of 2014 is when the plaintiff first received a

16  copy of the insurance policy with the policy limits of

17  $1 million, correct?

18  A.    Yes.

19  Q.    Okay.  And then it's April 8, just four days later, that

20  the plaintiff now makes the demand for the $1 million policy,

21  correct?

22  A.    Yes.

23  Q.    Okay, can we please move to Exhibit No. 71, and 71 is two

24  sheets of paper.  It's an email exchange.  And let me know if

25  you only have one.

```
 1    A.    Yes, there is only one.

 2    Q.    Only one there?  Okay.  Let me just for a second for

 3    purposes of examination --

 4    A.    Oh, under this one?  Oh, sorry.  Good, there's nothing

 5    there, okay.

 6              (Discussion off the record.)

 7              MR. HOEY:  Your Honor, since I referenced the letter

 8    to refresh her recollection, may I mark it for identification

 9    purposes?

10              THE WITNESS:  71.

11              THE CLERK:  A.

12              (Exhibit A marked for identification.)

13    Q.    And, Ms. Blair, the letter for identification A was a

14    letter of April 4 of 2014 to Mr. Kenney from plaintiff's

15    counsel:  "Please find enclosed a copy of the policy that you

16    requested."  And this resembled when the plaintiff first

17    received a copy of the policy and its policy limits.

18         Okay, I'm sorry, back to Exhibit No. 71.  This is an email

19    communication from you to Paul Kemp, correct?

20    A.    Yes.

21    Q.    And if I recall, Paul Kemp was the insurer, someone from

22    the insured, Radius management?

23    A.    Yes.

24    Q.    And you're providing him with I guess a financial report

25    on six cases that were pending?
```

1    A.    Yes.

2    Q.    And talking about whether they had to pay a deductible or

3    what have you?

4    A.    Correct.

5    Q.    Okay.  Now, turning to the next page of Exhibit No. 71,

6    can you please read the second sentence for us.  It starts with

7    "liability."

8    A.    "Liability is problematic, and we have estimated exposure

9    of $250,000 to each defendant."

10   Q.    The next sentence.

11   A.    "We are attempting to get plaintiff to agree to mediation

12   and settle the case before prolonged litigation."

13   Q.    Now, Ms. Blair, a couple questions here.

14          THE COURT:  What was the date of this memo?

15          MR. HOEY:  That was my next question.  It's a

16   continuation from December 20, 2013, December 20 of 2013.

17   Q.    So as of December 20 of 2013, you're informing the insured

18   in this case that liability is problematic, correct?

19   A.    Yes.

20   Q.    Okay.  And you're telling the insured that you are

21   attempting to get plaintiff to agree to mediation.  When was

22   the plaintiff ever asked to go to mediation?

23   A.    They didn't ask.

24   Q.    But you told the insurer that you were trying to get the

25   plaintiff to go to mediation.  When was the plaintiff ever

1   invited to mediation on the Calandro case?

2   A.   I -- I didn't invite them.  Sorry.

3   Q.   Do you know if Mr. Kenney did?

4   A.   Uhm, I don't believe he did.

5   Q.   And as of December of 2013 when you're communicating with

6   Radius and you mentioned that you believe you have exposure of

7   $250,000, you didn't make an offer at that time, did you?

8   A.   No, I did not.

9   Q.   Will you please turn to Exhibit No. 23.  And, I'm sorry,

10  Ms. Blair.  I'm going to put that one back in the binder.

11  A.   Right, so this one's empty.

12  Q.   23.

13  A.   I have 23 here.  Now we're back in January, 2014.

14  Q.   We're into the new year now.  So here is where you

15  expressed that there's a global offer to settle for $500,000.

16  "We're still at the table.  The codefendant reached out.

17  You're to determine your willingness to jointly resolve this

18  matter."  Is that what this email exchange is about?

19  A.   Yes.

20  Q.   And down the bottom is an email from Larry Kenney to Joe

21  Pacheco.

22          MR. HOEY:  Just so the Court knows, Joe Pacheco was

23  the claims adjuster for Dr. Wahl.

24  Q.   And here Mr. Kenney is saying, and you're copied on it,

25  "So we would be willing to contribute up to $200K if necessary

1    but would prefer to start at something lower and see what

2    Hoey's response is."  Do you say that?

3    A.    Yes.

4    Q.    Was that a directive by you, or was that a directive by

5    Mr. Kenney?

6    A.    By Mr. Kenney.

7    Q.    If we go back up, Joe Pacheco is communicating with

8    Mr. Kenney again on January 30 of 2014.  You're cc'd on the

9    email.  The last sentence:  "I was thinking of a joint 300K

10   offer ($150K apiece) and see what David does."  Do you see

11   that?

12   A.    Yes.

13   Q.    Were you part of that decision?

14   A.    Uhm, let's see.

15         (Witness examining document.)

16   Q.    I know you're cc'd on the email.

17   A.    Yeah, I'm cc'd on it.  It's at a time when I was, uhm --

18   had just returned from some deaths in my family, and, uhm, I

19   was cc'd in.  I think it's, uhm -- as far as this message, I'm

20   in agreement with it with Larry Kenney, yes.

21   Q.    Did you have any discussions with Joe Pacheco, or was that

22   all through Larry?

23   A.    No.  I did speak with Joe.

24   Q.    Before or after he resolved the case with Dr. Wahl?

25   A.    Before.

1    Q.    And what was that about?

2    A.    He'd phoned me and indicated that they were looking at the

3    case.  They were going to evaluate it, and they wanted to know

4    if I was interested in contributing towards a settlement, a

5    global settlement.

6    Q.    And you agreed?

7    A.    I said, "Yes, I am interested, but first of all, let's

8    evaluate the -- what's your evaluation of this, of the damages

9    and the liability?  Let's get to a figure that will -- to see

10   if we agree on it."

11         And we did discuss it, and it was determined that we both

12   felt it could be a verdict value in the amount of $350,000 --

13   no, $300,000 to $500,000, and we agreed on it.  And I said,

14   "Okay, we're in agreement on this.  Let's continue and make an

15   offer."

16   Q.    Okay.  And that offer was a joint offer of only $275,000?

17   A.    That was our first offer, yes.

18   Q.    Off a $500,000 line-in-the-sand demand?

19   A.    Yes.

20   Q.    Can we please turn to Exhibit No. 52.

21         THE COURT:  So at that point, though, the suggestion

22   was a $300,000 offer, and at some point later the decision was

23   made to reduce that?

24         THE WITNESS:  We were trying not to reduce it but to

25   negotiate it.  You just don't put out a figure:  "You want

1    $500,000?  Okay, here it is."  We still --

2         THE COURT:  Then you say $275,000, and they don't

3    accept it, and then it just dies?

4         THE WITNESS:  I don't think we knew immediately, your

5    Honor, that they didn't accept it, but plaintiff's counsel can

6    speak to that.

7         THE COURT:  Well, at some point, though, you just

8    never -- you thought it was worth $300,000.  You never went

9    from the $275,000 to the $300,000 at that point in time?

10        THE WITNESS:  Correct.

11   Q.   Can we move to Exhibit No. 52.

12        THE COURT:  At that point -- let me just ask

13   counsel -- is there anything in the record that would show a

14   counter at that point in time?

15        MR. HOEY:  The letter explains the history of that,

16   April 8, 2014.

17        THE COURT:  All right, so that's what you would say.

18   So that's several months later.

19        MR. HOEY:  Over 90 days later.

20   A.   I have Exhibit 52 here.

21   Q.   So this is just to confirm that -- in the body of that

22   middle paragraph where it starts out "Joe," it says, "I have

23   discussed.  She is willing to go 50/50."  The "she" is

24   referring to you?

25   A.   Yes.

```
 1   Q.   Okay.  And at that time 50 would have been $250,000 each
 2   for a total of $500,000, correct?
 3   A.   Yes.
 4   Q.   But instead, as I just noted to your Honor, the plaintiff
 5   received a $275,000 joint offer 90 days after the $500,000
 6   demand was made, and you --
 7            THE COURT:  I've lost you in the math on this.  Where
 8   does it say $250,000 each?
 9            MR. HOEY:  She says 50/50, "She is willing to go 50/50
10   on this."  And I said, "At that time the $500,000 demand was on
11   the table?"  And she said "yes."  And I said, "That would be
12   $250,000 each?"
13            THE COURT:  If they went with the demand.
14            MR. HOEY:  That's right.
15            THE COURT:  But if she wanted to negotiate lower, it
16   would be 50/50 of whatever they wanted to negotiate lower.  Is
17   that right?
18            MR. HOEY:  That was their choice.
19   Q.   Mary, Ms. Blair, can we please move to Exhibit No. 51.
20   A.   Yes, I have it.
21   Q.   And if we go to Paragraph 5.  First of all, what's the
22   date of this?  Is it February 7 of 2014?
23   A.   Yes.
24   Q.   Okay.  And going to Paragraph 5 -- they're numbered.
25   A.   "Defenses and potential liability."
```

1   Q.   Yes.

2   A.   Yes.

3   Q.   Here Mr. Kenney acknowledges that "Defending this case on

4   liability will be very difficult."  Do you see that?

5   A.   Yes.

6   Q.   And you agreed with that?

7   A.   Yes.

8   Q.   It was also reported that the anticipated verdict -- and

9   your Honor had already asked this question, but it's confirmed

10  in here -- that an anticipated verdict of $300,000 to $500,000

11  under defense counsel's analysis is what the exposure could be,

12  correct?

13  A.   For a verdict, yes.

14  Q.   That was in Paragraph 8.  But he also did mention that the

15  verdict bears approximately 35 percent interest; thereby, a

16  verdict would be somewhere between $500,000 and $700,000 when

17  you add in the interest, correct?

18  A.   Yes.

19  Q.   But at no time was $500,000 ever offered, was it?

20  A.   That's correct.

21  Q.   And at no time was $600,000 or $700,000 offered either?

22  A.   That's correct.

23  Q.   And at this point in time, when defense counsel gave you

24  the analysis of the verdict range, not calculating the interest

25  but telling you that interest would be calculated, and telling

2-62

1  you that defending this case on liability would be very

2  difficult, you didn't request additional authority at this

3  time, did you?

4  A.   No, I didn't.

5  Q.   Can we please move to Exhibit 50, I believe, which we've

6  already gone over maybe.

7         MR. HOEY:  Can I have one moment, your Honor?

8         THE COURT:  Did you send this to Hartford, this

9  letter?

10        THE WITNESS:  Yes.

11        THE COURT:  So this letter was sent to Hartford at

12 this point?

13        THE WITNESS:  I believe, it was, yes.

14        THE COURT:  On February 7?

15        THE WITNESS:  This letter, by the way, was for a trial

16 on June 3, which got bumped, I guess.

17 Q.   And we've already gone over Exhibit No. 50, so --

18 A.   Right, that's the April 8.

19 Q.   So can we go to Exhibit No. 32, please, Exhibit 32.  Let

20 me know when you have it.

21 A.   Okay, I have that, July 8.

22 Q.   So this is an email exchange between Becky Shingleton and

23 yourself, correct?

24 A.   Yes.

25 Q.   And the top is Becky Shingleton's response, but if you go

1   down below, it says "July 17, 2014 trial -- reserve/settlement

2   authority."

3       I just want to ask you a question:  What did you initially

4   reserve this case for?

5   A.   $85,000 indemnity.

6   Q.   $85,000 you initially reserved this case for, even though

7   you had authority up to $125,000 on any nursing home case by

8   Hartford, correct?

9   A.   Yes, that's correct.

10  Q.   Going to Page 2 of your email, the last sentence, will you

11  please read that to the Court.

12  A.   "Therefore I recommend posting a reserve of $350,000 and

13  proceeding to the court conference this Wednesday with $300,000

14  in authority to attempt settlement.  Let's see what plaintiff

15  will do."

16  Q.   So at this point you go and get more authority?

17  A.   Yes.

18  Q.   All right, this is now July 8 of 2014.  You get more

19  authority on behalf of the insured because at this point in

20  time Dr. Wahl is out of the case?

21  A.   Yes.

22  Q.   Did you ever offer $300,000 to the plaintiffs in this

23  case?

24  A.   No.

25  Q.   Did you ever offer $350,000 to the plaintiffs in this

1  case?

2  A.   No.

3          THE COURT:  To your knowledge, did Mr. Kenney ever

4  offer this amount?

5          THE WITNESS:  He offered $250,000.  And my discussions

6  with him were, at least, you know, start negotiations with

7  plaintiff's counsel and leave the door open, you know, to go up

8  to $300,000, $350,000.

9          THE COURT:  You're saying, at this settlement

10 conference, you told Kenney to go to $250,000?

11         THE WITNESS:  Uhm, he wasn't at the settlement

12 conference.  When I got the authority up to $300,000, I told

13 Larry Kenney to contact -- it was easier, you know, for him to

14 negotiate directly, and contact Attorney Hoey and make an offer

15 starting at $250,000 to settle.  But I said to Larry, "Don't

16 shut the door.  If they're willing to go, you know, a little

17 bit higher, then we'll do that," meaning another $50,000 would

18 have brought us into the low end, the $300,000.

19         THE COURT:  At that point you thought your exposure

20 was $700,000?

21         THE WITNESS:  Uhm, it could be with the interest put

22 onto it.

23 Q.   Now, Ms. Blair, at some point there was a couple court

24 hearings prior to the trial day, and then there was a day to

25 select the jury.  And do you recall that you chose not to come

1    to one of those hearing days right before the trial?  Do you

2    recall that?

3    A.    I -- I recall, uhm, was at the pretrial, correct.

4    Q.    Okay.  And do you recall the reason why you didn't want to

5    attend that final pretrial conference?

6    A.    Yes.  There came two reasons.  First of all, Larry Kenney

7    was not going in that day.  I think an associate went in.  And

8    I thought, you know, if Larry was there, I might have gone with

9    him.  However, it was pretty obvious to me that you -- well,

10   plaintiff's counsel should do this through defense counsel.

11   Q.    But do you recall that the real reason why you didn't

12   attend either one of the two final pretrial trial conferences

13   was that you were "not going to attend tomorrow's motion

14   hearing or the impanelment.  I do not want to be available with

15   settlement authority until after the trial starts"?  Do you

16   remember that?

17   A.    Yes.

18   Q.    And you in fact put that into an email communication to

19   Becky Shingleton, did you not?

20   A.    Yes.

21          (Witness examining document.)

22   Q.    So you just testified to an email communication that you

23   had with Becky Shingleton.  What's the date of that?

24   A.    July 15.

25   Q.    Okay.  And that's you to Becky?

1    A.    Yes.

2    Q.    Can I see it.

3          MR. HOEY:  Your Honor, I'd like to move this into

4    evidence as the next exhibit.  It's --

5          (Document given to defense counsel.)

6          MR. DAVID:  I have no objection if the attachments are

7    included.

8          MR. HOEY:  Okay, that's fine.  There's no objection,

9    your Honor.

10          THE COURT:  So what exhibit is this?

11          THE CLERK:  It will be 72.

12          (Exhibit 72 received in evidence.)

13          THE COURT:  And what is it here in my --

14          MR. HOEY:  It's not.  So my explanation is that it was

15    part of the summary judgment record and attached there.  It

16    just never made it over to the book.

17          THE COURT:  All right.  Well, he's not objecting as

18    long as the whole thing goes in.

19          MR. DAVID:  There are four or five attachments that

20    were on it.

21          THE COURT:  Well, I'm not going to sit and read it

22    now, so you'll flip it up on the screen to the extent --

23    Q.    So can you please read into the record the highlighted

24    part, please.

25    A.    "I am not going to attend tomorrow's motion hearing or the

1    impaneling, but I will, however, attend the trial.  Settlement

2    authority, do I still have $250,000 until the trial starts?"

3    Q.   Right before that, you left out "I do not want to be

4    available with settlement authority."

5    A.   Oh, I thought you said read the highlighted part.  Okay.

6    Q.   I read that correctly, right?  "I do not want to be

7    available with settlement authority"?

8    A.   No, I don't see it.  I'm sure it's there, but --

9    Q.   Do you see where it says, "I still have $250K?"

10   A.   "Do I still have $250K until after the trial starts."

11   Q.   Right, so the sentence before that, what does that say?

12   A.   "I am not going to attend tomorrow's motion hearing or the

13   impaneling."

14   Q.   All right, keep going.

15   A.   "But I will, however, attend the trial proceedings."

16   Q.   Okay, keep going.

17   A.   I'm just having trouble reading this.  "Plaintiff's

18   counsel has known me for many years, and I do not want to be

19   available with defendant -- with --"

20   Q.   Does it say "settlement authority"?  Is that better?  Zoom

21   in on this a little bit more.  Just two words.

22            (Witness examining document.)

23            THE COURT:  Is your screen not working?

24            THE WITNESS:  No.  It's moving back and forth here.

25            MR. HOEY:  May I approach?  I can help make it --

1          THE COURT:  Yes.

2    Q.    Right here, these two words, the words right here.

3    A.    Right, "Plaintiff's counsel has known me for many years,

4    and I do not want to be available --"

5          THE COURT:  Stop moving it.

6    A.    "-- with settlement authority," and then parentheses, "Do

7    I have $250,000?) until after the trial starts?"

8    Q.    So you did not want to make yourself available to me at

9    the hearing with settlement authority that day?

10   A.    That's right.

11   Q.    Why?

12   A.    I didn't feel at that point in the proceedings that I

13   should be coming forward.  I think it should have been done by

14   Attorney Kenney.

15   Q.    Any other reason --

16   A.    Most plaintiff counsel don't want to bother with us

17   adjusters, and I thought your relationship with Attorney Kenney

18   and his with you would be more profitable, and --

19         THE COURT:  Had you at that point offered the

20   $250,000?

21         THE WITNESS:  Yes.

22         THE COURT:  So you'd already offered $250,000?

23         THE WITNESS:  Yes.

24         THE COURT:  So what would have been the big deal?  I

25   guess I'm not understanding why you -- if you already offered

1    the $250,000 and you had $250,000 settlement authority --

2              THE WITNESS:  Right, and they hadn't said, "No, we

3    won't take the $250,000."  They gave us -- we gave them the

4    figure.  They didn't come back with anything.  And he wouldn't

5    have taken $300,000 at that point.

6              THE COURT:  Well, all right, so now that's what -- so

7    at that point you had $300,000 in authority --

8              THE WITNESS:  Right.

9              THE COURT:  -- and you didn't want to feel pressured

10   into giving it up before trial?  Was that basically it?

11             THE WITNESS:  That's correct.

12             THE COURT:  All right, so it's that difference between

13   the $250,000 and the $300,000 you were worried about?

14             THE WITNESS:  Yes.

15   Q.   Ms. Blair, are you sure that $250,000 offer was made?

16   A.   Yes.

17   Q.   You are?  How are you sure about that?

18   A.   I was told by Attorney Larry Kenney.

19   Q.   Do you have it in writing?

20   A.   Do I have it in writing what?

21   Q.   That $250,000 was made to plaintiff's counsel?

22             THE COURT:  Made by.  No, you're right, made to.

23   A.   Made to.  Yes, I have some notes in the file.

24   Q.   You do?

25             THE COURT:  Could you show them?

1   Q.   Yes, can you show them?  Do you know where they are?

2   A.   Uhm, it would be probably in the book.

3   Q.   Well, maybe Mr. David could bring those up to you during

4   cross-examination.

5   A.   Okay.

6   Q.   Anyhow, we're going to move to --

7           THE COURT:  Well, let me ask you this:  To the best of

8   your memory, somewhere in your claims file is the notation that

9   the $250,000 offer was made?

10          THE WITNESS:  Yes.

11          THE COURT:  And it's in your handwriting?

12          THE WITNESS:  It's in my handwriting.

13          THE COURT:  Do you have what you think is --

14          MS. HORNE:  Yes.  It's Exhibit 35.

15          THE COURT:  Okay.

16  Q.   Okay, Exhibit 35, these are your notes?

17  A.   Yes.

18  Q.   Okay.  And across the top, 7/16/2014, you write "Corporate

19  greed"?

20  A.   Yes.

21  Q.   What did you mean by that?

22  A.   Well, this was in relation to a telephone call received on

23  the 16th from defense counsel.  It was different things that

24  were I believe discussed or came across during that day when

25  they were impaneling.

1    Q.   The next thing says "13 jurors, 11 female"?

2    A.   Yes.

3    Q.   That was the makeup of the jury, if you recall?

4    A.   Yes.

5    Q.   The next says "No strikes by defense counsel"?

6    A.   Right.

7    Q.   So your recollection is that defense counsel made no

8    strikes.  You also recall that he made no peremptory challenges

9    as well?

10   A.   I didn't address that.  I don't know.

11   Q.   The next says "$250K Dr. Wahl."  Then the next says

12   "$250K plus offer"?  What does that mean?

13   A.   Uhm, "$250K plus" means that we offered $250,000,

14   Attorney Kenney had offered $250,000 with the understanding

15   that, uhm, if it took more or we could agree on something, we

16   would go higher.

17            THE COURT:  So he made that offer on that day?  Is

18   that it?

19            THE WITNESS:  I don't -- I think it was before then.

20            THE COURT:  Do you know?

21            THE WITNESS:  I don't know the day, but he would know.

22            THE COURT:  So the best of your knowledge, at least by

23   July 16, after impanelment, the day of impanelment, he had made

24   a $250,000?

25            THE WITNESS:  Yes.

1    THE COURT:  And other than that, you don't know when
2    it was made?
3    THE WITNESS:  No, I don't.
4    Q.   Other than making that note, do you have anything else as
5    to whether Mr. Kenney made a $250,000 offer to the plaintiffs
6    slightly before this date or on this date?
7    A.   No.
8    Q.   All right.  Now, I guess the rest of the note the 17th,
9    these are just notes of your observation at the trial or
10   something?
11   A.   Yes.
12   Q.   Okay, opening statement and some other things?
13   A.   Yes.
14   Q.   Let's go back to that day, the days that we did jury
15   selection.  Do you remember that a little bit?
16   A.   I wasn't there.
17   Q.   Okay.  How about the first day of trial right before
18   opening statements?
19   A.   Yes, I was there.
20   Q.   Okay.  And you recall Mr. Kenney and I stepped out for a
21   moment before we started the trial?  Do you recall that?
22   A.   No.  I can't remember back that specific thing.
23   Q.   Assume for a moment that Mr. Kenney and I had a
24   conversation in the hallway in which Mr. Kenney said, "What if
25   I can get you $250,000, would that settle the case?" and then

```
 1   says, "If you're looking for $500,000 or more, forget it,"
 2   would that be against your directives to Mr. Kenney in making a
 3   $250,000 offer?
 4            MR. DAVID:  Objection.
 5            THE COURT:  I'll take it as a hypothetical because
 6   that cannot come in as evidence.
 7            MR. DAVID:  If there's some good-faith basis to
 8   believe that there is going to be that evidence, fine, but I --
 9            THE COURT:  I don't know what Mr. Kenney is going to
10   say, since he would be the only other witness, other than
11   Mr. Hoey who cannot be a witness in this case.
12   Q.   Well, let me do it this way:  Do you remember or recall at
13   all any conversation or any time in which Mr. Kenney and I met
14   in the hallway moments before opening statements occurred?
15   A.   At this time, I do not.
16            THE COURT:  Does it ring a bell?
17            THE WITNESS:  Right, I can't -- 2014 was three years
18   ago.
19            THE COURT:  I understand that.  So to the best of your
20   knowledge, as you look at these notes refreshed by here, the
21   offer was made on or about July 16?  Does that sound right?
22            THE WITNESS:  It was I think a few days more, but just
23   confirming it on that day.
24            THE COURT:  Do you have a memory, or are you guessing?
25            THE WITNESS:  No, that's -- I don't have a memory of
```

1  the date.

2           THE COURT:  Okay, so it was on or about July 16, 2014?

3           THE WITNESS:  Right.

4           THE COURT:  And you don't know the exact date.  Is

5  that a fair statement?

6           THE WITNESS:  Yes, your Honor.

7  Q.   Please move to Exhibit No. 45.

8  A.   I have it, October 12, 2011.

9  Q.   This is an email from you to -- oh, Bistany Investigation

10 Services, Kathy.  That's Larry Kenney's secretary?

11 A.   Yes.

12 Q.   And who's Kathy Luta?

13 A.   She is the agent for Sullivan Insurance who wrote Radius

14 policies.

15 Q.   Like the broker?

16 A.   Yes, it would be a broker.

17          THE COURT:  Let me ask you, how much longer do you

18 think you have?

19          MR. HOEY:  I think this was...five, ten minutes.

20          THE COURT:  I'd love to finish the direct -- and I'll

21 try to keep quiet -- and then take our break at that point so

22 you can sort of prepare yourself for -- your attorney comes

23 next.  Does that make some sense?  Or do you need a break now?

24 I don't really feel strongly.

25          THE WITNESS:  I'm fine, your Honor.

1          THE COURT:  Okay, I'd like to finish this piece of it,

2     and then it will be Mr. David's turn.

3          MR. HOEY:  That's fine.  Thank you.

4     Q.   Exhibit No. 45, in here you say, "I'm not sure if you

5     meant this is the case he previously asked us to accept service

6     on or he asked if we would accept service again.  In any event,

7     he continues to name Roush, et cetera, in spite of all your

8     attempts to educate him.  He will never change, and because of

9     this, I will NEVER," capital letters, bolded, increased text

10    size, "authorize accepting service for his offer."

11         Why is that?

12    A.   Because I was not authorized to accept service.  And over

13    the years, you had targeted Radius, I guess, and we kept

14    telling you, you know, who they were.  So Larry had come to me

15    because I guess you had asked him -- that was our first

16    notice -- you asked him to accept service, and naturally Larry

17    came back to me and said, "Do you want me to accept service?"

18    I said, "No.  We don't have authorization."

19    Q.   You said "never."  Well, but your basis was, "He continues

20    to name Roush, et cetera, in spite of all the attempts."

21         Mary, who is the number one insured in the insurance

22    policy that you were handling in this case?

23    A.   Isn't it Radius Management Services?

24    Q.   Maybe it is.  And who's the additional insured?

25    A.   Oh, additional insured?  That's different.  There's a

1   number of different --

2   Q.   Is Roush Associates the additional insured in the

3   insurance policy?

4   A.   I believe that they were.

5   Q.   So then how is it that I was naming the wrong party, in

6   your opinion, if they're the number one insured under the

7   policy?  What was the real basis, Mary, for you not wanting

8   to -- well, to never accept service from me on any of my cases?

9   A.   Uhm, I don't have authority to accept -- to tell you that

10  we can accept service.  It has to go to Radius or Roush.

11  Q.   That's not what it says.  It says, "I will never authorize

12  accepting service."  It doesn't say you didn't have the

13  authority.  So what's the real reason why you --

14  A.   That's the reason.

15  Q.   That's not what it says, though, is that correct?  It says

16  something different:  "I will never authorize accepting

17  service."  That implies you had the authority to accept

18  service, but you chose not to because it was me.  Why?

19  A.   That's not what I said.  You're -- oh, I'm sorry.  What?

20  Q.   You don't have an answer?

21  A.   What was the question?

22  Q.   Why?

23  A.   Why wouldn't I what?

24        MR. DAVID:  Your Honor, that's been asked several

25  times.

```
 1            THE WITNESS:  Yeah.
 2            THE COURT:  Let's just finish this up.
 3    Q.   Exhibit 11.
 4    A.   Memo of October 14, 2011.
 5    Q.   Yes.  The second paragraph, the case:  "The first notice
 6    was received on 10/12/2011 from the Law Office of David Hoey,
 7    who is well known in Massachusetts for trying to ring the bell
 8    on nursing home cases and to date has been unsuccessful."
 9         Did you write that?
10    A.   Yes.
11    Q.   Okay, so you knew, in my pursuit of nursing home cases for
12    over 20 years, that I was eventually going to ring the bell?
13    You knew that in part of your evaluation of this case, right?
14    A.   It had nothing to do with the evaluation of the case.
15    Q.   Well, that's what I'm asking you.  Did it have anything to
16    do with the evaluation of the case?
17    A.   No.
18    Q.   What did it have to do with then?
19    A.   Just informing The Hartford representative of who
20    plaintiff's counsel was on this.  They have no idea.  We always
21    try to give them some idea of why the plaintiffs are --
22    Q.   Are you sure Hartford didn't know who I was?
23    A.   Maybe they did, but Brian Karpe didn't.
24    Q.   Exhibit No. 57.
25            THE COURT:  Can I ask, just backtracking, at what
```

 1    point did Hartford authorize you to go up to $300,000?  What

 2    was the date, do you remember?

 3          THE WITNESS:  I don't know the date, but it's in --

 4    it's in an email from Hartford.

 5          THE COURT:  That was the first time from that email

 6    that you'd gotten any formal authorization?

 7          THE WITNESS:  Yes.

 8          THE COURT:  That email, you would agree that was when

 9    you got it?

10          THE WITNESS:  Yes.

11    Q.   Exhibit No. 57, let me know when you're there.

12    A.   It's an email from The Hartford of July 23.

13    Q.   Okay, that's an email to you?

14    A.   Yes.

15    Q.   All right, we're going to go to the second paragraph under

16    you, your email to Becky, July 23, 2014.  Do you see that?

17    A.   Yes.

18    Q.   Okay.  The second paragraph, fourth line down, the line

19    starts "Much."

20    A.   "Much time and expenses --"

21    Q.   "-- he wants to put into pursuing the judgment over the

22    policy limits."  You underlined "time" and you underlined

23    "expenses," right?  That was you?  You did that?

24    A.   Yes, yes.

25    Q.   Okay.  And this is post-verdict?

1   A.    Uhm, yes, the 23rd.

2   Q.    So in this discussion, you're talking about whether the

3   plaintiff will take $1 million; and you believe the plaintiff

4   would take $1 million post-verdict because "it will take too

5   much time and expenses he wants to put into pursuing a judgment

6   on policy limits," right?

7   A.    That's what it says.

8   Q.    That's what you thought at the time?

9   A.    Yes.

10  Q.    And you're aware after doing 30 years of this, Ms. Blair,

11  that if a plaintiff lawyer demands the policy limits and the

12  policy limits are not tendered to the plaintiffs, and the

13  plaintiff obtains an excess verdict over the policy limits,

14  that under Massachusetts law, the insurance carrier is on the

15  hook for all of it?  You knew that after 30 years of experience

16  in claims, didn't you?

17          MR. DAVID:  Objection.

18          THE COURT:  Sustained.  You need to ask it a different

19  way.  Had at this point it become personal between you and

20  Mr. Hoey?

21          THE WITNESS:  I don't think so because I never spoke

22  with him.

23          THE COURT:  So at some point you referred to him in

24  that next paragraph I just noticed as a reptile.

25          THE WITNESS:  That's right.  That's his reputation.

1           THE COURT:  So --

2           THE WITNESS:  Oh, that's the reptile program.  Maybe

3    you're not -- that they pursue -- David is on there.

4           THE COURT:  I just can't hear.  What did you mean by

5    that?

6           THE WITNESS:  There is a program that David subscribes

7    to which is the "reptile" Theory, and he's on their panel, I

8    think, as a --

9           THE COURT:  They call themselves "the reptiles"?

10          THE WITNESS:  That's right.  That's right.  It's

11   through the -- it's known, especially in nursing home cases,

12   that their strategy is called "the reptile," and it's more or

13   less to inflame the jury that "This could have happened to you

14   on this," and hardly addresses the actual case.

15          THE COURT:  So "reptile" isn't your word?

16          THE WITNESS:  No.  Oh, no, no.

17          MR. HOEY:  One last question.

18   Q.   So going back to your investigation, because now you've

19   already found that liability was problematic; it was going to

20   be difficult to defend the case; you didn't have witnesses that

21   could testify; you didn't have records that you can produce at

22   trial, et cetera.  At some point the decision was made to try

23   to stipulate to liability, but it ended up being an admission

24   to liability at trial?  Do you remember that?

25          MR. DAVID:  Objection.

```
 1              THE COURT:  Overruled.  That's factual.
 2    A.   Correct.
 3    Q.   Correct, okay.  And what you were attempting to do was try
 4    the case on damages only?
 5    A.   Causation and damages, correct.
 6    Q.   Causation and damages, okay.
 7    A.   Yes.
 8              THE COURT:  Well, wait.  If you stipulate to
 9    liability, do you view that as including causation?
10              THE WITNESS:  Yes.
11              THE COURT:  All right, so you're only litigating
12    damages, what was caused by the negligence?  Is that what
13    you're trying to say?
14              THE WITNESS:  Correct.
15              THE COURT:  So you agree it caused her death.  You're
16    just -- the damages, though, you were trying as to what piece
17    of it was caused by the negligence?
18              THE WITNESS:  No.  We had an expert, and it was our
19    feeling also that her death was not caused by the breach.
20              THE COURT:  Well, then you weren't stipulating to
21    liability, were you?
22              (Witness pausing.)
23              THE WITNESS:  Yes.  We had a -- uhm, I don't know how
24    to explain this now.
25              THE COURT:  Were you litigating the amount of damages,
```

1  or were you litigating whether the wrongful death was caused by

2  the misconduct of someone at the nursing home?

3          THE WITNESS:  Whether or not the death was caused by

4  somebody at the nursing home.

5          THE COURT:  All right, so you had not conceded

6  liability then?

7          THE WITNESS:  Right.

8          THE COURT:  In your mind?

9          THE WITNESS:  In my mind, that's right.

10 Q.   Mary, so part of your investigation into causation and

11 damages, did you take --

12         THE COURT:  Can I ask you, the verdict, what did it

13 say?

14         MR. HOEY:  It had liability and damages -- liability,

15 causation and damages, and gross negligence.

16         THE COURT:  And was causation something to be answered

17 by the jury?

18         MR. HOEY:  Yes.

19         THE COURT:  So they did not fully concede liability?

20         MR. HOEY:  No.

21         THE COURT:  All right, all right.  So then she's

22 correct, they did not concede liability.

23         MR. HOEY:  They conceded to duty and breach.

24         THE COURT:  Okay, all right, that's very helpful.

25 She's correct.

1    Q.   Let's finish up here for a second.  Going back to your

2    investigation based on causation and damages, did you consider,

3    take into your evaluation, that there were up to five family

4    members that would be takers under the wrongful death statute

5    in Massachusetts?

6    A.   Yes.

7    Q.   You did?

8    A.   (The witness nodded affirmatively.)

9    Q.   Okay.  And you understand, in wrongful death statutes,

10   there's two prongs, right?  There's the family's claim for

11   their loss of love and affection in society and companionship

12   of the loss of their loved one, right?  You understand that?

13   A.   Yes, I understand that.

14   Q.   Okay.  But you also understand that there is the claim for

15   pain and suffering, disfigurement, loss of dignity of the

16   decedent?  You know that as well?

17   A.   Yes.

18   Q.   Okay, there's two prongs.  Did you take that into

19   consideration when you were evaluating causation and damages on

20   this case?

21   A.   Yes.

22   Q.   And did you consider -- I know that you considered her

23   underlying medical conditions, which were labeled as

24   "comorbidities" at trial, that she had beginning stages of

25   Parkinson's, that she had dementia, she suffers from diabetes,

1    she has controlled congestive heart failure -- there may have

2    been one or two other conditions -- that those conditions were

3    maintained by medicine and medical care, correct?

4    A.   Uhm, I didn't hear what you said.  They are contained

5    by --

6    Q.   They were contained --

7    A.   They were contained --

8    Q.   -- along with medical care and medicine?

9         MR. DAVID:  Objection.

10   Q.   Maintained, maintained.

11        THE COURT:  I'll allow it as to her understanding.  Do

12   you understand that --

13        THE WITNESS:  Yes.

14   Q.   Now --

15        THE COURT:  You need to finish up.

16        MR. HOEY:  Yes.

17   Q.   Did you take into consideration in your evaluation of

18   damages the amount of pain that Mrs. Calandro went through at

19   the hospital stay, so much that they had to provide her

20   morphine for her pain?  Did you take that into your

21   investigation consideration?

22   A.   I considered her follow-up care.

23   Q.   Did you take into consideration that she was suffering

24   from a bedsore the size of a softball to tennis ball, bone deep

25   with foul smell, drainage of fluid, and blood?

1   A.   Yes.  That was one of the conditions that she had.

2   Q.   Did you take into consideration that another aspect of her

3   damages was that she was fecally impacted for approximately two

4   weeks?

5   A.   I -- I don't recall that, but I do recall --

6        THE COURT:  I don't want to be gross, but what does

7   that mean?  Does that mean she was covered with feces or that

8   she was constipated?

9        MR. HOEY:  Yes, it was left in her -- she hadn't had a

10  bowel movement in two weeks.

11       THE COURT:  So she was constipated and impacted, all

12  right.

13  Q.   And do you understand -- last two questions -- did you

14  take into consideration that she had a urinary tract infection

15  which had affected her kidney failure?

16  A.   Yes.

17       MR. HOEY:  Okay.

18       THE COURT:  Done.

19       MR. HOEY:  Thank you.

20       THE COURT:  We'll take our break.  I'll see you at

21  quarter of.

22       How long do you think you'll have?

23       MR. DAVID:  I'm hopeful to be done by lunch.

24       THE COURT:  Okay, because I have to meet someone at

25  lunch, so I can't go into lunch break, but we're sitting this

1   afternoon.

2           MR. DAVID:  Yes.

3           THE COURT:  Okay.  And then who is after?

4           MR. HOEY:  Lawrence Kenney, Mr. Kenney.

5           THE COURT:  And where is he?

6           MR. HOEY:  He's going to be here by 1:30 today.

7           THE COURT:  Okay, because I was a little worried.  Is

8   that because he's trying a case in the morning?

9           MR. HOEY:  That case was moved.

10          THE COURT:  That's moved.

11          MR. HOEY:  Yes.

12          THE COURT:  All right, so he'll be here --

13          MR. HOEY:  1:30 today.

14          MR. DAVID:  He's fine.  He will be here as long as we

15  need him.

16          THE COURT:  He will be here tomorrow, if necessary?

17          MR. DAVID:  Yes.

18          THE COURT:  Okay.  He doesn't have to be back before a

19  judge?

20          MR. DAVID:  He doesn't have to be anywhere.

21          THE COURT:  Thank you.  All right.

22          THE CLERK:  All rise.

23          (A recess was taken, 11:15 a.m.)

24          (Resumed, 11:50 a.m.)

25          MR. DAVID:  Could we use this time to take up another

2-87


1    issue?

2              THE COURT:  Sure.

3              MR. DAVID:  It's kind of an unusual request, but there

4    has been a series of questions where Mr. Hoey has put himself

5    in as a witness, even though he's counsel.

6              THE COURT:  I will not take anything he says as

7    evidence in the case.

8              MR. DAVID:  Oh, I understand that, but I'm not sure at

9    this stage that it's appropriate, and, you know, I think a

10   mistrial might be required because of that kind of questioning.

11             THE COURT:  Overruled.  You should have thought of

12   that before, and I actually already thought of that issue

13   because I said to myself, "What are they going to do if Kenney

14   says X and Mr. Hoey says why?"  It was, in my view, something

15   that people should have been on notice was a possibility.  I am

16   not allowing anyone on the plaintiff's team to testify as a

17   fact witness, and I'm not going to take anything that Mr. Hoey

18   says to contradict it as a matter of law.  I thought about that

19   issue, and they put themselves in that position.

20             MR. DAVID:  Yes, but if Mr. Hoey can't do it directly,

21   I think someone else on that team --

22             THE COURT:  It's too late.  You should have thought of

23   this.  This is -- you should have thought of it.

24             MR. KEENAN:  Your Honor, for the record, we researched

25   a lot on this issue, and we are very comfortable --

```
 1          THE COURT:  Well, I'm not very comfortable, but that
 2    said, as far as I'm concerned, it's been waived.  And as far as
 3    I'm concerned, you put yourself in a terrible position, just
 4    saying, that, you know, you can't contradict a key witness
 5    that's coming in, and I'm not going to allow that to be done.
 6    And you can't inject your credibility into Mr. Hoey.
 7          And, by the way, we verified one thing that Ms. Blair
 8    said.  To my surprise, there is something known as the reptile
 9    strategy.  So my great innovative clerks have Googled it, and
10    there is such a thing.
11          MR. DAVID:  It is a real thing, and Mr. Kenney has had
12    a great deal of experience.  It's a sidelight, but it's
13    interesting, and I may ask him about it, with the Court's
14    indulgence.
15          THE COURT:  It shows you how a judge can actually go
16    off on the wrong track because --
17          (Laughter.)
18          MR. DAVID:  It's high praise actually.
19          THE COURT:  It turns out it was totally not about
20    that, so --
21          MR. KEENAN:  And, Judge, let the record reflect, I had
22    nothing to do with the Calandro case.  I came into this case --
23          THE COURT:  Yes, but you have nothing to do with this
24    one as far as I can tell.  I mean, you're not really examining
25    the witnesses.
```

1          MR. KEENAN:  Well, that may change.

2          THE COURT:  Well, if it does, it does, but it hasn't

3     so far.

4          MR. KEENAN:  It will.

5          THE COURT:  All right.  All right, let's go.

6          MR. DAVID:  Let's rock.

7          THE COURT:  Yes.

8     CROSS-EXAMINATION BY MR. DAVID:

9     Q.   Ms. Blair, you're currently retired?

10    A.   Yes.

11    Q.   And you said you retired in April, late March, 2017?

12    A.   Yes, correct.

13    Q.   And just a little bit of background.  You grew up in

14    Beverly, went to Beverly High School?

15    A.   Yes.

16    Q.   Got a degree in sociology from Suffolk?

17    A.   Yes.

18    Q.   What year?

19    A.   1969.

20    Q.   Now, I assume in 1969 all of the sociology jobs were

21    filled up when you graduated, right?

22    A.   They were.

23    Q.   What did you do right after graduating from college?

24    A.   I went out to an employment agency to see if I could use

25    my degree in something other than sociology.

1    Q.    So was the next best thing insurance?

2    A.    Yes.

3    Q.    Where did you end up initially?

4    A.    Initially I started with Liberty Mutual Insurance in

5    Boston.

6    Q.    And how long did you work for Liberty Mutual?

7    A.    About three years.

8    Q.    From 1970 to '73, '74?

9    A.    Yes.

10   Q.    And what lines of work?

11   A.    I took a position as an adjuster for three lines, which

12   was automobile, homeowners, and worker's compensation.

13   Q.    Let me back up a little bit.  What is your health like

14   right now?

15   A.    My health is good now.

16   Q.    Okay.  Let's go back to 2015.  Anything happen to you in

17   2015?

18           THE COURT:  Would you just speak up just a little bit.

19           MR. DAVID:  I'm sorry.

20   Q.    Did anything happen to you in 2015?

21   A.    Yes.

22   Q.    Explain to the Court what happened.

23   A.    Uhm, I had a history of aneurysms, cerebral aneurysms.  I

24   was being followed for years by Mass. General, and I went in

25   for a routine procedure, an angiogram, and it was just to check

1    to see, you know, that where they had done surgery was still

2    holding up well because I had endovascular coiling; and when I

3    was having this routine procedure, I stroked at the Mass.

4    General.  And there's a number of reasons, but it is one of the

5    hazards of that test is that you can stroke.  So I was

6    fortunate to be at Mass. General at the time, and immediately

7    they sent me out to Spaulding Rehabilitation where I stayed for

8    many weeks doing rehabilitation.

9    Q.   When you got out of Spaulding Rehab, did you have

10   outpatient rehabilitation?

11   A.   Yes.

12   Q.   Now, that was through the summer of 2015?

13   A.   Into, yes.

14   Q.   Okay.  And you were deposed in this case --

15           THE COURT:  Can I ask you, and I don't want to get too

16   personal, but did it have an impact on your memory, the stroke?

17           THE WITNESS:  Yes.

18           THE COURT:  Have you fully recovered from that, or is

19   it still impairing your ability cognitively?

20           THE WITNESS:  No.  I have recovered from that, and it

21   was -- at the time I immediately went back to work.  I have a

22   couple of fingers on my left hand that have no sensation at

23   all, but cognitively, uhm, it wasn't enough to stay at rehab

24   that way.

25           THE COURT:  But today you're okay?

```
 1              THE WITNESS:  But today I'm rocking, yeah.

 2              THE COURT:  No, but, I mean, you --

 3              THE WITNESS:  I don't have that fogginess that I had

 4    before to, you know, focus on anything.

 5              THE COURT:  All right, thank you.

 6    Q.   When you were deposed in this case in October of 2015,

 7    were there medical restrictions on the deposition?

 8    A.   Yes.

 9    Q.   And what were they?

10    A.   Because of the stress involved and my condition at that

11    time, the doctor limited me to two-hours-a-day sessions for

12    depositions.

13    Q.   So we did two hours a day three days in a row?

14    A.   Correct.

15    Q.   And you're still being seen by Dr. Seth Harmon of the

16    brain injury service at Spaulding Rehab?

17    A.   Yes.

18    Q.   When we were broke off, you were at Liberty Mutual.  When

19    you left Liberty Mutual, where did you go?

20    A.   I went to The Hartford Insurance.

21    Q.   How long were you at Hartford?

22    A.   I remained with them through I'd say, like, 2011 directly

23    working for Hartford or one of their subsidiaries.

24    Q.   At some point did you take a hiatus from the insurance

25    industry?
```

1    A.    Yes.  I got away from it for a while.

2    Q.    Okay, so you didn't go right to Hartford?

3    A.    No.

4    Q.    Where did you go when you left Liberty Mutual?

5    A.    I -- no, I'm sorry.  I did go to Hartford, and I was there

6    from maybe to 1984 or '85.

7    Q.    And then what?

8    A.    And I took a position with a government contractor to

9    handle their insurance.

10   Q.    And where was that located?

11   A.    In Pennsylvania.

12   Q.    And you did insurance-related work for the contractor?

13   A.    Yes.  They had a number of different, obviously, programs.

14   Q.    How long did you do that?

15   A.    Oh, almost nine years.

16   Q.    And after that, what did you do?

17   A.    I decided I wanted to come back to Massachusetts, and I

18   still liked handling claims, so I was lucky enough to get a

19   position in Baltimore with Commercial Union Insurance Company

20   just to get back in the door because I was getting a little

21   older, and I wanted to refresh myself in the industry.

22   Q.    Baltimore is not Massachusetts?  What did --

23   A.    Oh, Baltimore, Maryland, just outside of Pennsylvania.

24   Q.    Back in Massachusetts, though?  Did you end up back in

25   Massachusetts?

1    A.    Yes.

2    Q.    How did that happen?

3    A.    Uhm, I -- because of the way that I left The Hartford, I

4    went back to them and asked them if they were hiring anybody,

5    and fortunately they were, so they resumed my employment and

6    benefits right away.

7    Q.    That was around 1999?

8    A.    Yes.

9    Q.    And is there a particular part of Hartford Insurance

10   Company that you worked for?

11   A.    Yes.  Initially it was for First State Management Group.

12   Q.    What is First State?

13   A.    They're a subsidiary of Hartford Insurance.

14   Q.    And what lines of business did you handle for First State?

15   A.    First State, I started off with commercial general

16   liability, and just getting back into their procedures and

17   their policies for handling commercial general liability.

18   Q.    And at some point did you start doing more and more

19   nursing home claims?

20   A.    Yes.  Shortly after I was there, The Hartford announced

21   that they wanted First State to write nursing home policies,

22   and I was there at the time.  I was asked, would I help develop

23   a claims department right from the beginning.  In other words,

24   I had to -- I wasn't by myself, but I needed to find out what

25   the basics were because I had no experience at all.

1   Q.   This was a new line of business for Hartford?

2   A.   For Hartford.

3   Q.   And we'll go into your specific work in the nursing home

4   field, but just in terms of your work history, where did you go

5   from First State?

6   A.   From First State, they were sold in I think 2009, and --

7   Q.   Was it to a company called Specialty Risk Services?

8   A.   No.  They were sold to Beazley Insurance but did not sell

9   the nursing home.  They retained the nursing home program,

10   Hartford.  So they had their own third-party administrator

11   division known as SRS, Specialty Risk Services.  So they just

12   moved me over into that unit and with the files, and I worked

13   for them.

14   Q.   Was there a physical move, or were you literally in the

15   same place?

16   A.   I stayed in the same place in Boston.

17   Q.   How long were you with SRS?

18   A.   I believe it was three years, and then they sold --

19   Hartford sold SRS to Sedgwick Claims Management Services.

20   Q.   And would that have been around 2011?

21   A.   Yes.

22   Q.   And you just went with that sale?

23   A.   Right.

24   Q.   With the nursing home business?

25   A.   With everything, yes.

1  Q.   It's fair to say that you have been involved in either the

2  insurance industry or insurance-related businesses your entire

3  career?

4  A.   Yes.

5  Q.   Now, once you're at Sedgwick, you had testified that your

6  jurisdiction covered forty states; is that right?

7  A.   Yes.

8  Q.   And how many people service those forty states?

9  A.   I'm not sure.  How many people --

10  Q.   Let me ask it this way:  You were in the Boston office?

11  A.   Yes.

12  Q.   How many people worked in the Boston office with you?

13  A.   Two.

14  Q.   How many of them were claims people?

15  A.   One.

16  Q.   What was that person's name?

17  A.   Patricia Meany.

18  Q.   And the other person was a clerical person?

19  A.   Yes.

20  Q.   And between you and Ms. Meany, what area did you service?

21  A.   Forty states, as far west as California.

22  Q.   Okay.  And I think we've already established this morning

23  and yesterday that Janie Hanna was your manager?

24  A.   She was our manager, yes.

25  Q.   And do you know who her manager was?

1  A.   I believe it was Kathy Conway.

2  Q.   Now, Sedgwick is a TPA, correct?

3  A.   Yes.

4  Q.   And Hartford was one of its clients?

5  A.   Yes.

6  Q.   Now, when you first got to Sedgwick in 2011, how long had

7  you been involved in servicing The Hartford nursing home

8  business?

9  A.   Twenty to 25 years.

10  Q.   You don't have to open up to Exhibit 39, but that is the

11  TPA agreement.  And you're aware that there is a specific

12  reference to you on Page 19?

13  A.   Yes.

14  Q.   Do you know why that's there?

15  A.   I think right along, because of my background with

16  The Hartford, that they wanted me to stay in the program.

17  Q.   Okay.  Over the course of your career, how many nursing

18  home cases have you handled?

19  A.   More than a thousand.

20  Q.   Do you have licenses in various states?

21  A.   Yes.  I think I was licensed in 27 states.

22  Q.   Massachusetts does not require a license?

23  A.   That's correct.

24  Q.   Now, when you set up this program, one of the things that

25  you would need is lawyers; is that right?

1    A.    Yes.

2    Q.    How do you go about finding defense counsel that you could

3    use in nursing home cases?

4    A.    I think the easiest thing to reference was that Sloane and

5    Walsh was right here in my own hometown, and specifically we

6    had started writing the -- Hartford had started writing the

7    policies already, so we were waiting for claims to come in.  So

8    I had to take it just as you would a normal line of business

9    and try to develop attorneys, independent adjusters, get people

10   that were versed in that state, not just Massachusetts but

11   whatever state it was, try to look at a stable of experts and

12   so forth, so I started with Sloane and Walsh.

13   Q.    Okay.  And what did you know about that firm?

14   A.    I know they had done quite a bit of work for The Hartford

15   already, and, as I said, they were right here in my hometown,

16   so I asked to speak with them first.

17   Q.    Who did you speak to first?

18   A.    I believe it was John Ryan.

19   Q.    And did Mr. Ryan refer you to one of his partners?

20   A.    Yes.

21   Q.    And who was that?

22   A.    Larry Kenney.

23   Q.    What did you know about Mr. Kenney?

24   A.    Because I hadn't been in town that long, I really wasn't

25   aware of his reputation or anything that way, but did check

1    with other firms and find out what his experience was in the

2    nursing home area and med-mal cases.

3    Q.    And what did you find out?

4    A.    He was very well thought of.  He had worked quite a while.

5    He had some -- a lot of good defense work that he had done.

6    But he was also knowledgeable, and that's what I needed was

7    somebody who not only knew the law but knew what was going on

8    in Massachusetts.  For example, things like tribunals and

9    things, I needed him to start educating me on that.

10   Q.    It's fair to say he knew more about nursing homes and

11   nursing home law than you did at that point?

12   A.    Yes.

13   Q.    Okay.  And you began working with him?

14   A.    Yes.

15   Q.    Over the years, how many cases have you worked with

16   Mr. Kenney on?

17   A.    It could be as many as a hundred.

18   Q.    All nursing home cases or different kinds?

19   A.    All nursing home.

20   Q.    Did you come to rely on his judgment?

21   A.    I did.  I had no reason at all from some of the experience

22   that we were going through and different things we discussed on

23   a case, that I had confidence in him, complete confidence in

24   him that he was going to make the correct recommendations and

25   evaluations.  I had no reason at all to question him, and it

1  did work out fine.

2  Q.   Was that based on specific experience you had had with him

3  over the years?

4  A.   That plus, as I said, the rest of the industry, the courts

5  knew Larry, so I -- and I knew we had a good working

6  relationship as far as an adjuster and a defense counsel, that

7  we could work in tandem.

8  Q.   Now, you were assembling panels of lawyers nationwide; is

9  that right?

10  A.   Yes.

11  Q.   Where would you put Larry Kenney in terms of ability among

12  the lawyers you were assembling for your cases?

13  A.   I have to put him at the very top because he, uhm, he was

14  that good.  And he also, you know, assisted me for other

15  jurisdictions, or, uhm, you know, gave me some advice what we

16  might do here in Massachusetts.

17  Q.   Your first formal notice of the Calandro claim was in

18  October of 2011; is that right?

19  A.   Yes.

20  Q.   And you can turn to Exhibit 11, if you would.  That is a

21  memo you wrote to Brian Karpe?

22  A.   Yes.

23  Q.   Is it pronounced Karpy?

24  A.   Yes.

25  Q.   On October 14, 2011, correct?

1    A.    Yes.

2    Q.    Now, you say at the top of that that you're reporting it

3    pursuant to special instructions?

4    A.    Yes.

5    Q.    What does that refer to?

6    A.    It refers to, in the agreement between The Hartford and

7    Sedgwick, there was requirements that Hartford had named

8    certain types of cases -- for example, amputations, death

9    claims, coverage issues, anything like that -- be reported to

10   them right away so they could decide if they were going to

11   follow the claim or not.

12   Q.    Okay, can you turn to Exhibit 39, and I'm going to direct

13   you to a Bates number.  Are you at 39?

14   A.    Yes.

15   Q.    Okay, SED02585.

16   A.    Okay, I have it.  I have it.

17   Q.    Those are the special claims instructions; is that right?

18   A.    Yes.

19   Q.    Now, when you get a special claim -- and, by the way, a

20   special claim would include a fatality?

21   A.    Yes.

22   Q.    You have to notify Hartford, and what is their option?

23   A.    Once they get notified, they make the decision whether or

24   not they're going to leave the case with me or they're going to

25   take over the handling of it.

1  Q.   Okay.  In the course of your dealing with Hartford, have

2  you ever known Hartford to actually take a case back?

3  A.   No, they haven't.

4  Q.   Okay, so all of the cases that were special claims that

5  you dealt with were handled at Hartford's express direction?

6  A.   Yes.

7  Q.   In those cases, to whom did you report directly?

8  A.   I went through three different consultants, TPA

9  consultants, and that was Brian Karpe, Antinik Thompson, and

10 then she turned -- let's see, Becky Shingleton was the last

11 person.

12 Q.   And they are all Hartford employees?

13 A.   Yes.

14 Q.   So I probably asked the question a little inartfully.

15 Would you report to Sedgwick or to Hartford with respect to

16 special claims?

17 A.   To Hartford.

18 Q.   You were asked to accept service of process in the

19 Calandro case, right?

20 A.   Yes.

21 Q.   And you refused?

22 A.   Refused.

23 Q.   And tell us the reason you refused.

24 A.   Hartford -- excuse me, not Hartford.  Sedgwick and

25 Hartford both understood that service should be made on their

1   insured, and so I had no authority from either place to accept

2   service.

3   Q.   Was there any animosity between you and Mr. Hoey in

4   October of 2011?

5   A.   No, not at all.  Not on my part anyhow.

6   Q.   Pardon me?

7   A.   Not on my part.

8   Q.   And how would you describe your relationship?

9   A.   I thought it was -- it was good right through -- you know,

10  this is the type of work that we do, so who likes a claims

11  adjuster?  Not a lot of people probably.  But I thought because

12  also I had defense counsel with me, it was, you know, kind of

13  difficult to have that one-on-one relationship with David.  But

14  we mediated cases.  We were -- I followed him in his career

15  from the beginning, and I had no animosity towards him at all.

16  Q.   Okay.  And that stayed the same throughout the life of the

17  Calandro case?

18  A.   Right.

19  Q.   Do you know who Phil Bistany is?

20  A.   Yes.

21  Q.   Who is he?

22  A.   He's an independent claims adjuster who does

23  investigations.

24  Q.   Is he approved by Hartford to do investigations on

25  Hartford claims?

1   A.   Yes.

2   Q.   Had you worked with him before?

3   A.   Yes, I had.

4   Q.   And what was the quality of his work?

5   A.   It was good.  He, uhm, kind of looked more so towards

6   Massachusetts.  It's the only place that he was licensed,

7   although you don't need a license, but you couldn't go out of

8   Massachusetts.  And he started from the very beginning being

9   notified by the broker that they were going to be writing

10  nursing home cases for us, so he got to know the people real

11  well on the nursing homes.

12  Q.   Was Mr. Bistany retained to do the investigation in this

13  case?

14  A.   Yes.

15  Q.   And do you know when that took place?

16  A.   That was also in October of --

17  Q.   If you go to Tab 12, it might tell you exactly.

18  A.   October 12, 2011.

19  Q.   And he was retained by Mr. Kenney at your authorization?

20  A.   Yes.

21  Q.   Did you get reports from Mr. Bistany?

22  A.   Yes, I did.

23  Q.   And there's a small volume right in front of you of

24  disputed exhibits, and if you turn to Tab I.

25  A.   Yes, that's October 24, 2011.

1   Q.   Okay, so you had retained him on the 12th, and you got a

2   report from him within two weeks?

3   A.   Yes.

4   Q.   Okay.  And did you get a second report?

5   A.   Yes.

6   Q.   And I'll direct your attention to Tab J.

7   A.   The second report was January 13, 2012.

8   Q.   And the second report deals with his interviews of the two

9   nurses; is that right?

10  A.   That's correct.

11  Q.   That you located?

12  A.   Yes.

13       MR. DAVID:  Your Honor, I'd like to offer these as

14  exhibits.

15       THE COURT:  All right.

16       MR. DAVID:  Is there an objection?

17       MR. HOEY:  Give me one minute.  It's kind of a long

18  one.  Okay, so right now, your Honor, I -- wait a minute, this

19  one?  I only have one of them, but I have no objection.  We're

20  okay.

21       THE CLERK:  What letters are they?

22       MR. DAVID:  They are I and J.

23       THE CLERK:  Okay, so 73 and 74.

24       (Exhibits 73 and 74 received in evidence.)

25  Q.   Did you have a copy of the death certificate?

1    A.    Yes.

2    Q.    Did you make notes about the death certificate?

3    A.    Yes, I did.

4    Q.    And if you turn to Tab 10 in the big book.

5    A.    There's a handwritten note dated October 17, 2011.

6    Q.    And is that your summary of the death certificate?

7    A.    Yes.

8    Q.    What was the condition of Radius in terms of a going

9    entity in October of 2011?

10   A.    They were in the process of turning over -- closing some

11   of their facilities, and in particular the Radius of Danvers

12   was under sale to a different nursing home corporation.

13   Q.    Did that create any problem with respect to getting

14   records?

15   A.    Yes, it did.

16   Q.    What was the problem?

17   A.    Well, first of all, the employees, everybody who was there

18   had left, knowing that they were going to be sold, so if they

19   could get jobs, they left.  Normally the records should be at

20   the facility, but nobody could locate most of them, and we had

21   to go to their warehouse, I think, to follow up to see which

22   records were missing.

23   Q.    Were you able to find some records?

24   A.    Yes.

25   Q.    Were you able to find Mrs. Calandro's clinical chart?

1   A.   Most of it.  I believe, yes, we did get her chart.

2   Q.   Okay.  And do you know whether the plaintiff had the

3   chart?

4   A.   They already had it, yes.

5   Q.   They had it before you did?

6   A.   Yes.

7   Q.   And where did you get the names of the witnesses that were

8   interviewed?

9   A.   Well, most of the time the best thing to do is to go to

10  the administrator there, and that administrator was no longer

11  at Radius Danvers.  There was a part-time temporary

12  administrator who we asked, you know, to talk to.  He knew

13  nothing about Mrs. Calandro, so we looked into -- we had him

14  tell us which ones of those employees might still be there, and

15  we found one director of nursing services who I believe knew

16  who might be working that day, went back into the records for

17  employment.

18  Q.   Okay, the records that she went back into was the clinical

19  chart to see who was on duty at a particular time?

20  A.   That and looking at scheduling information.

21  Q.   And you were able to locate these nurses?

22  A.   Yes.  They had both moved on to different positions, but

23  after we got their last-known address, we were able to find

24  them.

25  Q.   And at some point Mr. Kenney made a decision that you

1  agreed with that they would not be called as witnesses at the

2  trial?

3  A.    Yes.

4  Q.    Okay.  And what was his reason for doing that?

5  A.    Because of the conflicting stories that they had and

6  missing some of the reporting of the circumstances of the --

7  there was an incident where Mrs. Calandro had fallen from her

8  wheelchair.

9  Q.    Was there ever a decision that you made or that you know

10 that Larry Kenney made to withhold the names of those nurses?

11 A.    Yes, there was a decision.

12 Q.    From the trial list?

13 A.    Yes.

14 Q.    Did you expunge them from the clinical record?

15 A.    I'm not sure how to answer that.

16 Q.    The names were in the clinical chart, correct?

17 A.    Oh, the clinical, yes.  Yes.

18 Q.    Had anyone wanted to find out who they were, you could

19 look at the clinical chart?

20 A.    Yes.

21 Q.    Did Mr. Kenney explain to you the particular problems that

22 he was facing because of the lack of witnesses and documents?

23 A.    Yes.  He did indicate that this was an issue with him.

24 Q.    Did he come up with a strategy?

25 A.    Yes.  After some time of trying and trying, he recommended

1    conceding to a breach of duty and to call -- to try the case,

2    if we had to try it, on damages and causation.

3    Q.   And as far as you know, is that what happened?

4    A.   That is what happened.

5    Q.   Dr. Wahl --

6         THE COURT:  So just so I can understand, so you

7    claimed that your negligence was not the cause of the acute

8    renal failure and congestive heart failure?

9         THE WITNESS:  Correct.

10        THE COURT:  Was that litigated?

11        THE WITNESS:  That's correct.

12        THE COURT:  And what did you understand the acute

13   renal failure was due to?

14        THE WITNESS:  It was just a longstanding comorbidity

15   that the deceased had.

16        THE COURT:  So you took the position, it wasn't the

17   result of the urinary tract infection?

18        THE WITNESS:  Right, or falling from a wheelchair.

19        THE COURT:  So, in your view, the alleged negligence

20   was what?

21        THE WITNESS:  I think we stipulated to certain things

22   that I'd have to look back at the -- certain failures that were

23   breaches of standard of care or duties.

24        THE COURT:  So one was falling from the wheelchair,

25   right?

1           THE WITNESS:  Yes.

2           THE COURT:  Was one the bedsore?

3           THE WITNESS:  You know, I'd have to look.

4           THE COURT:  Well, was one the extreme urinary tract

5    infection?

6           THE WITNESS:  Okay, that we conceded to?

7           THE COURT:  It was a breach of the duty of care?

8           THE WITNESS:  No.

9           THE COURT:  So, no, you don't -- so do you remember

10   what the breach was?

11          THE WITNESS:  There were, I think, seven different

12   allegations.  I'm just trying to remember back then.

13          THE COURT:  Don't guess if you don't remember.  But if

14   one of them was the fact that she had such a raging or extreme

15   urinary tract infection, would you have been contesting that it

16   caused the acute renal failure?

17          THE WITNESS:  Yes.  We would have to contest that.

18   These were things that she --

19          THE COURT:  Well, did you have medical evidence that

20   supported that?

21          THE WITNESS:  Yes.  We had --

22          THE COURT:  That the urinary tract infection was not

23   the cause of the renal failure?

24          THE WITNESS:  Yes, that's right.

25          THE COURT:  You had a doctor that said that?

```
 1              THE WITNESS:  Yes.
 2   Q.    Dr. Wahl was Mrs. Calandro's personal physician; is that
 3   right?
 4   A.    Yes.
 5   Q.    And his insurer was whom?
 6   A.    Coverys, I think part of ProMutual.
 7   Q.    C-o-v-e-r-y-s?
 8   A.    Yes.
 9   Q.    And the person there handling this claim for him was Joe
10   Pacheco?
11   A.    Correct.
12   Q.    Now, you've valued a number of cases in your career; is
13   that right?
14   A.    Yes.
15   Q.    And you've looked at defense counsels' valuations of cases
16   over the course of your career?
17   A.    Yes.
18   Q.    Is that right?  I don't want to sound callous about this,
19   but was there anything unusual about the damages that were
20   claimed in the Calandro case?
21   A.    Uhm, no, there wasn't anything unusual.
22   Q.    Did you ask Mr. Kenney to do a valuation?
23   A.    Yes.
24   Q.    And if you turn to Exhibit 51 in your book.
25   A.    Sloane and Walsh letter of February 7, 2014.
```

1    Q.    Is this a pretrial report that you asked him to do?

2    A.    Correct.

3    Q.    And if you turn to Page 4.

4    A.    Okay.

5    Q.    Okay?  And at the bottom of the page where he talks about

6    damages, do you see that?

7    A.    Yes.

8    Q.    "Usual wrongful death damages"?

9    A.    Yes.

10   Q.    Okay, "There is nothing particularly compelling or unusual

11   about the loss of their admittedly frail 91-year-old mother

12   that would take this case out of the norm on the usual measure

13   of damages"?

14   A.    That's correct.

15   Q.    Did you agree with that?

16   A.    Yes.

17   Q.    And on the next page, Page 5, he sets out a verdict value?

18   A.    He did.

19   Q.    And what was the verdict value he gave?

20   A.    $300,000 to $500,000 verdict value, which was assuming

21   full liability.

22   Q.    So assuming full liability as a death case for -- is this

23   for all defendants or just the Radius defendants?

24   A.    This was for all defendants.

25   Q.    Are you familiar with generally the concept of joint and

1  several liability?

2  A.   Yes.

3  Q.   Assuming, let's say, $500,000 is the maximum verdict

4  exposure and there are two sets of defendants, what was, as you

5  understood it, the net exposure to the Radius defendants, if

6  you accept Mr. Kenney's valuation?

7  A.   It would be 50 percent of that amount, $150,000 to

8  $250,000.

9  Q.   Okay.  And did you accept Mr. Kenney's valuation?

10       THE COURT:  Does that include the interest?

11       THE WITNESS:  No, it doesn't.

12       THE COURT:  So if you included the interest, what was

13  the range of liability?  "Exposure" I guess is the way you put

14  it.

15       THE WITNESS:  I think it was another $200,000 at the

16  time.

17       THE COURT:  $35,000 interest, so --

18       THE WITNESS:  35 percent.

19       THE COURT:  35 percent.  So it would be what, $400,000

20  to -- is that how you would do it, a third of $150,000?

21       THE WITNESS:  Right.  And I think I got a high end of

22  $700,000 to $750,000.

23       THE COURT:  $700,000 was a potential exposure?

24       THE WITNESS:  Yes, full.

25  Q.   In valuing cases, Ms. Blair, do you typically add interest

1   onto the verdict value?

2   A.   No.

3   Q.   Have you ever done that in the insurance industry over

4   your career?

5   A.   No.

6           THE COURT:  At 12 percent a year, why wouldn't you?

7           THE WITNESS:  Because, uhm, that's the hazard of this

8   line of business.  When they're going to give you -- I mean,

9   some states don't allow anything, but it doesn't increase --

10          THE COURT:  I know.  I'm talking about Massachusetts,

11  when you're valuing a case and it's such a high interest rate,

12  do you include the interest rate in the value of the case?

13          THE WITNESS:  No, I don't.

14          THE COURT:  That's your practice, was your practice?

15          THE WITNESS:  Yes.

16  Q.   Did Mr. Kenney's valuation of the damages ever change

17  during the course of the Calandro case?

18  A.   No.

19  Q.   Okay.  And if you turn to Tab 13.

20  A.   June 30, 2014.

21  Q.   Okay, that is another pretrial report that Mr. Kenney did

22  for you; is that right?

23  A.   Yes.

24  Q.   And I think if you turn to Page 5, is there a valuation

25  there?

1   A.   Oh, yes, No. 8, "verdict value"?  Is that the top?

2   Q.   It's the same, right?

3   A.   Yes.

4   Q.   Based on your experience, did the $300,000 to $500,000

5   verdict value range comport with valuations in similar cases

6   that you've handled?

7   A.   Yes, yes.

8   Q.   Do you know whether Mr. Pacheco of Coverys agreed with the

9   valuation?

10  A.   Oh, definitely he did, yes.

11  Q.   Now, let's turn to February, 2014.  There was an offer

12  made; is that right?

13  A.   Yes.

14  Q.   Okay.  At that time, what was the plaintiff's demand?

15  A.   $500,000.

16  Q.   And what was the offer?

17  A.   It was a combined offer from Dr. Wahl's carrier, insurance

18  company, and me of $275,000.

19  Q.   Okay.  And how much of that was yours?

20  A.   $125,000.

21  Q.   Did you have personal settlement authority that you could

22  use without getting permission from Hartford?

23  A.   Yes.

24  Q.   How much was that?

25  A.   $125,000.

1   Q.   So you had offered all of the authority you personally

2   had?

3   A.   Yes.

4   Q.   And the total was $275,000, which brought it just under

5   the low end of the verdict range, right?

6   A.   Yes.

7   Q.   Was this intended to be a final and firm offer, or was

8   this an initial offer with an expectation that there would be

9   negotiations?

10  A.   It was an initial offer from the carriers, and normally

11  there would be some type of negotiations between plaintiffs and

12  the defendants.

13  Q.   Okay, could you turn to Tab 21.

14  A.   An email dated February 18, 2014.

15  Q.   Okay, the bottom email is an email from Mr. Pacheco to

16  David Hoey?

17  A.   Yes.

18  Q.   And take a look at the second paragraph.  Are you there?

19  A.   Yes.

20  Q.   Okay, Mr. Pacheco says to Mr. Hoey, "This was an initial

21  offer, and we have room to move."  Did that accurately reflect

22  your position?

23  A.   Yes, definitely.

24  Q.   Okay.  And then Mr. Pacheco forwards the email to you

25  saying, "It looks like David is taking a hard stance here."

1    A.    Correct.

2    Q.    Okay, at that point the demand was $500,000.  What was the

3    next demand in response to your $275,000, offer?

4    A.    There was a demand to each of the carriers of $1 million.

5    Q.    Okay, so that's a total demand of $2 million?

6    A.    That's right.

7    Q.    Had anything, as you understood it, in the case changed to

8    cause a demand to quadruple in a two-month period?

9    A.    No.

10          THE COURT:  So that was two months later in April?

11          THE WITNESS:  Yes, April.

12   Q.    Okay.  And if you turn to Exhibit 25, that's the demand

13   letter?

14   A.    Correct.  I have that, yes.

15   Q.    2014.  There was a line of questioning about when Mr. Hoey

16   got the actual insurance policy.  Do you remember that?

17   A.    Yes.

18   Q.    Do you know whether Mr. Hoey knew the --

19          THE COURT:  When he --

20          MR. DAVID:  Pardon me?

21          THE COURT:  Mr. Hoey demanded it, you mean?

22          MR. DAVID:  When he got the insurance policy.

23          THE COURT:  Or when he actually read it?  I'm not sure

24   I understand the question.

25          MR. DAVID:  The line of questioning was, Mr. Hoey

1   asked for and got a physical copy of the insurance policy on

2   April 4.

3            THE COURT:  I see.

4   Q.   Okay.  And taking that April 4 date, do you know whether

5   Mr. Hoey was aware of the amount of the policy before April 4?

6   A.   I think that he was aware from his other dealings with

7   Radius.

8   Q.   He had had other Radius cases with you; is that right?

9   A.   Yes.

10  Q.   And was there a standard Hartford policy that was issued

11  to Radius over the years?

12  A.   Yes.

13  Q.   And what were the limits of insurance in that policy?

14  A.   $1 million each occurrence, $3 million aggregate.

15  Q.   And this followed that pattern, this policy?

16  A.   Yes.

17  Q.   Now, Mr. Kenney had advised you that this case would be

18  very difficult to defend on breach of duty, but that it was

19  defensible on the issue of causation; is that right?

20  A.   Yes.

21  Q.   Did you get a medical opinion from a physician on the

22  issue of causation?

23  A.   Yes.

24  Q.   Who was the doctor?

25  A.   Dr. Terrance O'Malley.

1    Q.   And what did you know about Dr. O'Malley?

2    A.   He was highly thought of.  He's in Massachusetts at Mass.

3    General Hospital, and he had -- his expertise was in -- I

4    believe it was geriatric medicine, and we checked his

5    background out and couldn't find anything that would be

6    negative to him.

7    Q.   Okay, so he specialized in geriatric medicine?

8    A.   Yes.

9    Q.   He was on the staff of Mass. General?

10   A.   Yes.

11   Q.   Was he on the faculty of Harvard Medical School?

12   A.   Yes, he was.

13   Q.   Did you get an opinion from Dr. O'Malley?

14   A.   Yes.

15   Q.   And was the opinion that nothing the nursing home did or

16   failed to do contributed to Mrs. Calandro's death?

17   A.   Yes.

18   Q.   Could you open the small book to Tab D.

19   A.   Okay, it's the Additional Supplemental Answers to

20   Interrogatories.  It looks like a disclosure of our expert.

21   Q.   Okay, that's Mr. Kenney's expert disclosure of

22   Dr. O'Malley?

23   A.   Yes.

24   Q.   And it has his opinion in the first few pages, and then

25   the rest of it is Dr. O'Malley's CV?

1   A.   Yes.

2          MR. DAVID:  Your Honor, I'd like to offer that.

3          THE COURT:  Allowed.

4          MR. HOEY:  I don't have the CV, but if it's the same

5   CV as the time of the trial --

6          (Discussion off the record between attorneys.)

7          MR. HOEY:  Is it the same one at the time of the

8   trial?

9          MR. DAVID:  Yes.

10         MR. HOEY:  Okay, your Honor.

11         THE CLERK:  So that would be 75.

12         (Exhibit 75 received in evidence.)

13  Q.   Now, you attended the trial?

14  A.   Yes.

15  Q.   Every day but jury impanelment?

16  A.   Correct.

17  Q.   And you saw Dr. O'Malley testify?

18  A.   Yes.

19  Q.   And without getting into details of his testimony, was his

20  testimony at trial consistent with the disclosed opinion?

21  A.   Yes.

22  Q.   Now, let's turn to June of 2014, just before the trial.

23  What was your goal in trying to resolve this case at that time?

24  And this is before Dr. Wahl settles out.

25  A.   My goal was to get enough of an agreement with Dr. Wahl to

1   show that there was a question -- that they should be sharing

2   in this case with us.  We agreed, uhm, and I didn't see

3   anything different at all as to the assessment of damages or

4   the verdict range on this that was any different from what I

5   had on it.  And we agreed, you know, both of us, which was

6   good, anywhere from $300,000 to $500,000 verdict value.

7   Q.   Would you turn to Exhibit 19, please.

8           THE COURT:  So basically the $300,000 to $500,000

9   stayed steady since February, is that right, when you

10  understood you had liability?

11          THE WITNESS:  Yes.

12          THE COURT:  Which exhibit are we going to?

13          MR. DAVID:  We're going to 19.

14  Q.   And this is an email from Mr. Pacheco to you?

15  A.   Yes.

16  Q.   And that's on June 8, 2014?

17  A.   Yes.

18  Q.   And Mr. Pacheco tells you that he has made a second joint

19  offer?

20  A.   Yes.

21  Q.   Of how much?

22  A.   $300,000.

23  Q.   And was that rejected?

24  A.   Yes.

25  Q.   Now, turn to Tab 65.

```
 1   A.    July 3, 2014.

 2   Q.    Who is Chris Sobczak?

 3          THE COURT:  Can I ask about the next paragraph.  "I

 4   know when we spoke in February we agreed that we would each

 5   contribute $400,000."  Had you agreed to that?

 6          THE WITNESS:  We would contribute, it meant globally,

 7   I believe.  Let me look back at --

 8          THE COURT:  It doesn't say it.  I'm looking now at

 9   Exhibit 19.  Do you see that?

10          THE WITNESS:  I'm going back to it now.

11          THE COURT:  This is Pacheco writing.

12          (Witness examining document.)

13          THE WITNESS:  Oh, yeah, I believe it meant that we

14   would contribute a grand total of $400,000.  It wasn't going to

15   be $400,000 each because that would be $800,000.

16          THE COURT:  That makes sense.  So then later on it

17   says that he was hoping to resolve the case for $500,000 and

18   wanted you to see if you could get half of it?

19          THE WITNESS:  Yes, right, which I did.

20          THE COURT:  So that was in June you got -- did you ask

21   for the $250,000 in early June?

22          THE WITNESS:  No.  I think it was in July.

23          THE COURT:  So why did you wait so long?

24          THE WITNESS:  Uhm...I don't know.  I can't surmise

25   right now.
```

```
 1    Q.   Let me ask you, Ms. Blair, given Dr. O'Malley's opinion
 2    that there was no causation in June of 2014, did you believe
 3    that liability was reasonably clear, liability meaning breach
 4    of duty, causation, and damages?
 5               THE COURT:  Well --
 6               MR. HOEY:  Objection.
 7               THE COURT:  I think you need to distinguish between
 8    them because damages isn't usually thought of as part of
 9    liability.  She thought -- you thought breach of the duty --
10    let's just parse it through -- you thought breach of the duty
11    of care was likely, right, that the nursing home didn't perform
12    according to standards of professional care?  Is that right?
13               THE WITNESS:  Right.  We --
14               THE COURT:  But you disagreed that it caused her
15    death?
16               THE WITNESS:  Correct.
17               THE COURT:  And you disagreed on the amount of
18    damages?  Is that right?
19               THE WITNESS:  Yes.
20               THE COURT:  All right, so --
21               MR. DAVID:  I think that establishes it.
22    Q.   I think we were talking about Exhibit 65.
23    A.   July 3 email.
24               THE COURT:  By the way, did you generally agree with
25    Pacheco's decision in early June?
```

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  That basically the most you were going to

 3     offer was $500,000, and after that, not another dime?

 4              THE WITNESS:  Globally, yes, that's right.

 5              THE COURT:  Did you agree it was fair for you to

 6     contribute $250,000?

 7              THE WITNESS:  Yes.  It was an attempt to try to kick

 8     start some negotiating here on it.  You don't just put out a

 9     figure and expect it to be accepted, nor do you put out a

10     demand and say that's it.

11     Q.   You're not copied on Exhibit 65, but you've seen it

12     before?

13     A.   Yes.

14     Q.   And Mr. Sobczak was a colleague of Mr. Hoey's?

15     A.   Yes.

16     Q.   Thursday, July 3, without being too obvious, is the

17     Thursday before the 4th of July weekend?

18     A.   That's correct.

19     Q.   And was that the first time you learned that Dr. Wahl had

20     settled?

21     A.   Yes.

22     Q.   And Mr. Sobczak was making a $1 million demand with a time

23     limit on it?

24     A.   Correct.

25     Q.   The following week?
```

1    A.    Yes.

2    Q.    When did you learn about this demand?

3    A.    I think about a week later.

4    Q.    Was Mr. Kenney gone for the long weekend?

5    A.    Yes, he was gone, and he had other -- he wasn't in the

6    office.  I know that.

7    Q.    When you got alerted to that letter, what did you do?

8    A.    Well, got together again with Larry Kenney, and we said,

9    "What are we missing here that this thing is now up to

10   $1 million?"  I mean, there was no explanation if it was

11   because of some other new information that had come forward; or

12   could it be the client, that was their demand, I mean, the --

13   yeah, the plaintiff's client was the demand and they were

14   putting in?  We couldn't find anything.  So we went back

15   through what we had and made the decision then that we had to

16   stay with our global $300,000 to $500,000 verdict value.

17   Q.    Did you ask Hartford for authority?

18   A.    Yes, I did.

19   Q.    And I think that there has been evidence that initially

20   you asked for and got $300,000?

21   A.    Yes, it was $300,000.

22   Q.    Did that $300,000 change?

23   A.    Yes, it did.

24   Q.    What happened to it?

25   A.    The Hartford then, after they looked at it, went back down

1    to $250,000.

2    Q.    Okay, if you turn to Tab 31.

3    A.    I have it, July 10 email.

4    Q.    Okay, there is an email from Becky Shingleton to you on

5    July 10, correct?

6    A.    Correct.

7    Q.    And your final instructions from Hartford going into the

8    trial were, how much authority did you have?  Look at the

9    bottom.

10   A.    On Page 1, $250,000.

11   Q.    Okay.  And did she put any conditions or caveats on that

12   $250,000?

13   A.    Yes.

14   Q.    What did she say?

15   A.    As she says, "If the opportunity for settlement arises,

16   you have authority to $250,000."  But, uhm, you know, that

17   wasn't etched in stone.

18   Q.    You thought you could get a little more?

19   A.    Yes, right.

20   Q.    Did you tell Mr. Kenney that you had authority to at least

21   $250,000?

22   A.    Yes.

23   Q.    Okay.  And do you know what he did with that -- let me

24   back up.  Did you give him any instructions on what to do?

25   A.    Yes.  I informed him, you know, that The Hartford had

1    everything that we had.  And I told him, you know, we should
2    still try to get our offer out there, and that if he could get
3    an offer out of $250,000, don't slam the door and say, "This is
4    our last offer before trial.  See what plaintiffs come back
5    with."  I mean, it would either be definitely not that or, you
6    know, "Can you put on another $100,000?" something like that
7    that we could consider.
8    Q.    Okay, do you know whether he made the offer?
9    A.    Yes.
10   Q.    And if you turn to Tab 35.
11   A.    I have it.  It's a handwritten memo.
12   Q.    Let's lay this out.  You did not make the offer?
13   A.    No, no.
14   Q.    The only way you know that the offer has been made is that
15   Mr. Kenney told you he had made the offer?
16   A.    Yes.
17   Q.    And over the period of time you had known Mr. Kenney, have
18   you ever known him to give you false information?
19   A.    No, no.
20   Q.    Okay.  Exhibit 35 are your handwritten notes on July 16?
21   A.    Right, correct.
22   Q.    And that was the day of jury impanelment, correct?
23   A.    Yes.
24   Q.    You weren't there in court?
25   A.    No.

1    Q.    Mr. Kenney obviously was?

2    A.    That's correct.

3    Q.    And did he call you when he got back from court?

4    A.    Yes.

5    Q.    And you made notes of that conversation?

6    A.    Yes.

7    Q.    And at the top it says "Corporate greed."  What is that

8    about?  What does that refer to?

9    A.    It seemed like that was the theme coming from the

10   plaintiffs, why they were pushing it past a case where offers

11   had been made, part of the case has settled, and, uhm, that was

12   about it.

13   Q.    Okay.  And then he talks to you about the composition of

14   the jury?

15   A.    Yes.

16   Q.    And at the bottom there are two sets of numbers?

17   A.    Yes.

18   Q.    What does the first one represent?

19   A.    That was, definitely $250,000 was the settlement amount

20   for Dr. Wahl and that he wouldn't be at the trial.

21   Q.    Okay.  Now, you had suspected that Dr. Wahl had settled

22   for $250,000?

23   A.    Yes.

24   Q.    You didn't know that for certain?

25   A.    No.

1    Q.    Is this the first confirmation you got that he had in fact

2    settled for $250,000?

3    A.    The first valid confirmation, yes.

4    Q.    Okay.  And the number under that says "$250,000 plus

5    offer"?

6    A.    Yes.

7    Q.    What does that represent?

8    A.    That was the offer from Larry Kenney of $250,000 plus.

9    "Plus offer" means starting at $250,000, but I would go up or I

10   could get more authority if $250,000 wasn't satisfactory.

11          THE COURT:  Was that something that Mr. Kenney said

12   that he had said to Mr. Hoey, or is that your own thinking?

13          THE WITNESS:  No, no.  That was from Mr. Kenney.

14          THE COURT:  So Mr. Kenney said what?

15          THE WITNESS:  He had offered $250,000, and understood

16   from me that if that could be negotiated or accepted or

17   rejected, that I still would consider more, a higher offer.

18          THE COURT:  And those are the words he said, at least

19   the way you understood it, to Mr. Hoey?

20          THE WITNESS:  Yes, yes.

21          THE COURT:  I mean, it sort of made sense that

22   Dr. Wahl had settled out for $250,000; you don't understand

23   why, uhm, you know -- but we were willing to go higher just to

24   settle the case.

25   Q.    Did you report the offer to Becky Shingleton?

1    A.    Yes.

2    Q.    And if you turn to Tab 34, let's go to the first page.

3    This is Becky Shingleton writing to you on July 24; is that

4    right?

5    A.    Yes.

6    Q.    And that's right after the verdict?

7    A.    Yes.

8    Q.    And she's attaching an email she circulated or sent to her

9    people at Hartford?

10   A.    That's right.

11   Q.    You recognize some of those names?

12   A.    Yes, I do.

13   Q.    Okay.  And if you go to the second page, there is an entry

14   on settlement efforts?

15   A.    Yes.

16   Q.    And about five lines from the bottom, and I'll read it,

17   "Unbeknownst to us, the codefendant settled directly with the

18   plaintiff's counsel for $250,000 immediately prior to the

19   commencement of the trial.  We tried to match that amount, but

20   plaintiff's counsel did not reduce his demand of $1 million.

21   Despite our best efforts to engage in meaningful negotiations

22   with plaintiff's counsel, we were unable to reach a settlement,

23   and the case proceeded to trial in Middlesex."

24         Do you know where Becky Shingleton got that information?

25   A.    She got it from me.

```
 1    Q.    You're not aware of any separate offers that Hartford was

 2    making at this point?

 3    A.    No, I'm not aware of any.

 4    Q.    As far as you know, the only offer came from you through

 5    Larry Kenney?

 6    A.    That's correct.

 7    Q.    You sat through the trial --

 8          THE COURT:  Excuse me.  So this is July 24.  I'm

 9    sorry.  Was that after the verdict?

10          THE WITNESS:  Yes.

11          THE COURT:  The second verdict or the first verdict?

12          (Pause.)

13          THE COURT:  I guess it may have been after the second

14    verdict.

15          THE WITNESS:  Right, which was like a day later, I

16    think.

17          THE COURT:  All right, I see.  So this is a

18    retrospective?

19          THE WITNESS:  Yes, and, uhm, when you read it, it's

20    questions that she asked me to -- no, wanted to do concise to

21    her people to say what happened.

22    Q.    You sat through the trial?

23    A.    Yes.

24    Q.    And it lasted for, apart from impanelment, four days; is

25    that right?
```

1  A.   Yes.

2  Q.   You have sat through a number of trials in your career,

3  right?

4  A.   Yes.

5  Q.   How did you see the evidence going in, from your

6  perspective?

7  A.   I saw it going in, uhm, as we anticipated, uhm, but

8  especially that there was nothing new in this that would cause

9  me to say, "Oh, let me get up and go look at that again."  I

10 kept checking with Larry Kenney to make sure I wasn't missing

11 anything because there was a tremendous amount of sidebars that

12 I couldn't hear what was going on, but I think it was, you

13 know, Larry would have said that "This is the good news," or

14 whatever, but there was nothing different going into the case.

15        THE COURT:  Well, I need to break for that lunch I

16 mentioned, so how much longer do you think you have with her?

17        MR. DAVID:  Three minutes.

18        THE COURT:  Oh, finish the three minutes.  I just may

19 get going a little late.

20        MR. DAVID:  Yeah, no, this is it.

21 Q.   Did Mr. Hoey or Mr. Sobczak ever approach you during trial

22 to discuss settlement?

23 A.   No.

24 Q.   The verdicts came in.  Were you surprised?

25 A.   I was stunned, yes.

1   Q.   Okay.  Were you surprised by the fact that you had lost or

2   by the amount, or both?

3   A.   I think more so the big thing was the punitive damages on

4   this.  The compensatory, that's what a jury felt it was worth.

5   There's nothing I could do, you know, on that part, and I

6   didn't think, you know, they were real outrageous, but, uhm,

7   that's something I could swallow, but the punitives were not.

8   Q.   When did your involvement in the case end?

9   A.   I think a day or two after the judgment.

10  Q.   At some point there was an offer of the policy; is that

11  right?

12  A.   Yes.

13  Q.   If you turn to Exhibit 55.

14  A.   Did you say 55?

15  Q.   55.

16  A.   Okay, yes, July 31.

17  Q.   Is that a letter from Mr. Kenney to Mr. Hoey offering the

18  insurance policy, the $1 million?

19  A.   Yes.

20  Q.   It says in the first line, "I have been authorized to

21  tender the full amount of the insurance coverage."  Do you see

22  that?

23  A.   Yes.

24  Q.   Did you authorize Mr. Kenney to tender the full amount of

25  the insurance coverage?

1    A.    No.

2    Q.    Who did that?

3    A.    Hartford Insurance.

4    Q.    Were you ever in a position to authorize Mr. Kenney to

5    offer the full amount of the policy?

6    A.    No.

7              MR. DAVID:  Thank you.

8              THE COURT:  I'll see you at five past.  Thank you.

9              THE CLERK:  All rise.

10             (Noon Recess, 1:05 p.m.)

11             (Resumed, 2:13 p.m.)

12             THE COURT:  Okay.

13             THE CLERK:  You can be seated.

14             MR. HOEY:  May I proceed, your Honor?  Exhibit No. 65,

15   please.

16             THE WITNESS:  It's the email from July 3rd?

17             MR. HOEY:  Right.

18   REDIRECT EXAMINATION BY MR. HOEY:

19   Q.    Just a real quick reference, it's an email from Krzysztof

20   Sobczak, who was affiliated with my office at one time, to

21   Larry Kenney?

22   A.    Yes.

23   Q.    And the email is on July 3 at 10:30 in the morning, right?

24   A.    Yes.

25   Q.    Okay, anything unusual about that?  July 3 is a business

1    day, is it not?

2    A.    It was, I believe, the day before --

3    Q.    The 4th of July?

4    A.    -- the 4th of July.

5    Q.    It's 10:30 in the morning.  There isn't anything unusual

6    about sending an email --

7            THE COURT:  No, no, come on.  Don't argue with her.

8    Q.    I'm not arguing with you, Ms. Blair.  Just the observation

9    is, it was sent at 10:30 in the morning on July 3?

10   A.    Correct.

11   Q.    Please move to Exhibit No. 35.  I believe this was your

12   notes.

13   A.    Handwritten, yes.

14   Q.    And do you make these handwritten notes on the day that

15   you have dated them, or did you make them later but put down

16   the date of the event?

17   A.    No.  I did it that day to make it running.

18   Q.    So how is it, Ms. Blair, that you knew that Dr. Wahl

19   resolved his case for $250,000 when that was a confidential

20   settlement?

21   A.    I think we found out from you.  It's not in a letter?

22   Q.    Is that your testimony?  You believe you found out from --

23           THE COURT:  Do you know, or are you guessing?

24           THE WITNESS:  No, I -- I didn't -- this is when Larry

25   found out apparently.  He can testify to that.

```
 1              THE COURT:  Excuse me.  Larry told you that on that
 2    day?
 3              THE WITNESS:  Yes.
 4              THE COURT:  Okay.
 5    Q.   Do you know how Mr. Kenney found out, when that was a
 6    confidential settlement?
 7    A.   No.
 8    Q.   Moving to Exhibit No. 13 --
 9              THE COURT:  But let's say -- let me just put this.  I
10    would like to finish -- how much time do you have?
11              MR. HOEY:  I have only one sheet of paper.
12              THE COURT:  Fine, because I need to get to Mr. Kenney.
13    He's not sitting here, right?
14              MR. HOEY:  He's outside.
15    Q.   Exhibit No. 13, please.
16    A.   June 13, 2014.
17    Q.   Right, this is a letter to you from Mr. Kenney?
18    A.   Yes.
19    Q.   If you go to the next page, go to No. 1, it says "Trial,"
20    lower case "a," it says "Hartford's coverage"?
21    A.   Yes.
22    Q.   Hold on one second.  I think I lost my place.  Oh, I'm
23    sorry, Ms. Blair.  Go down to the paragraph that starts "The
24    defense of the Radius defendants --"
25    A.   Yes, I have it.
```

1    Q.    "-- is extremely difficult."  You see that?

2    A.    Yes.

3    Q.    "-- due to the fact that all the resident entities have

4    since been dissolved."  Go down to the last sentence, please.

5    A.    Yes.

6    Q.    And please read it for the Court.  It starts with "It is

7    very."

8    A.    Yes.

9    Q.    Okay, please read it for the Court.

10   A.    "It is very likely if the case goes to trial that we will

11   have no alternative but to concede liability and try the case

12   on damages only."

13   Q.    "Try the case on damages only."

14   A.    Uh-huh.

15   Q.    I read that correctly?

16   A.    That's what that one says, yes.

17   Q.    And that was Mr. Kenney's pretrial report and budget to

18   you?

19   A.    Yes, as of that date, because he did more than one report,

20   June 30.

21   Q.    Can we please move to Exhibit No. 51.

22   A.    Okay, February 7 letter from Kenney's office.

23   Q.    And there it's a projected verdict was between $300,000

24   and $500,000, correct?

25   A.    Correct.

1   Q.   Okay.  And you know that it's the responsibility under the

2   insurance policy that if there is a verdict between $300,000

3   and $500,000, that the 38 percent interest would be added to

4   that?

5   A.   Approximately that, yes.

6   Q.   And your estimate of exposure, to use Mr. David's word,

7   pretrial then, using the interest and the $300,000 to $500,000,

8   was between $420,000 to $700,000?  Do I have that right?

9   A.   Uhm, yes.

10          THE COURT:  That was what you said to Mr. Hoey -- or

11   excuse me.  Who did you say that to, that's your exposure,

12   Mr. Kenney?  I just missed the question.

13          MR. HOEY:  Yes, I'm sorry, your Honor.  We're going

14   back that the document, the projected verdict value of $300,000

15   to $500,000, under the policy they would be responsible for the

16   approximately 38 percent interest.  And Mr. David had asked her

17   whether their exposure -- that's the word we used -- you

18   actually referred to the fact --

19          THE COURT:  Yes.

20          MR. HOEY:  -- pretrial was X to X, and I just

21   confirmed --

22          THE COURT:  Oh, you're just saying what we said

23   before.

24          MR. HOEY:  Yes.  I wanted to make sure the numbers

25   were clear in the record.

1   Q.   Right, so therefore your exposure wasn't $300,000 to

2   $500,000.  The exposure under the policy was $420,000 to

3   $700,000, correct?

4   A.   It could be.

5   Q.   Okay.  You understand that interrogatories have to be

6   signed by the insured, a representative from the insured,

7   right?

8   A.   30(b)(6) representative.

9   Q.   Well, 30(b)(6) is a type of deposition.

10  A.   Okay.

11  Q.   I mean, it's Exhibit No. 74, so why don't we turn to

12  Exhibit No. 74.

13  A.   Well, my book is empty.  There's nothing under 74, but --

14  Q.   That was recently added.  I apologize.

15  A.   That's okay.

16  Q.   I'll bring it up to you.  Look at Exhibit No. 74.  These

17  are the defendant Radius Healthcare's supplemental answers to

18  interrogatories.  Are they signed by anybody from the insured?

19  A.   No.

20  Q.   Okay.  Do you understand that it is a requirement that

21  answers to interrogatories be signed by the insured; i.e.,

22  Mr. Kenney's true client?  Do you understand that?

23          THE COURT:  What did you ask her?

24          MR. HOEY:  I asked her, does she understand that

25  answers to interrogatories have to be signed under the pains

1    and penalties of perjury by the insured?

2           THE COURT:  What do you have up on the screen?  Is

3    that what you're talking about?

4           MR. HOEY:  No.  I didn't have anything on the screen,

5    I don't believe.  I did?

6           THE COURT:  No, no, it had something signed by

7    O'Malley.

8           MR. HOEY:  Yes, okay.  Under Rule 30(b), doctors now

9    have to certify their disclosure in the supplemental answers to

10   interrogatories.  There's two signatures.

11          THE COURT:  So we have Dr. O'Malley's up there.  All

12   right, so now what are you asking her?

13          MR. HOEY:  I asked her, is it her understanding that

14   answers to interrogatories also have to be signed by the

15   insured, by the defendant, under the pains and penalties of

16   perjury?

17          MR. DAVID:  Objection.

18          THE COURT:  Sustained.

19          THE WITNESS:  I don't know because I'm not a lawyer.

20          MR. HOEY:  No, no, no.

21          THE WITNESS:  Oh.

22   Q.   Are these answers to interrogatories signed by anybody

23   from the insured, Radius Healthcare?

24          MR. DAVID:  Objection.

25          THE COURT:  Overruled.

1   A.    No.

2   Q.    Okay.  What is the date in which these supplemental

3   answers to interrogatories are provided?

4   A.    May 27, 2014.

5   Q.    Two months prior to the trial.  And the answers to

6   interrogatories are for Dr. O'Malley?

7   A.    Yes.

8   Q.    Okay, so Dr. O'Malley, his anticipated testimony is

9   provided to the plaintiffs in May, two months prior to the

10  trial, according to that document, correct?

11  A.    Yes.

12  Q.    Now, you sat in at the trial, and you recall, since

13  sitting at the trial, that Dr. O'Malley's analysis,

14  credibility, credentials were all questioned by the lawyers,

15  and that it was the jury to determine whether he was credible,

16  and did not accept his opinions at trial?

17  A.    He was questioned, yes.

18  Q.    And did the jury accept his opinions at trial?

19  A.    Uhm, I guess not.

20  Q.    And you were also aware from talking to Mr. Pacheco that

21  they could not find an expert on behalf of Dr. Wahl on

22  liability or causation; isn't that true?

23  A.    That's true.

24          THE COURT:  And you knew that when?

25          THE WITNESS:  Probably back in February when I was

1    talking to his insurance company.

2    Q.    Moving to Exhibit No. 57.

3    A.    An email dated July 23, 2014.

4    Q.    It's a little bit of an email chain.  It goes --

5    A.    Okay.

6    Q.    I believe it starts back --

7          THE COURT:  You need to finish up in about five

8    minutes.

9          MR. HOEY:  This is the last question.

10         THE COURT:  Good, perfect, because we need to move on.

11   Q.    So, Ms. Blair, it says here by you, "Hartford had inquired

12   as to whether the plaintiffs would take a $1 million offer,"

13   correct?

14   A.    After the judgment, is that when it was?

15   Q.    Yes.

16   A.    Yes.

17   Q.    Okay.  And you advised them that, yes, they would because

18   of how much time and expenses it would take in pursuing the

19   judgment, correct?

20         MR. DAVID:  Objection.  That's not what it says.

21         THE COURT:  The document speaks for itself.

22   Q.    But was that one of the reasons why you recommended that

23   Hartford make a $1 million policy post-verdict was because of

24   the expense and the time it would take to chase down a

25   judgment?  Correct?

```
 1              MR. DAVID:  Okay.
 2              THE COURT:  Once again, sustained.  The document
 3     speaks for itself.
 4     Q.   And was another reason that you recommended to Hartford
 5     that they can make a $1 million -- strike that.  Hartford asked
 6     for your opinion as to whether the plaintiffs would take a
 7     $1 million offer, correct?
 8              MR. DAVID:  Objection.
 9              THE COURT:  Overruled.
10     A.   Yes.
11     Q.   Okay, and you told them, yes, they would?
12              MR. DAVID:  Objection.
13              THE COURT:  You know, I'm trying to get through this.
14     Overruled.  Last question.  Did you tell them?
15              THE WITNESS:  Yes, I did.
16              THE COURT:  Okay, thank you.  Any further questions?
17              MR. DAVID:  None.
18              THE COURT:  Perfect.  Thank you.  Thank you,
19     Ms. Blair.
20              THE WITNESS:  Thank you.
21              (Witness excused.)
22              MR. KEENAN:  Your Honor, the next witness is Larry
23     Kenney, and that will be, with the exception of our expert,
24     Judge, our last witness.  Our expert, if the Court will recall,
25     can't be here till Friday.  Defense counsel doesn't want to
```

```
1   call their witness out of order, which means, if Mr. Kenney has
2   to go over till tomorrow, that will be the only thing for
3   tomorrow.
4            THE COURT:  Well, wait a minute.  I didn't agree to
5   this whole scenario.  So I have a whole day blank and I have to
6   go into next week?  I didn't understand that we wouldn't have
7   any testimony for tomorrow.
8            MR. KEENAN:  Your Honor, I -- I'm sorry, I didn't mean
9   to interrupt.
10           THE COURT:  I didn't know that I had nothing for
11  tomorrow.
12           MR. KEENAN:  Well, your Honor --
13           THE COURT:  We blocked the day.
14           MR. KEENAN:  We've been going faster than we thought,
15  but here's --
16           THE COURT:  I don't know that I'll agree to that, but
17  let's just at least see where we are with Mr. Kenney.
18           MR. KEENAN:  Well, here's how it is:  our expert on
19  Friday followed by their witness; we do closings, we're done.
20  We're done.
21           THE COURT:  I don't know.  Let's see Mr. Kenney, and
22  then we will discuss scheduling.
23           MR. KEENAN:  Okay.  I just wanted to --
24           THE COURT:  I don't understand why I can't do the
25  insurance expert first, and then just give him a brief
```

```
 1    opportunity for a -- I mean the defense -- and then give him a
 2    brief opportunity for rebuttal, if that's what the concern is.
 3              Do you have an expert?
 4              MR. DAVID:  No.
 5              THE COURT:  Oh.
 6              MR. DAVID:  This is a fact witness who will be coming
 7    in, and it's the only witness we have in our case.
 8              THE COURT:  And he's not available tomorrow, is that
 9    it?
10              MR. KEENAN:  Our expert, your Honor, has a commitment
11    longstanding for a charity board meeting.
12              THE COURT:  I understand that.  I may be
13    misunderstanding.  You have an expert.  Don't they have an
14    expert?
15              MR. KEENAN:  No.
16              THE COURT:  Oh, I see, so this is the last witness.
17              MS. HORNE:  No.  We are calling one witness.
18              MR. DAVID:  A fact witness.
19              MS. HORNE:  A fact witness.
20              THE COURT:  Who?
21              MS. HORNE:  Kathy Conway.  She's a Sedgwick
22    representative.
23              THE COURT:  All right, so she could be here tomorrow.
24    I'll take her out of order.
25              MR. DAVID:  I think our preference would be to close
```

1    with her, but if the Court is ordering it, then --

2         THE COURT:  I'm ordering it.  I don't want it to be --

3    and we'll sequester, so it won't matter to the expert.  And if

4    there's a brief need for rebuttal, then so there is.  I don't

5    know the answer to that, but we can at least do most of it.

6    You know what he's going to say.  You've read the report.  So

7    go ahead.

8         MR. KEENAN:  And, your Honor, we will then close

9    Friday for sure.  Now we call Attorney Larry Kenney.

10        THE WITNESS:  Good afternoon, your Honor.

11                       LAWRENCE KENNEY

12   having been first duly sworn, was examined and testified as

13   follows:

14        THE CLERK:  Would you please state and spell your name

15   for the record.

16        THE WITNESS:  My name is Lawrence Kenney.  My name is

17   spelled K-e-n-n-e-y.

18        MR. KEENAN:  May it please the Court.

19   DIRECT EXAMINATION BY MR. KEENAN:

20   Q.   Mr. Kenney, how are you?

21   A.   Nice to see you again.

22   Q.   Good to see you.  We actually shared a courtroom for about

23   three weeks, did we not?

24   A.   We did.

25   Q.   And that was not this building, but it was Suffolk County?

1    A.    That's correct.

2    Q.    I hope you've been well since then.  Now, you have been

3    deposed in this case, the Calandro case, twice.  True?

4    A.    In this case once.

5    Q.    Well, maybe a bad question.  Thank you.  In a case

6    involving the Calandro trial and the judgments made, you have

7    been deposed twice?  True?

8    A.    I was deposed in this case, and I was deposed in a case in

9    New York involving Hartford Insurance Company.

10   Q.    Well, but it involves the handling of the Calandro case by

11   Sedgwick, and you're a fact witness.  True?

12   A.    True.

13   Q.    Okay.  Now, that New York deposition was only about

14   90 days ago.  True?

15   A.    Roughly, yes.

16   Q.    All right.  Now, you've had the occasion to review your

17   file.  True?

18   A.    At some points, yes.

19   Q.    Well, I mean, you knew about today's testimony, right?

20   A.    Correct.

21   Q.    Did you review your file?

22   A.    A little bit, not very much.

23   Q.    Well, did you review either one of your depositions?

24   A.    I reviewed the deposition in this case.  I didn't review

25   the deposition in the New York case.

1    Q.    You did not?

2    A.    I did not.

3    Q.    Even though it was 90 days ago.  Okay, well, then you know

4    that the Court wants the best answers we can get on all these

5    issues, true?

6    A.    Yes.

7    Q.    Now, for that purpose, you have in front of you two

8    notebooks.  One contains exhibits which were agreed upon.

9    They're numbered.  The other one is objection exhibits, most of

10   which will come in.  You have that at your disposal.  I will

11   call your attention from time to time to exact documents.

12        Now, if you need time to review documents, tell me, and

13   I'll stop the questioning.  Is that fair?

14   A.    That's fair.

15   Q.    All right.  Now, likewise, Mr. Kenney, we have --

16             MR. KEENAN:  May I approach, your Honor?

17             THE COURT:  Yes.

18   Q.    We have both of your depositions, and they're in this

19   notebook, and from time to time I may want you to refer because

20   maybe your memory is not clear enough or whatever.  So you have

21   all the data and the depositions in front of you, okay?

22        Now, did you bring any notes to help you with your

23   testimony today?

24   A.    No.

25   Q.    Okay.  Now, let's go over the basics here.  You've been

1    practicing thirty-seven years?

2    A.    Correct.

3    Q.    You've had between forty and fifty cases with the last

4    witness, Mary Blair?

5    A.    That's about right, yes.

6    Q.    Okay.  We understand at times she was with Hartford,

7    actually employed by Hartford?

8    A.    Correct.

9    Q.    And we understand also -- and you know at this point,

10   Mr. Kenney, that the Court is well aware of a lot of facts.  It

11   is not fresh.  You haven't been in here, but -- so if I tend to

12   go a little fast, it's because we all know this.

13   A.    That's fine.

14   Q.    So let me rephrase it.  We understand that Mary Blair once

15   was an employee solely of Hartford.

16   A.    My understanding, yes.

17   Q.    Okay.  Did you in fact work with her while she was a

18   Hartford employee?

19   A.    I did.

20   Q.    And she then went to another company which I think was a

21   subsidiary, which is not important, of Sedgwick.  Did you work

22   with her in that capacity?

23   A.    To my understanding, she was employed by Sedgwick, but I

24   could be wrong about that.

25   Q.    All right.  And so you've dealt with her through her job

1    at Sedgwick too?

2    A.    I did.

3    Q.    Okay.  Now, as far as the owner or operator of this

4    nursing home, the defendant in the underlying case, you have

5    actually represented them, according to your testimony, about

6    twenty-two separate times.  True?

7    A.    That's correct.

8    Q.    Okay.  And as far as this lawyer here, David Hoey, you've

9    had actually four completed cases, nursing home cases, with

10   him?

11   A.    I'm sorry.  I've had more cases than four with David Hoey.

12   Q.    Nursing home cases?

13   A.    I've probably had a dozen nursing home cases with David

14   Hoey.

15   Q.    Oh, I'm sorry.  Four trials.

16   A.    You know, I thought about that after the deposition.  I

17   think it was probably two or three.  I thought it was four at

18   the time, but I could have been mistaken.

19   Q.    Okay.  And memory does that, doesn't it?

20   A.    It sure does.

21   Q.    That's not critical to the outcome of this case, let me

22   assure you.

23   A.    I wouldn't think so.

24   Q.    So it's either three or four cases that you actually tried

25   to a verdict, the jury came back with their decision, with

1    Mr. Hoey.  True?

2    A.    One of the cases was stopped I think in the middle of the

3    trial.  I think there was a settlement that didn't actually get

4    to a verdict, but we actually tried and impaneled and so forth.

5    Q.    But it was David Hoey involved?

6    A.    Yes, that's correct.

7    Q.    And is your testimony correct, at least your past

8    testimony, that every one of the nursing home cases that you

9    tried with David Hoey involved Mary Blair?

10   A.    I think that's correct.

11   Q.    Okay.  So this Calandro case was not new relationships.

12   You had been down this road before?

13   A.    With both of them, yes.

14   Q.    Okay.  Now, we need to know just a thumbnail about

15   settlement authority and where these numbers are coming from.

16   I want to know generally, and then later we're going to get

17   into the specifics of how it came about in this case.

18        Now, Mr. Kenney, most of the time, with your considerable

19   case load -- and you've got a lot of cases, true?

20   A.    I do.

21   Q.    Okay, you are the settlement funnel?  That is, all

22   settlement negotiations between the carrier, the self-insured,

23   and plaintiff's counsel go through you, the lawyer.  True?

24   A.    Generally that's true.  I can't say that's true in every

25   single case, but almost always that would be the case, yes.

1   Q.   All right.  And that's standard, old-school way to do it?

2   A.   As far as my experience, yes.

3   Q.   I wish we always did that.  But in this case there was an

4   exception because of the relationship that Mary Blair had with

5   David Hoey, and that under this circumstance, it was okay for

6   the two of them to talk, true, because they did?

7   A.   I'm not sure I'd agree with that.

8   Q.   Well, so we can move on, change it, and let's see if we

9   can get an agreement on it.

10  A.   You want me to change what?

11  Q.   Change the scenario because we have several instances

12  where Mary Blair is speaking directly to David Hoey, not

13  through you.

14           MR. DAVID:  Objection.

15           THE COURT:  Is that a question?

16           MR. KEENAN:  Yes, your Honor.

17           THE COURT:  Do you remember that?

18           THE WITNESS:  I don't remember that.

19           THE COURT:  Okay, next question.

20  Q.   All right, so let's get to settlement timeline, if we can,

21  and I'm going to go over some things that the Court is well

22  aware of.  The very first demand from Attorney Hoey was

23  $500,000.  True?

24  A.   Not true.

25  Q.   What was it?

1    A.    My memory is that before the case was even filed, David

2    had called me -- Mr. Hoey had called me about a case involving

3    this particular nursing home that he wanted to try to settle,

4    and that was sometime -- if I go back, there's a reference to

5    it in one of the emails, but he asked me at that point in time,

6    he said he didn't really want to put it in suit, but is it

7    possible to try to resolve it?  My memory was something around

8    $100,000.

9    Q.    Well, is your memory specifically the Calandro case or

10   just a case that he was talking about?

11   A.    No.  Actually it wasn't about -- the name didn't mean

12   anything to me, and I don't think he even used the name, but

13   the particular nursing home is one that I had represented two

14   or three times prior to this.  And I know that David knew that

15   I was generally going to be representing the Radius entities,

16   and he called me and didn't say anything about the name, but he

17   told me about a case, and the only other case we ever handled

18   was the Calandro case.

19        THE COURT:  So you're basically presuming that that

20   was the case, but he never used the name Calandro or described

21   the situation?

22        THE WITNESS:  No, he didn't use the name Calandro, but

23   he did use the name of the Radius Nursing Home, Radius Danvers,

24   and that was the only case that we ever had after that.

25        THE COURT:  So you don't know whether it was this case

1    or some other case that he just dropped?

2           THE WITNESS:  I don't.

3           MR. KEENAN:  Thank you, your Honor.  That was my next

4    question.

5    Q.   So we don't know, or you don't know?

6    A.   I don't know.

7    Q.   Go to tab or Exhibit 50, if you would.

8           THE COURT:  Did he describe the circumstances of the

9    other case, the $100,000 case?

10          THE WITNESS:  In a general -- I didn't even make any

11   notes about this because it was a very casual conversation, and

12   it was sometime in the summer of 2011, I guess it would be, and

13   he asked if we might be able to resolve the case or mediate the

14   case.  He said it involved the Radius Danvers Nursing Home.  I

15   did not know the name of the particular resident, but he

16   described her as a very elderly, very frail potential

17   plaintiff, but he preferred to try to resolve it without having

18   to put it into suit.

19   Q.   Well, "very elderly and very frail" could refer to a lot

20   of residents in nursing homes, could it not?

21   A.   About every single one.

22   Q.   You bet.  Now, turn to Exhibit 50, if you would,

23   Mr. Kenney.  You tell me when you're there.

24   A.   Okay.

25   Q.   Does that letter to you from Mr. Hoey on his law firm

1    letterhead reflect a $500,000 demand?

2            (Witness examining document.)

3    A.   A $1 million demand.

4    Q.   What's that?

5    A.   A $1 million demand.

6    Q.   Where is that, what page?

7    A.   The second page.

8    Q.   Okay, but I'm trying to establish the first official

9    demand that Mr. Hoey made.  We'll get to the $1 million in a

10   minute.  Look at the first paragraph, the second sentence.

11           (Witness examining document.)

12   A.   Yes.

13   Q.   So other than your memory about this other matter that may

14   or may not be the Calandro, is it true that Mr. Hoey's first

15   demand on this case, the Calandro case, is $500,000?

16   A.   As to -- as to -- yes, $500,000.

17   Q.   All right.  Now, the next thing that we have -- and,

18   again, I'm just trying to get the sequence, and I don't mean to

19   be fussing at you -- but the next thing we have in terms of

20   sequence, that was November of '13.  Then we have January of

21   '14 --

22           THE COURT:  Wait a minute.  Where did you get

23   November?  I'm looking at February 7, 2014.

24           MR. KEENAN:  That's what the letter says, your Honor.

25   If I may, on November 13 of last year -- this would have been a

```
 1   letter in '14, and then, and I quote --
 2             THE COURT:  I'm sorry.  Where --
 3             MR. KEENAN:  May I approach, your Honor?
 4             THE COURT:  Are we looking at Exhibit 51?
 5             MR. KEENAN:  50.
 6             THE COURT:  50.
 7             MR. KEENAN:  Yes.  I'm sorry.  I tend to start
 8   speeding up if time is an issue.  I'll slow down.
 9             THE COURT:  All right, go ahead.  So November of 2014,
10   all right, I see that now.
11             MR. KEENAN:  You do, your Honor?
12             THE COURT:  Yes.
13             MR. KEENAN:  Okay, but actually the $500,000 was
14   November of '13, your Honor, because this letter --
15             THE COURT:  It looks as if it's February 7 of 2014.
16   Am I looking at the same thing you are?
17             MR. KEENAN:  Your Honor, may I approach?
18             THE COURT:  Exhibit 51.
19             MR. KEENAN:  No, 50.
20             THE COURT:  Well, all right, I see what you mean.  So
21   you're not following 51 at all?
22             MR. KEENAN:  I'm not.  We're on 50.
23   Q.    You have 50, don't you?
24   A.    I do.
25   Q.    And this was a letter dated in April of '14?
```

1    A.    Correct.

2    Q.    But it refers to a November the 13th of last year, which

3    would be November of '13:  "I made a onetime discounted oral

4    demand in the amount of $500,000."  Did I read that correctly?

5    A.    You read it correctly.

6    Q.    Thank you.  So I just want to get a point of reference.

7    The very first official demand that we know of from

8    Attorney Hoey was $500,000 in November of 2013.  True?

9    A.    I don't remember the -- my understanding was, his first

10   $500,000 demand was in October of 2011.

11   Q.    Okay.  Whatever it was -- let me rephrase it.  The first

12   dollar figure, firm demand from Attorney Hoey was $500,000?

13   A.    Correct.

14   Q.    Well, let's move on.  Then we have, if we can use that

15   date of November of '13, in January of '14 -- and if you'd turn

16   to Exhibit 23, and tell me when you've got there.

17   A.    I'm here.

18   Q.    Okay.  So this is January of '14, and this would have been

19   an email from the adjuster representing the codefendant.  True?

20   A.    Correct.

21   Q.    And he's reaching out to you as the lawyer for the nursing

22   home to see if you all could do a joint resolution, joint

23   offer, and be able to get the case concluded.  Is that the best

24   way to read this?

25   A.    Let me just read it, if you will.

1    Q.    Sure.

2          (Witness examining document.)

3    A.    I've read it.

4    Q.    Okay.  And did my characterization, bottom line, is that

5    correct?

6    A.    Repeat the question again.  I'm not sure I understood what

7    you're asking.

8    Q.    Sure.  This adjuster from the doctor, the codefendant, is

9    reaching out to you as your capacity as a lawyer for the

10   nursing home and saying, "Hey, let's do a joint offer to see if

11   we can conclude the entire case."  Is that the gist of this?

12   A.    Well, if I remember correctly, Mary Blair had I think two

13   deaths in her family at the time and was out of work for a

14   period of time.

15   Q.    Okay.

16   A.    Joe Pacheco is an adjuster who I know from other cases,

17   and he just was using me as a conduit to speak to Mary.

18   Q.    Okay, but the categorization on the record, is it correct?

19   A.    Well, he wants to negotiate a settlement, yes.

20   Q.    Right.  And he's suggesting $300,000 or $150,000 each.

21   True?

22   A.    Well, that's what it says, yes.

23   Q.    Okay.  And then you obviously had that information.  And

24   then if you turn to 52, Exhibit 52, sir, and tell me when

25   you're there.

```
1    A.    I am.

2    Q.    Okay.  And particularly that second email on the thread on

3    the 30th of January, 2014, in response to that previous email,

4    you responded to him that, yes, your client, the nursing home,

5    could go 50/50?

6    A.    Are you referring to the email that's from me, and it's

7    entitled "Joe, sorry --"

8    Q.    That's right.  Do you see it there?

9    A.    Yes.  I said, "She is willing to go 50/50 with Coverys

10   this."

11   Q.    Correct.

12   A.    Okay.

13   Q.    "And she is willing to contribute up to $400,000."  Do you

14   see that?

15   A.    I wrote there, "She would be willing to contribute up to

16   $200,000, if necessary, but would prefer to start at something

17   lower."

18   Q.    Right.  And the "she" is Mary Blair, true?

19   A.    That's true.

20   Q.    Okay.  Now, in terms of the sequence, the plaintiff, David

21   Hoey, makes an official request for the policy, and

22   specifically the endorsement, to find out how much coverage the

23   defendant nursing home has.  Do you recall that?

24   A.    I recall that.  Yeah, we produced it.  I don't remember

25   how it got produced, but we did produce it.
```

1    Q.   Okay.  And when it was produced, it indicated $1 million.

2    True?

3    A.   My memory was that the limit was $1 million, correct.

4    Q.   Okay.  And clearly and succinctly, it did not include

5    coverage for punitive damages.  True?

6    A.   I can't say that.  I don't know.

7    Q.   You don't know, okay.  Did you examine the policy as its

8    lawyer, the lawyer for the nursing home, to determine what the

9    exposure to the nursing home would be?

10   A.   I didn't examine the policy to determine what the exposure

11   to the nursing home would be because I don't usually involve

12   myself in coverage issues between the carrier and its insured.

13   Q.   All right.  So then we have four days later, four days

14   after the production of the $1 million debt sheet --

15   A.   Can you direct me to where that is?  I don't see that

16   here.

17   Q.   It's actually a newly added expert exhibit, Mr. Kenney.

18   It's A.

19            MR. HOEY:  Marked for identification.

20            (Witness examining document.)

21   A.   April 4, 2014?  I see that.

22   Q.   Right.  And do you recall that less than four days later,

23   Mr. Hoey demanded the entire policy?

24   A.   I can't give you the dates.  If you point me to a

25   communication, it would be helpful.  I don't remember the days.

1    I know at one point he did demand the policy, but I don't know

2    what day it was.

3    Q.   Well, let's be exact.  We don't want to guess about it.

4    It was four days, if you look at Exhibit 50.  And tell me when

5    you get there.

6    A.   Oh, okay, I see where, yeah.  That's correct, he did.

7    Q.   And it was four days after official notification that

8    that's what the insurance policy covered.  True?

9    A.   Well, this letter indicates to me that he was demanding

10   $2 million against both defendants but $1 million each.

11   Q.   Right.  Well, it's a policy limit demand, true?

12   A.   That's correct.

13   Q.   Okay.  Once again, you didn't -- it's four days after he

14   received official notice of what the policy was, true?  You

15   just had the document up there and it was addressed to you.

16   A.   I think Mr. Hoey was well aware of the policy limits in

17   these cases, but that's all right.

18   Q.   Well, we thank you for that.  And, by the way, you know,

19   that really is a good question.  Even if you have dealt with a

20   defendant before and you know what the insurance company has

21   given them in coverage in those other cases, there is no

22   guarantee, Mr. Kenney, that a new case is not going to have a

23   different policy, is there?

24   A.   No, of course not.

25   Q.   So just because he may have had cases in the past of

```
1   $1 million, he's not going to say, "Well, I guarantee it's
2   going to be $1 million in this case."  He has to ask, and you
3   have to produce, true?
4   A.   That's right.
5   Q.   And he did, and it was $1 million, right?
6   A.   Correct.
7   Q.   And four days later he demanded the policy.  Now, it was
8   in -- and if you would go to Exhibit 32, and tell me when you
9   get there.  That's July the 7th of '14, very close to the
10  trial, where Mary Blair requests $300,000.  Just tell me when
11  you get there.
12  A.   I'm at Exhibit 32.  I wasn't a participant in this email
13  exchange, so are you asking me to read what's there?
14  Q.   No.  I'm just asking you, you later became aware, did you
15  not, because we're going to go to that, about your dealings
16  with Attorney Hoey based on the authority?  And, by the way,
17  goodness, I failed, your Honor, and please excuse, I failed to
18  make this point:  When you are the lawyer for a defendant that
19  has insurance coverage, you don't have any authority, do you,
20  Mr. Kenney?
21  A.   I do not.
22  Q.   I mean, you can recommend until the cows come home, but
23  you can't give any authority, true?
24  A.   That's correct.
25  Q.   And the way it works is, the adjuster, a Mary Blair, has
```

1   got to go get it, and then may or may not give it to you to

2   negotiate?  That's how it works, right?

3   A.   In a general sense, yes.

4   Q.   All right.  And you, of course, make recommendations.

5   True?

6   A.   Generally, yes.

7   Q.   Now, are you telling us you were not aware that shortly

8   before trial, Mary Blair goes to Hartford and says, "I need

9   $300,000"?  You were unaware of that?

10  A.   I was unaware of that.

11  Q.   You didn't know that, all right.

12  A.   I did not.

13  Q.   Okay.  Now --

14       THE COURT:  What did you believe at this point in time

15  the settlement authority you had was?

16       THE WITNESS:  I believed that Mary had a settlement

17  authority of $250,000.

18       THE COURT:  So that's what she told you?

19       THE WITNESS:  That's what she told me.

20       THE COURT:  Did she ever tell you she had any wiggle

21  room?

22       THE WITNESS:  No.  Just to the contrary actually.

23  Q.   Well, that's why we're glad you're here because now I want

24  to ask you what you were the witness for.

25       THE COURT:  What you were -- I didn't hear.

1    Q.    What you are the witness for; that is, firsthand, okay?

2    Now, do you recall around the 13th of July having a

3    conversation with David Hoey about Mary's communication of

4    offers, your communication of offers?  Do you generally

5    remember that?

6    A.    I do remember that because I knew it would be a subject

7    brought up today, and I went back into my calendar and tried to

8    look to see when that conversation likely took place, and my

9    best recollection is, it took place on the 14th.

10   Q.    The 14th, okay.

11          THE COURT:  All right, so what happened on the 14th?

12          MR. KEENAN:  Your Honor, that's where I'm getting to.

13          THE COURT:  Yes, because I don't know what you're

14   referring to.

15   Q.    Please, go to your deposition, your second one 90 days

16   ago --

17          THE COURT:  I just want him to testify.  What happened

18   on July 14?

19   Q.    All right, go ahead.

20   A.    I had been in communication with David for some period of

21   time.  He was away for a period of time -- I don't remember the

22   exact dates -- but I found out in the interim that he had

23   settled the case with the codefendant, Dr. Wahl's carrier.  I

24   was not aware of that until shortly -- the week before that

25   when I received a demand, which I conveyed to Mary Blair, of

2-165

$1 million; and that if there was not an offer forthcoming from

2 Sedgwick for a payment of greater -- not $500,000 but greater

3 than $500,000, they would not consider any further settlement

4 discussions whatsoever. In response to that, I did speak to

5 David on the 14th. I'm certain it was the 14th because there's

6 a reference actually to our conversation in an email from David

7 on the 15th. In that conversation, I asked David, "What are

8 you doing?" I was very upset with him because I thought he was

9 doing something that I thought was inappropriate. And I said,

10 "Mary Blair has $250,000, and she's been trying to offer it to

11 you." And I said, "If you will not accept that, maybe I could

12 get $350,000, but I don't have that." And I didn't get a

13 response except the next day I got a response that didn't make

14 any sense.

15       In response to that, I told Mary Blair that I had offered

16 the $250,000 to Mr. Hoey, and I said, "If that doesn't do it,

17 perhaps I can get you to give him $350,000." And Ms. Blair was

18 very sharp with me about that and said, "I don't have authority

19 for $350,000. Do not offer that." And I said, "I didn't offer

20 it," but I said, "If it would do it, think about it."

21 Q.    All right. You know when it comes to enforceability of

22 settlement agreements, wording is extremely important? You

23 know that?

24 A.    I do.

25 Q.    So a statement like, "David, I can get you, I think,

1    $250,000 --"

2           THE COURT:  No.  What did you precisely say?

3           THE WITNESS:  I wouldn't have said it that way.  What

4    I said was, "Mary has $250,000.  She's been trying to give it

5    to you, and you haven't returned her calls."  And I then said,

6    "If it would do it," which is contingent, "then maybe she can

7    come up to $350,000, if -- if that would do it."  I responded

8    that I would talk to Mary about that.  And Mary then, when I

9    told her about that potential for $350,000, she said, "No.  You

10   don't do that.  I don't have $350,000 in authority."

11          THE COURT:  Did she tell you she had $300,000?

12          THE WITNESS:  No.

13          THE COURT:  Did she tell you she could get $300,000?

14          THE WITNESS:  No.

15   Q.   You didn't read what you said 90 days ago, true, in the

16   deposition?

17   A.   I did not, no.

18   Q.   Can you please go to Page 45.

19   A.   Which deposition is this?

20          THE COURT:  Excuse me.  What did Hoey say when you

21   said maybe you could get $350,000?

22          THE WITNESS:  My memory is vague on that, but there

23   was a very noncommittal response, whatever that was, and I

24   can't repeat it verbatim.  I don't recall.

25          THE COURT:  And when was trial?

1          THE WITNESS:  The 17th, I think?

2          THE COURT:  So three days later.

3          THE WITNESS:  Three or four days later.

4          THE COURT:  And how did you know that the doctor had

5    given $250,000?  Do you remember?

6          THE WITNESS:  I do.  I didn't know anything about it.

7    There was a nondisclosure agreement that had been drafted.  We

8    were not aware of this.  I learned initially from Mr. Hoey's

9    associate, Mr. Sobczak, who sent me an email on the afternoon

10   of Thursday, July 2 or 3.  It was the holiday weekend.  I had

11   taken that day and Friday off and Monday as a long weekend.

12   When I returned to the office on Tuesday morning, I saw his

13   email, and I think it may be an exhibit.  I'm sure it's an

14   exhibit someplace here.  And basically there was a drop-dead

15   demand:  "If you don't offer no less or greater than $500,000,

16   then there will be no further settlement discussions," and that

17   we would go to trial and take a verdict.  I reported that to

18   Mary, and --

19          THE COURT:  But how did you find out the doctor

20   offered $250,000, or given $250,000?

21          THE WITNESS:  Robert Bouley, who was his attorney in

22   that case, he was not permitted to tell me what it was that

23   they settled the case for, but he told me, "You can figure it

24   out," $250,000.

25          THE COURT:  He used the word "$250,000," or you

1   figured it out?

2            THE WITNESS:  I did.

3            THE COURT:  You did.

4            THE WITNESS:  It was subsequently confirmed, but

5   that's what it was.

6            THE COURT:  I didn't hear you.

7            THE WITNESS:  It was subsequently confirmed at

8   $250,000, but at the time I just --

9            THE COURT:  So for you, based on the past offer that

10  had been made, you made that assumption?

11           THE WITNESS:  Probably more than that, but, yes, I

12  made an assumption.

13  Q.   Okay, you guessed right.  So let's go back to where we

14  were, and that is, please go to your deposition, Page 44, just

15  by way of background.  Then I'm going to refer you to a

16  specific section on Page 45 to see if that refreshes your

17  memory.

18  A.   Are both these transcripts together?

19  Q.   They are.

20           THE COURT:  Which exhibit?

21           MR. KEENAN:  Your Honor, this is the deposition.

22           THE COURT:  Oh, oh, oh.

23           MR. KEENAN:  The New York deposition.

24           THE COURT:  I don't have it, so --

25           MR. KEENAN:  We'll supplement the record, your Honor.

```
1              MR. DAVID:  I think this is being offered to refresh
2    Mr. Kenney's memory, and I am not aware that he said he has a
3    lapse of memory on any of this yet.
4              THE COURT:  Well, or a prior inconsistent statement,
5    so it sort of depends.  How are you doing this?
6              MR. KEENAN:  Well, however you want to categorize it.
7    I'd like to be professional and assume that he just doesn't
8    remember it correctly, or --
9              THE COURT:  All right, so he just reads it, and then
10   you ask him, "Does that refresh your recollection?"
11             MR. KEENAN:  Thank you.
12   A.   What am I looking at?
13   Q.   First of all, you're going to go to Line 23 when you were
14   asked, "What date was this conversation?" and you say, "It was
15   July 13 actually.  I called him."
16   A.   I'm sorry.  What page are you on?
17   Q.   At the bottom of Page 44 beginning at Line 23, the
18   next-to-the-last -- tell me when you got there.
19             (Witness examining transcript.)
20   Q.   Do you see where it says "July 13"?  Line 23 on Page 44.
21   A.   I think I'm looking at the wrong -- which transcript are
22   we looking at here?  Are you talking about the deposition a
23   couple of months ago?
24   Q.   Yes, sir.  I am trying to get you out of here, but I don't
25   want to rush you at the same time.
```

1    A.   I'm sorry, but I don't see it.

2         MR. KEENAN:  May I approach, your Honor?

3         THE COURT:  Yes.

4         MR. KEENAN:  Mr. Kenney, may I approach?

5         THE WITNESS:  Sure.

6    Q.   Videotape deposition, August 16, 2017.

7    A.   Correct.  I remember that.

8    Q.   Okay, now we're at Page 44 where you were asked about that

9    conversation.

10        (Witness examining transcript.)

11   Q.   Where it says, "It was July 13 actually."  Now we know

12   that's not right, right?

13   A.   That's not right.

14   Q.   It's the 14th?

15   A.   Yes, it is, correct.

16   Q.   "I called him and said, what are you doing?"  You said

17   that?

18   A.   I did.

19   Q.   "We had an arrangement that you weren't going to settle

20   one without the other.  In fact, he told me on several

21   occasions that he wanted a joint settlement."

22        Next paragraph:  "And I said, what are you doing?  I said,

23   Mary was -- she was prepared, prepared to offer you $250,000

24   three weeks ago."

25   A.   Correct.

1    Q.    Okay.  Well, Mr. Kenney, do you see the difference between

2    somebody being prepared to offer $250,000 and in fact offering

3    $250,000?  Do you see the difference or not?

4    A.    Well, if I can read further on my answer?

5    Q.    In fact I intend to.

6    A.    Okay.

7            THE COURT:  My problem is, the two of you are talking

8    to each other, so I can't hear.  So I just need it in the mic.

9            THE WITNESS:  That's a very long answer, and I can

10   read the whole thing, if you'd like, but --

11           THE COURT:  Sure.

12           MR. KEENAN:  Whatever you want.

13           THE COURT:  If you want to.

14           THE WITNESS:  Do you want me to read the whole answer,

15   your Honor?

16           THE COURT:  Sure, if you want to.

17           THE WITNESS:  Okay.  Okay, the full question before,

18   "You followed up with Mr. Hoey?

19            "I never heard from Mr. Hoey again.

20            "You didn't or Mary didn't?

21            "Either one of us.  Normally it would be me.  Normally

22   I would be the conduit for all conversations with other

23   counsel, but she knew David very well, having had many cases

24   with David over the years, and she felt comfortable speaking to

25   him.  And I thought it was an odd response at that point in

1  time because all she wanted to do was make an offer of

2  $250,000, and he wouldn't even hear it.  I thought that was

3  kind of odd.  I didn't think anything at the time.  I waited

4  and waited and waited and waited, until sometime in the first

5  week of July, about three weeks later, I got an email from his

6  associate demanding $1 million, and, well, you have the record,

7  you have the document.  And David was then, if my memory serves

8  me, was in Ireland playing golf.  I think he was.  So I had to

9  wait a few days.  I did call him, and I've gone through my

10  emails in trying to reconstruct this.  The best I can tell, I

11  think it was July 13.  Actually, I called him and said, 'What

12  are you doing?  We had an agreement that you weren't going to

13  settle with one without the other.'  In fact he had told me on

14  several occasions that he wanted -- that the only thing he

15  would consider is a joint settlement.  And I said, 'What are

16  you doing?'  I said, 'Mary was, she was prepared to offer you

17  $250,000 three weeks ago.  You never got back to her.'  And he

18  admits it.  I have an email someplace where he admitted he

19  didn't get back to her.  And he denies that he was trying to

20  set her up, but I don't believe that, frankly.  So I offered

21  him -- at that point I said, 'David, I know she has $250,000,'

22  and I said, 'I don't know what Joe Pacheco,'" who was the

23  adjuster for the other carrier, "'I don't know what Joe paid

24  you, but I'm sure Mary would match it.  Maybe she could get

25  more than that, $350,000 or something.  I don't have any

1    authority for that, but maybe she could.'  And his answer was

2    like nothing, he was, like, noncommittal.  So I reported that

3    to Mary."

4    Q.   Okay, thank you, and you read that verbatim.

5    A.   I did.  I tried to.

6              THE COURT:  Is that your testimony today?

7              THE WITNESS:  Yes.

8    Q.   So Mary Blair never made the $250,000 offer to David Hoey.

9    True?

10   A.   Mary didn't.  I did.

11   Q.   Okay.  And you did it right there?

12             THE COURT:  Right where?

13   A.   The day --

14   Q.   That day?

15   A.   I was mistaken about the day, by the way.

16             THE COURT:  So what's the day as you currently --

17             THE WITNESS:  The day -- I looked at the calendar --

18   that was a Sunday.  The conversation was on the Monday, which

19   was the 14th.  I misspoke on the day.

20   Q.   Okay, so we understand how settlements are done here, take

21   a look at what you just read, because you said, "And so I

22   offered him -- at that point I said, 'David, I know she has

23   $250,000.'"  Did I read that right?

24   A.   Right.

25   Q.   So, now, Mr. Kenney, do you consider that to be an offer

1    for $250,000?  Do you consider that an offer?

2    A.    Yes.

3    Q.    Oh, you do?

4    A.    I do.

5    Q.    Okay.  And this $350,000, says she could get more than

6    that, $350,000 or something, "But I don't have authority --"

7    A.    Correct.

8    Q.    "-- to do it"?

9    A.    Correct.

10   Q.    Okay.  And neither did Mary?

11   A.    Not to my knowledge.

12   Q.    Okay, all right.  And all this occurred what, several days

13   before trial?

14   A.    Correct.

15   Q.    The trial started what, the 16th, sir?

16   A.    The 16th or 17th, something -- that week, sometime later

17   that week.

18   Q.    So this was 48 hours before the trial?

19   A.    I think it was actually more than that, but not very long

20   before the trial, correct.

21   Q.    Okay, all right.  All I wanted to do is to get your

22   testimony on the flow of the settlement.

23              THE COURT:  So you made the offer three days before

24   trial.  And when you accused Mr. Hoey of not getting back to

25   Mary Blair when at least you believed she was going to offer

1   the $250,000, did he deny that at all?

2            THE WITNESS:  No.

3            THE COURT:  So if that was three weeks before that she

4   was planning on making that offer, in your view, that would put

5   it mid-June?  Is that something along that line?

6            THE WITNESS:  I can tell you exactly when it was, your

7   Honor.  We were present, if I can explain --

8            THE COURT:  Yes.

9            THE WITNESS:  Mary Blair and I were present in a

10  conference room at a mediation with a mediator from Atlanta,

11  which is why I remember it, named Strauss, who I had never met

12  before.  And we were waiting at the mediation session in a

13  separate room, and we were just killing time.  And Mary said to

14  me at that point in time, "I want to settle the Calandro case."

15  And she said, "You know, I'd like to get something from David,"

16  and I said, "Well, why don't you call him right now."

17            And I remember this because I gave her his -- she

18  didn't have his office number -- I gave her his office number,

19  and she spoke to David, or at least she said she was speaking

20  to David --

21            THE COURT:  Wait.  So you were there while she made

22  the call?

23            THE WITNESS:  I was.

24            THE COURT:  And what did she say?

25            THE WITNESS:  She said to David, "I want to make you

1    an offer."

2              THE COURT:  Did she put a number on it?

3              THE WITNESS:  Not at that point in time, no, she did

4    not.  And I only heard her side of the conversation, but she

5    told me that he said he did not want an offer at that point in

6    time because he wanted to speak to his client.  And she said

7    "Okay."  He said that he would get back to her, and that's

8    where it was left.

9              THE COURT:  And that would be -- do you remember

10   timing?

11             THE WITNESS:  It was Friday, June 13.

12             THE COURT:  Friday, June 13?  Okay.

13             MR. KEENAN:  May it please the Court.

14   Q.   Mr. Kenney, let's move on to a completely different topic,

15   and that is how you as lawyer for the nursing home went about

16   valuing the exposure that they were looking at.  You do that

17   with every one of your clients, don't you?

18   A.   Did I consider the case and put a potential value on the

19   case?

20   Q.   Correct.

21   A.   Is that what you're asking?

22   Q.   Correct?

23   A.   Yes, I did.

24   Q.   Okay.  And so as to understand your use of terms, because

25   it's been a little different, value is what you believe the

```
1   jury is going to put on the verdict line.  True?
2   A.   There is verdict value and there's settlement value, and
3   they're not necessarily the same thing.
4   Q.   Will you hold that thought for a minute?
5   A.   Sure.
6   Q.   All right, but the value that you as the defense lawyer
7   put on the case is what the jury is going to determine.  True?
8   A.   Well, it's my best judgment.  It's what's likely, yes.
9   Q.   Okay.  Now, it does not include 36 percent interest.
10  True?
11  A.   No.
12  Q.   Okay.  But that's got to be paid too when there's a
13  verdict, right?
14  A.   Correct.
15  Q.   So if we use the term "exposure" -- we've heard that --
16  that is how much the insurance company is going to have to pay,
17  right?
18  A.   Well, you're asking me two different things.  You're
19  asking me about exposure, and you're asking me about verdict
20  value.  They're two different things.
21  Q.   That's my point.  You already described what verdict value
22  is.  Now I'm trying to --
23            THE COURT:  So verdict value is just the ad damnum on
24  the damage line?
25            THE WITNESS:  Correct.
```

1          THE COURT:  Without consideration of the 12 percent

2    interest rate?

3          THE WITNESS:  It's verdict, not judgment value,

4    correct.

5          THE COURT:  Okay.

6          MR. KEENAN:  Thank you, your Honor.

7    Q.   And the exposure is the verdict value plus the accumulated

8    interest because that's real money.  True?

9    A.   That's correct.

10   Q.   Okay.  Now, let's go to Exhibit 13.  You have filed with

11   Radius and sent to Sedgwick as well a number of pretrial

12   reports and budgets.  You do that customarily for all your

13   clients, true?

14   A.   The different carriers do it differently, but in this

15   particular case, my memory is that Hartford wanted a pretrial

16   report 30 days, or something like that, prior to trial.

17   Q.   By the way -- and forgive me, but we need to know and I've

18   not asked -- who was paying Larry Kenney's lawyer bill?

19   A.   That's a good question.

20   Q.   Or did you do it for free?

21   A.   No, we didn't do it for free, but I'm not sure if it was

22   Hartford or Sedgwick, to be honest with you.

23   Q.   You don't know?

24   A.   I honestly don't know.

25   Q.   Okay, fair enough.  Now, let's go to Exhibit 13, which

1   bears the date of June, 2014, a month before the actual trial.

2   A.    Correct.

3   Q.    Okay?  And direct your attention to Category 6, the

4   damages, and tell me when you're there.

5   A.    Yes.

6   Q.    Okay, quote, "Usual wrongful death damages.  Decedent left

7   three adult children.  There's nothing particularly compelling

8   or unusual about the loss of their admittedly frail 91-year

9   mother that would take this case out of the norm on the usual

10  measure of damages."  Did I read that right?

11  A.    Correct.

12  Q.    Okay.  And then do you recall in your deposition -- that

13  is, the one 90 days ago -- you said there was really nothing

14  significant that would enhance damages?  Do you remember saying

15  that?

16  A.    I don't remember it, but it's very likely I did say

17  something like that, correct.

18  Q.    Right.  And then you conclude, at least on the report --

19  and it's No. 8 under "Verdict value" -- tell me when you're

20  there.  It's the next page, right?

21  A.    I've got it.

22  Q.    "Assuming full liability, we think an award of $300,000 to

23  $500,000 is possible."

24  A.    Correct.

25  Q.    Did I read that correctly?

1    A.    Yes.

2             THE COURT:  When you say "full liability," are you

3    including causation?

4             THE WITNESS:  If there was causation, correct.  There

5    was two different counts here, which I need to explain it

6    but --

7             THE COURT:  Go ahead.

8             THE WITNESS:  Do you want me to explain it?

9             THE COURT:  Yes.

10            THE WITNESS:  There were two counts, and the first

11   count was for conscious pain and suffering, and the second

12   count was for wrongful death.  The wrongful death -- the

13   causation on conscious pain and suffering to some extent seemed

14   likely to me.  The causation with respect to the wrongful death

15   was highly doubtful, and there was a number of reasons for

16   that; but the evaluation, when I said $300,000 to $500,000, was

17   really an evaluation with respect to potential conscious pain

18   and suffering, having considered that the likelihood, in my

19   view, of a causation finding on the wrongful death case was

20   very unlikely.

21            THE COURT:  So did you dispute -- when you went to

22   trial, you conceded liability on both of those claims?

23            THE WITNESS:  No.  Conceded negligence, your Honor,

24   not causation, not damages.

25            THE COURT:  So not causation on either of the claims.

1    You litigated causation both for conscious --

2         THE WITNESS:  It's clear in the filings we filed, your

3    Honor, that the question of breach of the standard of nursing

4    care was probably likely because my own expert said there were

5    certain things that were likely, but he disputed vehemently

6    that there was any causal relationship with death.

7         THE COURT:  But how about the conscious pain and

8    suffering?

9         THE WITNESS:  Well, to some extent, yes.  If you

10   breach the standard of care and she suffers a decubitus ulcer,

11   for example, yeah, there's some conscious pain and suffering.

12        THE COURT:  So when you went to a jury, were you

13   challenging causation on both counts?

14        THE WITNESS:  We didn't distinguish it for the jury,

15   but we certainly disputed --

16        THE COURT:  You didn't distinguish it?  It wasn't a

17   separate verdict form?  I can get it, I'm sure.

18        THE WITNESS:  No, there were two.  I can explain to

19   you if you want, your Honor.

20        THE COURT:  So but when you're saying assuming full

21   liability, you mean what, on both claims?

22        THE WITNESS:  No.  When I -- we use the term

23   "liability."  It's a generic term.  There are three elements to

24   every tort claim, as you well know:  There's some negligence.

25   There has to be causation.  There has to be damages.  The

1   negligence with respect to the care by the nursing home in some

2   respects was admitted.  It was.  We hotly disputed whether that

3   caused her death.  That was the real issue in the case.

4          THE COURT:  But did you dispute whether it caused pain

5   and suffering while she was still alive?

6          THE WITNESS:  No, not really, no.

7          THE COURT:  So it did not go to the jury?  You

8   basically conceded the whole thing other than damages with

9   conscious pain and suffering?

10          THE WITNESS:  Well.  There was only two counts, and

11   the two counts were stated separately --

12          THE COURT:  I see, and then there was one causation

13   question?  I get it.  So you didn't give the jury the

14   opportunity to make a distinction between the wrongful death

15   and the pain and suffering?

16          THE WITNESS:  Well, I'm not sure I had a say in that,

17   but somebody didn't.

18          THE COURT:  The judge when he wrote it just had one

19   causation question, one proximate cause issue?

20          THE WITNESS:  Right.

21          THE COURT:  I see.  So you never know which one they

22   came down on.

23          THE WITNESS:  Well, they came down for wrongful death,

24   so they assume that they found causal relationship with the

25   wrongful death.

```
 1              THE COURT:  Right, because you had to do the -- but
 2    you don't know whether they came down on the conscious pain and
 3    suffering?
 4              THE WITNESS:  I don't, your Honor, no, not
 5    specifically.  That was not a function -- that was not a real
 6    focus in the case.
 7              MR. KEENAN:  Your Honor, with due respect, that's not
 8    entirely correct, but I will cover it in --
 9              THE COURT:  All right.  Well, you'll give me the
10    verdict forms, so --
11              MR. KEENAN:  And what was read to the jury as to the
12    issues they were to be considering.
13              THE COURT:  Well, was there a separate causation issue
14    with respect to each claim?
15              MR. KEENAN:  No, but there were several liability
16    issues that went to the jury.
17              THE COURT:  But that's what we're debating here is
18    what "liability" means.  So, I mean, what at least I'm
19    understanding, there's conscious pain and suffering, wrongful
20    death.  There was one causation question, and there may have
21    been different theories of breach of duty.
22              THE WITNESS:  Right.
23              THE COURT:  So I'm just trying to understand what he
24    meant when he said "with full liability."  I'm going to take it
25    at face value and assume it's with both claims.
```

1          MR. KEENAN:  But, your Honor, the distinction -- may

2     I?

3          THE COURT:  Yes.

4          MR. KEENAN:  -- is they admitted to certain of the

5     liability causes of action.  They didn't as to others, which --

6          THE COURT:  Did they stipulate to causation?

7          MR. KEENAN:  No.

8          THE COURT:  All right, so --

9          MR. KEENAN:  No.

10         THE COURT:  We may be playing with semantics, but I

11    usually think of proximate causation as part of the liability

12    case, and damages is separate.  If that's semantic, we can

13    argue about that, but I just want to understand.  There was one

14    causation question, regardless of which of the claims that

15    there were, right?

16         MR. KEENAN:  Yes, but we will put in your Honor's

17    record exactly what liability was considered by the jury as a

18    contested issue and what was admitted.

19         THE COURT:  Was it contested that there was breach

20    with respect to the urinary tract infection?

21         MR. KEENAN:  We don't believe -- when your Honor hears

22    what was actually read to the jury, which was approved by

23    counsel and the judge, we take the position that it wasn't,

24    that that was a truly legitimate liability issue to which they

25    had to decide.

1          THE COURT:  I see.

2          MR. KEENAN:  And I don't mean to fuss, Judge, but it

3    does make it --

4          THE COURT:  Well, why don't we finish up with him, and

5    then we can --

6          MR. KEENAN:  Okay, all right.

7    Q.   Mr. Kenney, just to kind of sum this all up, we

8    established that as far back as November of '13, you and

9    Sedgwick had knowledge of a $500,000 demand.  True?

10   A.   True.

11   Q.   And every single evaluation included $500,000, true?

12   $300,000 to $500,000, $400,000 to $500,000, true?

13   A.   I think it was $300,000 to $500,000 throughout the case.

14   Q.   Okay.  And so from November of '13 until Mr. Hoey got the

15   policy and made the demand $1 million, you had many months

16   where all you'd had to do is say "accept," and the case would

17   have been over, right?

18   A.   I don't have anything to do with that.

19   Q.   All right, okay.  Now, I want to go down as quick as I can

20   because you said that this was a usual wrongful death damage

21   case, it wasn't anything significant out of the ordinary, so I

22   want to ask you whether or not you think these are significant.

23   There was pled in the complaint, Mr. Kenney, several paragraphs

24   of punitive damages.  True?

25   A.   I don't remember several.  I think there was a punitive

1    damages claim, yes.

2    Q.   Yeah.  And it was unusual because of all the cases you had

3    with David Hoey, this is the first one?  True?

4    A.   I don't know whether that's true.

5    Q.   Well, then look at your deposition, your second one, the

6    New York deposition, Page 32.

7    A.   I don't think I have that transcript, Mr. Keenan, I don't

8    think.  Wait a minute.  Is this it?

9    Q.   It's the type of transcript you and I don't like, the

10   condensed ones that takes a while to see.

11   A.   I have the *Calandro v. Sedgwick* deposition, both in a mini

12   and full script, but I don't think I have the other.

13   Q.   Well, let me do the heavy lifting for you.

14        MR. HOEY:  Here you go, here's a clean one.  It's a

15   clean one.  He can have it.

16        MR. KEENAN:  Yeah, I know, but -- Page 32, and just

17   give me the line.

18        MR. HOEY:  Okay, Page 32 is right here.

19        (Discussion off the record between plaintiff counsel.)

20   Q.   Let me just go on.  So you were aware from the date of the

21   complaint that Mr. Hoey had pled punitive damages.  True?

22   A.   Yes.  I'm sure I was.

23   Q.   All right.  And it was your opinion at that time that the

24   legal standard for punitives was so high that the plaintiff

25   would never be successful?

1    A.   That's right.

2    Q.   Okay.  And you obviously would have filed motions to

3    convince the court that punitive damages are not proper?

4    A.   Correct.

5    Q.   But that failed.  The court didn't agree, based upon the

6    disclosure of the evidence?

7    A.   Denied a motion for directed verdict on that count, yes.

8    Q.   All right, and denied your motion to exclude punitive

9    damages altogether?

10   A.   I'm sure we filed that.  I don't recall it today, but I'm

11   sure we did.

12   Q.   Okay.  And so you knew prior to trial you were heading on

13   into a jury with punitive damages hanging over your head.

14   True?

15   A.   Just because it's pled doesn't mean it's likely.  I didn't

16   think it was likely at all.

17   Q.   Okay.  Well, do you consider it unusual for your client,

18   your defendant, to be out of business?

19   A.   It's not the norm, but I can't say it's never happened.

20   Q.   Well, isn't that unusual, Mr. Kenney?

21   A.   It certainly is not the norm, but I can't say it's never

22   happened.  It does happen from time to time.

23   Q.   Isn't it unusual to go to a jury with punitive damages

24   hanging over your head?

25   A.   Every death case I've ever tried, and there's dozens and

1  dozens and dozens, almost every one has a punitive damage

2  count.

3  Q.   So it doesn't bother you?

4  A.   It doesn't.

5  Q.   Okay.  And you were furious when the codefendant settled

6  out from under you, right?

7  A.   No, I wasn't furious at that.

8  Q.   You were mad at somebody?

9  A.   I was mad at Mr. Hoey for deceiving Ms. Blair, which I

10 felt.

11         THE COURT:  Why deceiving her?

12         THE WITNESS:  Because he left her with the -- she

13 tried to make an offer, which I was present at.  He declined to

14 even accept an offer at that point, which I found to be very

15 odd because I didn't know what he was going to take back to his

16 client if there wasn't an offer.  My understanding was, she

17 wanted to offer him $250,000, and he said, she told me, "Don't

18 do that.  I need to talk to my client first."  Then nothing

19 happened for several weeks.  I'm not sure why.  I think Mary

20 was out of town or something.

21         THE COURT:  I'm losing you in the pronouns.  Who said

22 "Don't do that"?  Mary Blair said don't do what, don't --

23         THE WITNESS:  David Hoey -- she told me, David Hoey

24 told her, "Do not make me an offer.  I want to talk to my

25 client first."  I thought that was an odd way to do it, but...

1    Q.    Well, doesn't from a --

2          MR. KEENAN:  Oh, I'm sorry, your Honor.  May it

3    pleases the Court?

4    Q.    Doesn't from a defense standpoint -- you've heard of the

5    empty chair, haven't you?

6    A.    Sure.

7    Q.    You have used the empty chair, haven't you?

8    A.    Absolutely.

9    Q.    And it's a great thing for defense lawyers, right?

10   A.    As long as the case is tried properly, correct.

11   Q.    Okay.  So the fact that the doctor settled out, that

12   wasn't a disaster to you.  You could use it.

13   A.    You could use it, and I intended to use it, but the case

14   was not tried on that theory.

15   Q.    Okay.  Well, let me hold because we're going to get to the

16   difference between the medical doctor taking care of a patient

17   and the medical director and his responsibilities that he's

18   being paid to do by the nursing home.  We'll get there.

19          Now, how often, Mr. Kenney, do you request the records

20   from the facility, and you're told there's no training records,

21   there's no financial records, there's no incident reports, and

22   there's no staffing records?  How often does that occur?

23   A.    I think this is the only case that's ever occurred in my

24   experience.

25   Q.    Well, would you call that unusual, sir?

1    A.    That is unusual.

2    Q.    Okay.  And can we make one step in logic and say, that's

3    not a good thing for a defendant?

4    A.    It's not a good thing.

5    Q.    In fact, you saw Mr. Hoey use that effectively during the

6    trial when he argued to the jury, "You don't have these

7    things," right?

8    A.    That's right.

9    Q.    He got them all whooped up?

10   A.    What?

11   Q.    I'm sorry.  Got them all excited.  I'm Southern.  You know

12   that.  Okay.  Now, isn't it true --

13            THE COURT:  Where is that an expression?

14            MR. KEENAN:  I'm sorry, your Honor?

15            THE COURT:  Where is "all whooped up" an expression?

16            MR. KEENAN:  In the South, your Honor, where I'm from.

17            THE COURT:  Where?

18            MR. KEENAN:  All over, in sophisticated circles and

19   some of the areas that I deal with, Judge.  Thank you for

20   asking, though.

21   Q.    Now, let's talk about the stipulation for a minute.  Here

22   it is, you don't have any records.  And, by the way, you don't

23   even have any witnesses, do you?

24   A.    No.

25   Q.    Now, I know you're a good defense lawyer, but how often

1   you gotta go in court and you have not got no witnesses?

2   A.   I'm sorry.  Say it again.

3   Q.   How often, Mr. Kenney, do you have to go in and try a case

4   where you don't have any witnesses?

5   A.   Not very often.

6   Q.   That's unusual?

7   A.   It is.

8   Q.   Now, it was because you don't have any records, staffing,

9   financial, incident report, and no witnesses?

10  A.   Well, that's not quite true.  I do have a witness.

11  Q.   Well, your expert?

12  A.   I have my expert.

13  Q.   Fact witnesses?

14  A.   Didn't have any.

15  Q.   Zip?

16  A.   Correct.

17  Q.   Now, coming up on that trial, you must not have been

18  feeling very good about it.

19  A.   I disagree with that.

20  Q.   Well, words like "problematic, likely defense verdict," do

21  you see that scattered throughout the files that we've been

22  dealing with for two days now?

23  A.   You have to remember, Mr. Keenan, that I was talking to

24  someone who's sophisticated and who understands this business.

25  There was the likelihood of losing on the negligence element.

2-192

1    We conceded that.  What we did not concede was damages and

2    causation, and we decided to try the case with those two

3    elements at issue.

4    Q.   Well, Mr. Kenney, what you first decided to do was, you

5    wanted to stipulate, didn't you?

6    A.   Stipulate to what?

7    Q.   Well, didn't you draft up a stipulated document and hope

8    to get the plaintiffs to agree to it?  You don't recall that?

9    A.   I do, I do.  I did an initial draft, and then I did

10   another draft.

11   Q.   And they wouldn't agree to it?

12   A.   No.

13   Q.   So now, without getting a stipulation of liability, the

14   next thing you've got to consider is, you've got to admit to

15   some stuff.  True?

16   A.   True.

17   Q.   Okay.  Now --

18             MR. KEENAN:  Your Honor, just one copy.  May I

19   approach?

20             THE COURT:  What are we doing now?

21             MR. KEENAN:  We're saying exactly what was admitted

22   and what was contested liability.

23             THE COURT:  All right.  You're going to try and finish

24   up by 4:00, so we'll do cross tomorrow?

25             MR. KEENAN:  I'll talk fast, Judge.

1           THE COURT:  Yes.

2           MR. KEENAN:  All right, thank you.

3     Q.   Mr. Kenney, is it okay if I approach?

4     A.   Sure.

5     Q.   Now, we have a page out of the trial transcript that you

6     in fact participated in?

7     A.   I did.

8     Q.   But you haven't seen it for a long time, right?

9     A.   No, not for a real long time.

10    Q.   Okay.  Well, I'm going to show it to you now, and it has

11    Mr. Hoey reading all of these admissions to the jury.  Do you

12    see that?

13    A.   Is this the beginning of the trial?  What is this?

14    Q.   It's Mr. Hoey reading to the jury the admissions.

15    A.   May I read it?

16    Q.   Sure.

17           (Witness examining transcript.)

18    A.   This was read to the jury at the beginning of the case.

19    Q.   That's right.

20    A.   Right.

21    Q.   Because that's what you're admitting to, sir, true?

22    A.   That's correct.

23    Q.   That's all I'm trying to establish.  We want to know what

24    you admitted that the jury could accept as fact and what you

25    didn't that had to be tried on liability.  That's what I'm

1  getting to.  I'm not trying to ambush you.

2  A.   I know you're not.  What I'm trying to suggest to you is,

3  what was read to the jury was the stipulation.  The stipulation

4  was those facts in addition to the fact that we contested and

5  we're going to try the case to the jury on the issues of

6  causation and damages.  So did he read that?  I don't remember

7  that, but he may have, but that was only part of what the

8  stipulation was.

9  Q.   Well, it says "End of sidebar conference," and then

10  Mr. Hoey says, "The nursing home has admitted to liability on

11  the following issues, 1 through 7."  Do you see that?

12  A.   Okay.

13  Q.   Okay, now, I don't mean to be difficult, but -- and the

14  Court has heard some evidence on this -- you did not admit to

15  the allegation of understaffing, did you?

16  A.   No.

17  Q.   You did not admit to the allegation that you were

18  underfunded, that you simply didn't have enough money to be

19  able to give quality care to the residents?  You didn't admit

20  to that either?

21  A.   I don't think I had any evidence of that.

22  Q.   Well, don't you remember complaining to the judge about

23  evidence coming in on that issue?

24  A.   I complained to the judge about a lot of things in that

25  case.  I don't remember that particularly, but I'm sure, if I

1  complained, there was a reason for it.

2  Q.   But you don't recall that one of the litigated liability

3  facts was, they simply had drained off the money, and they

4  didn't have the money to take care of these patients?

5  A.   That was the allegation, I think, in the pleadings, but

6  I'm not sure I ever saw any evidence of that.

7  Q.   Well, you heard argument.  You heard something at trial.

8          THE COURT:  Don't argue with the witness.

9          MR. KEENAN:  I'm sorry, your Honor.

10  Q.   So you don't remember?

11  A.   I don't remember there were any evidence at all with

12  respect to funding or staffing or any of those issues which are

13  very common in these cases.  And what we did was select those

14  issues raised by their expert, which were reviewed by my

15  expert, a physician at Mass. General Hospital, who agreed in

16  some cases this was correct.  So that we decided to stipulate

17  as to negligence, breach of standard of care with respect to I

18  think six or seven issues, and that's what we admitted to.

19  Q.   Okay.

20          MR. KEENAN:  Your Honor, in order to shorten this up,

21  we have the actual complaint in the underlying case which sets

22  forth all of the allegations.  We now have the transcript which

23  says what they admitted to and what they didn't, and we can

24  shortcut a lot of this --

25          THE COURT:  Good.  Let's do it.

1        MR. KEENAN:  -- if we could just put it in to your

2   Honor.

3        THE COURT:  Yes.

4        MR. KEENAN:  Okay.

5   Q.   All right, now, were you aware, Mr. Kenney, that in

6   February, Sedgwick decided that liability could not be

7   defended, February?

8   A.   Did Sedgwick decide that?  I don't know that for a fact,

9   but --

10  Q.   Did you know from any source, Mary Blair, anybody, that in

11  February -- that's February, March, April, May, June, July --

12  five months before the actual trial, that they had given up on

13  liability?

14  A.   I know that in February -- there was an original trial

15  date which was earlier, and I had to do the report that you

16  showed me earlier, but I had to do a similar version in January

17  or February.  And I sent that to Mary Blair, and I think I said

18  essentially the same thing, that it's going to be difficult to

19  defend it on breach of standard of care, and that we're going

20  to have to defend the case on causation and damages.  I think

21  that's what I said in sum, and I think she may have told

22  somebody else that.  I don't know.  I have no idea who she

23  spoke to.

24  Q.   You're guessing?

25  A.   I'm not guessing about what I said.

1   Q.  Well, you're guessing about what she thought and what she

2   said, and you don't know what she said in this court under

3   oath?

4   A.  I do not.  No, I do not.

5   Q.  Okay, thank you.

6           MR. KEENAN:  Now, your Honor, for the record, I'm

7   going to skip a couple issues here.  I think they're going to

8   come up in defense counsel, and so I've got an opportunity for

9   rebuttal, so let me just go on to the very end.

10  Q.  I want to talk to you about the conflict that existed, or

11  maybe not -- maybe you can shed some light -- on the

12  personality conflict between David Hoey, the defense, and Mary

13  Blair.  You know something about that, don't you?

14  A.  I don't know if there's any conflict.

15  Q.  Well, didn't you say under oath that, in your opinion,

16  there was a personal vendetta by David Hoey against Sedgwick

17  and the nursing home?  Didn't you say "personal vendetta"?

18  A.  I don't think I ever said that in reference to Mary Blair.

19  I may have said that -- in fact, I probably did say it in

20  reference to David Rouse, who was a principal of one of these

21  companies or several of these companies; but I don't know if I

22  ever said -- and if I did, I misspoke -- Mary Blair, to my

23  knowledge, David, to my knowledge, never had an issue with Mary

24  Blair.

25  Q.  Well, that brings me to another statement you made.  You

1   accused him of trying to set up Mary Blair, didn't you?

2   A.    I did.

3   Q.    Well, do people that get along and like one another, is

4   that normally the custom to set them up?

5   A.    Among lawyers?  Yeah, it happens.

6   Q.    Okay.  Well, that was your opinion, that David Hoey was

7   trying to set up Mary Blair?

8   A.    He said that to me in an early correspondence.

9   Q.    He said he was trying to set her up?

10  A.    No.  He referenced filing a 176D bad-faith claim against

11  her.

12  Q.    So the fact that he put you all on notice that your past

13  action, and please be careful moving forward, was bad faith,

14  that's setting her up?

15  A.    I don't understand what you're just trying to say.  What

16  I -- I'll explain what I said was, when I found out that he had

17  declined to accept an offer, a reasonable offer from her in

18  June, and then later sent this drop-dead demand letter about

19  three weeks later, I did accuse David.  And I personally am

20  very fond of David.  I've had fifteen years of cases with him.

21  We get along fine.  I don't take it as a personal thing.  It's

22  a professional thing.  Professionally I thought he was setting

23  up a 93A bad-faith claim, I did.

24  Q.    Well, let's examine that for a minute.  He --

25          THE COURT:  How was he setting that up?

2-199

Case 1:15-cv-10533-PBS  Document 164  Filed 11/13/17  Page 199 of 212

1              MR. KEENAN:  Yes.  Thank you, Judge.

2              THE WITNESS:  By declining to accept an offer because

3     he was trying to set up a no offer, bad faith.  That was my

4     view of it.  It may be completely wrong.

5              THE COURT:  In your view, if you're supposed to

6     effectuate a prompt settlement, would June be considered

7     prompt?

8              THE WITNESS:  I'm sorry, your Honor.  What?

9              THE COURT:  Under the law, 176D, an insurance company

10    is supposed to try to effectuate a prompt and fair settlement.

11    I can't remember the exact words.

12             THE WITNESS:  Right.

13             THE COURT:  So, in your view, would mid-June have been

14    prompt?

15             THE WITNESS:  Given the status of the case at that

16    point in time, yes.  It changed completely.

17             THE COURT:  Why?

18             THE WITNESS:  Prior to -- I can explain, your Honor.

19    Prior to May of 2014, we had never seen an expert disclosure,

20    and my understanding -- and, again, I don't participate

21    necessarily in valuating the cases in terms of an offer, but I

22    do present my feeling about the likelihood of success on the

23    merits.  But there was an offer made in January or February.

24    That offer was declined, and then at some point in time -- I

25    think it was in May -- we get a disclosure of an expert which

1    we had never seen before.

2              THE COURT:  And who was that?

3              THE WITNESS:  Dr. Jenison.  He was their expert,

4    medical expert.  And Dr. Jenison came up with stuff that I was

5    really very surprised to see.

6              THE COURT:  Like?

7              THE WITNESS:  And it changed the case completely.

8              THE COURT:  Like?

9              THE WITNESS:  Well, he was going to offer testimony,

10   according to the disclosure, that suggested in effect that the

11   nursing home was responsible for evaluating, providing care,

12   treatment, prognosis, that type of thing, which is clearly not

13   a nurse's prerogative, which I believe is the case.

14             THE COURT:  The nurse or the nursing home?

15             THE WITNESS:  The same thing, your Honor.  The nursing

16   home does not have a physician on staff.

17             THE COURT:  So you view them as the same.  So, anyway,

18   that the nursing home or the nurse was supposed to provide the

19   care?

20             THE WITNESS:  They don't provide -- they provide

21   nursing care, not medical care.

22             THE COURT:  Sure.  So then what did he say that was so

23   surprising to you?

24             THE WITNESS:  Well, he suggested that the nursing

25   home's failure to do certain things, assess particularly her

1   physical condition, including most notably the fact that she

2   had an ulcerated appendix which was causing sepsis that they

3   failed to diagnose.  And I thought that was a very unusual

4   thing for a physician to say, and in fact at trial he said the

5   same thing, so that the valuation I think changed a bit

6   somewhere around May and June.

7           MR. KEENAN:  May it please the Court.

8   Q.   Mr. Kenney, is it possible that what you just said was in

9   the expert report and what he testified at trial about this

10  exploding appendix, you're confusing this with some other case?

11  A.   No.

12  Q.   All right.  Well, the record will show that.  Now, you

13  know that the medical doctor in this case was a physician to

14  Mrs. Calandro.   True?

15  A.   Are you talking about Dr. Wahl?

16  Q.   Yes.

17  A.   The codefendant?

18  Q.   Yes.

19  A.   Yes, he was her physician.

20  Q.   Yeah, but he was also your medical director.

21  A.   When you say "your," he was --

22  Q.   He was the nursing home's medical director?

23  A.   No.  He was a medical director.  He was not an employee of

24  the nursing home.  No medical director is an employee of

25  anybody.

```
1   Q.   Well, I'm not mincing terms.  He had responsibilities to
2   the nursing home --
3          THE COURT:  He's an independent contractor for the
4   nursing home?
5          THE WITNESS:  He's an independent contractor, which is
6   the norm.  In fact, I've done many, many nursing home cases
7   over the years.  I've never seen a medical director who is an
8   employee of a nursing home.
9          THE COURT:  So the distinction you're drawing is
10  between employee and independent contractor?
11         THE WITNESS:  Correct.
12         THE COURT:  But, in any event, he was the agent of the
13  nursing home, right?
14         THE WITNESS:  No, he was not, your Honor.
15         THE COURT:  Well, independent contractors can be
16  agents, right?
17         THE WITNESS:  The law is clear on this point, your
18  Honor, that a professional, most often a nurse -- I'm sorry,
19  strike that -- most often a physician, unless they are an
20  employee of the unit that hires them, there is no vicarious
21  liability that is imputed to the person where he works.
22  There's cases after cases on this, your Honor.  And in fact
23  what happened when this case was tried was that the issue of
24  vicarious liability became the means for finding the nursing
25  home responsible, which we argued about forever, because the
```

1   law is clear on that.  There cannot be imputed liability for a

2   professional decision, whether it be lawyer, a doctor, whoever.

3           THE COURT:  So, in your view, the coverage wouldn't

4   have covered the doctor at all?

5           THE WITNESS:  It didn't.

6   Q.   Mr. Kenney, these are the exact arguments you made to the

7   trial judge?

8   A.   Probably.

9   Q.   To exclude the expert from talking about the nursing

10  home's negligence for the medical director, true?

11  A.   I'm sure I did.  I don't recall specifically, but it was

12  an issue throughout the case.

13  Q.   Yeah, and the judge consistently ruled against you?

14  A.   He did.

15  Q.   And you lost that one?

16  A.   I lost the case.

17  Q.   Well, yes, all right.  And just looking back over the

18  trial, you objected to the trial judge expanding the use of the

19  expert's scope of testimony, and a number of other things you

20  complained about to the judge, true?

21  A.   That's correct.

22  Q.   And yet the verdict to include the punitive was paid in

23  full shortly after the verdict, right?

24  A.   It was.

25  Q.   Do you find it strange that if there were that many legal

1    issues to appeal on that were legitimate, that sophisticated

2    carriers would come in and pay that kind of money, rather than

3    just appealing it and seeing what the higher court would do?

4    Do you find that a little strange?

5    A.   I found it shocking, to be honest, Mr. Keenan, absolutely

6    shocking that they paid that judgment without an appeal.

7    Q.   Isn't it more consistent with the fact that there wasn't

8    any error in the case?

9    A.   Have you read the transcript, Mr. Keenan?

10   Q.   I've read it until I'm blue in the face.

11   A.   Have you read the motion for a new trial?

12   Q.   I've read the motion.  I've read everything.

13         THE COURT:  Finish up with him.

14         MR. KEENAN:  I'm sorry, your Honor.  I took the bait.

15         THE COURT:  I feel as if I'm back in Superior Court,

16   and a lot has changed in the twenty years, so --

17   Q.   So all in all, this was one colossal unusual case?

18   A.   You'd better believe it was.

19   Q.   Yeah.  But it's your testimony, "I didn't see it coming"?

20         THE COURT:  Well, come on, come on.  Let's finish.

21         MR. KEENAN:  I'm sorry.

22   Q.   The last question I'm going to ask you is -- oh, you also

23   under oath categorized Mr. Hoey as doing low-class maneuvering,

24   low-class.  Did you say that?

25   A.   Did I say it?

1    Q.    That's my question.

2    A.    I don't recall saying low-class, but I said it was a

3    reptile.

4    Q.    But you said it was low-class --

5              THE COURT:  What did you mean by "reptile"?

6              MR. KEENAN:  Oh, God, Judge, here we go.  We'll be

7    here all day.

8              (Laughter.)

9              THE WITNESS:  Your Honor, I can tell you this:

10   Reptile is a -- I want to expand the answer because it takes a

11   little bit of time, the answer to this question, but reptile is

12   a notion about trying cases in a certain way, developed in

13   large part by Mr. Keenan himself.

14             MR. KEENAN:  Thank you, Mr. Kenney.

15             THE WITNESS:  You're welcome.

16             THE COURT:  So you own the reptile moniker?

17             MR. KEENAN:  My children's foundation owns the

18   copyright and all of the templates, it does, your Honor.

19             THE COURT:  So this is something that's a badge of

20   honor, not a putdown.

21             MR. KEENAN:  But don't be looking at me like I'm

22   important because I'm not.

23             THE COURT:  I'm just saying.  All right, so what does

24   it mean?

25             THE WITNESS:  I've read Mr. Keenan's books, your

1    Honor.  We tried a case a couple years ago, and I'm very
2    familiar with reptile process.  What reptile, in my view, it's
3    unethical, and it creates standards that are not legal
4    standards, and asks the jury to judge defendants by some
5    standard that is created, about which in many cases it's
6    impossible to comply.  It teaches, and Mr. Keenan teaches and
7    Mr. Hoey teaches, to basically, as I read the literature on
8    this, is to -- and I've seen it in action -- is to ignore what
9    a judge tells you in terms of instructions and to try the case
10   in whichever way you want.  So that if you are doing something
11   that the judge tells you to stop doing, then you just ignore
12   the judge and do it anyway.  And I've seen it in this case, and
13   I've seen it in another case with Mr. Hoey and Mr. Keenan two
14   years ago that was reversed by the trial judge and taken away,
15   vacated the finding, because of exactly that.  And this is what
16   happened in this case.  And what happens, your Honor, as long
17   as I'm on the subject --
18            THE COURT:  Wait, wait, wait.  So reptile, in your
19   view, means ignoring the judge's instructions?
20            THE WITNESS:  In part.  There's a lot of other things
21   too.
22            THE COURT:  I just don't -- we're going to -- it's
23   Halloween.  Although it would be quite a treat, I don't -- it's
24   not really directly relevant.  But, in any event, if Ms. Blair
25   referred to counsel as following a reptile strategy, that's

1   known in the field?  It's not a personal attack on him?

2           THE WITNESS:  Mr. Keenan has entitled the process

3   "reptile."

4           THE COURT:  Okay.  Okay, thank you.

5           MR. KEENAN:  Your Honor, if I may, just one question.

6   Q.   Isn't it true, the case that you and I were in the

7   courtroom, it resulted in a substantial plaintiff's verdict?

8   True?

9   A.   That's true.

10  Q.   All right.  Shocked on that one too, weren't you?

11          THE COURT:  Wait, wait.  You know what, I'm not re- --

12  I feel like this is like -- all right, so how long do you need

13  tomorrow?

14          MR. DAVID:  An hour and 15 minutes.

15          THE COURT:  Okay, and then there will be a little

16  redirect.  So you'll be out of here by 11:00.  I know that

17  you -- and then, ideally speaking -- it's only half a day

18  tomorrow.  How long will this witness of yours be?

19          MR. DAVID:  I think we have to discuss with the client

20  tonight whether the testimony is limited to a narrow topic, in

21  which case she's short, or whether it gets expanded beyond

22  that, in which case she's long.  She is going to talk --

23          THE COURT:  You can step down, Mr. Kenney.  I'll see

24  you tomorrow morning.

25          THE WITNESS:  Thank you.

```
 1              MR. KEENAN:  Your Honor, I just have two questions.
 2              THE COURT:  I thought you told me you were done.
 3              MR. KEENAN:  No, I didn't say that, no.
 4              THE COURT:  Well, finish, two questions, finish.  I
 5   thought --
 6              MR. KEENAN:  Thank you, your Honor.  May it please the
 7   Court.
 8              THE COURT:  Two, because then I'm going home with my
 9   grandchildren and trick or treating.
10   Q.    This is an email from you to Mary Blair, right?  It's
11   Exhibit 3 to your second deposition, and I direct your
12   attention to the comments made about Mr. Hoey, quote:
13   "Frankly, a low-class shit --" I'm sorry, Judge -- "a low-class
14   shit move to a longtime friendly business partner."
15         Did I read that?
16         (Witness examining document.)
17   Q.    And that's your word?
18   A.    I did say that, yes.
19   Q.    "A low-class shit move"?
20   A.    Yes.
21   Q.    Okay.  And then, finally, it would be true when you said
22   on the deposition that you were angry and mad at David Hoey?
23   You said that, didn't you?
24   A.    I was angry and mad at what David Hoey did, not
25   necessarily at David.
```

```
 1    Q.   Oh, okay.
 2              MR. KEENAN:  Your Honor, that's all the questions.
 3              THE COURT:  So tomorrow I'll assume that you'll be out
 4    of here no later than 11:00, and then we get going again at
 5    11:30.  I cannot sit in the afternoon.
 6              Where is this person coming in from?
 7              MR. DAVID:  Michigan.
 8              THE COURT:  Will she be here anyway?
 9              MR. DAVID:  I think she will.
10              THE COURT:  If she's here, we should just get her
11    started and ideally finished so she can go home.  But your
12    expert, plaintiffs, how long?
13              MR. KEENAN:  Ninety minutes direct.
14              THE COURT:  Yes, so probably it will take, I ballpark
15    it, the same on cross.  I don't know if that's true or not.
16              MR. DAVID:  I would say 90 minutes.
17              THE COURT:  But probably you'd be done by midday on
18    Friday?
19              MR. KEENAN:  And a rather short closing.
20              THE COURT:  Well, we can talk about that later.  Okay,
21    so thank you.
22              MR. DAVID:  Your Honor is not going to expect closings
23    immediately after the last witness?  And if you are --
24              THE COURT:  Say it again?
25              MR. DAVID:  Are you going to expect closings right
```

1   after the last witness?

2        THE COURT:  I don't know.  I leave it up to you.  Let

3   me put it this way:  It could potentially be the next day, I

4   mean, the following week you could come back.  But if we've got

5   the time, why not?

6        MR. KEENAN:  Your Honor, just for scheduling, I'm

7   sorry, I just feel like I'm going to overburden the Court.  The

8   fellow who is going to do our closing is from Washington, D.C.

9   You heard him at one of the motion hearings.

10       THE COURT:  Who did I hear, the expert?

11       MR. KEENAN:  This fellow right here.

12       THE COURT:  You're the expert?

13       MR. VAIL:  No.

14       MR. KEENAN:  Well, he's the law guy, okay.  He's been

15  sitting here taking copious notes, so he will be the one to do

16  the closing.  And so for us to leave and then come back when

17  the argument is only going to be what --

18       THE COURT:  It depends how much time we have.  You

19  know, I don't feel strongly about it.

20       MR. KEENAN:  Thank you, Judge.

21       THE COURT:  I just don't feel strongly one way or

22  another.  But I do feel strongly about one thing, which is, the

23  law clerk working on this is leaving as of December 31, so this

24  case is not going to have a long drag-out period because I need

25  to have it written and done, okay?  That's my limitation, and

```
1    everyone enjoys the holidays.

2              THE CLERK:  All rise.

3              (Adjourned, 4:01 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3

 UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
 CITY OF BOSTON                )

5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 2-1

9  through 2-111 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 15-10533-PBS,

11 Garrick Calandro, as Administrator of The Estate of Genevieve

12 Calandro v. Sedgwick Claims Management Services, and thereafter

13 by me reduced to typewriting and is a true and accurate record

14 of the proceedings.

15           Dated this 9th day of November, 2017.

16

17

18

19

20           /s/ Lee A. Marzilli
            _____
21           LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
22

23

24

25