**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| GARRICK CALANDRO, AS | : | |
| ADMINISTRATOR OF THE ESTATE | : | |
| OF GENEVIEVE CALANDRO, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 1:15-cv-10533-PBS |
| | : | |
| SEDGWICK CLAIMS MANAGEMENT | : | |
| SERVICES, INC., | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S POST-TRIAL PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

**A.  INTRODUCTION**

These proposed post-trial findings of facts and conclusions of law are submitted at the direction of the Court. Pre-Trial Conference Transcript at p. 7-8. On November 9, 2017, Plaintiff filed Motion for Extension of Time to November 17, 2017 to File Proposed Findings of Fact and Conclusions of Law. Having not heard from the Court, and in an abundance of caution, Plaintiff submits and files the document contained herein.

On April 25, 2017 this Court denied Defendant Sedgwick's Motion for Summary Judgment.  Sedgwick claimed that it is not subject to chapter 176D because it is not in the business of insurance and that, in any case, it made a prompt, fair, and equitable settlement offer within the safe harbor provided by chapter 93A.  In denying the Defendant's motion, the Court found that Sedgwick is in the business of insurance as a matter of law.  The Court went on to find that a reasonable fact finder could <u>easily</u> find that Defendant engaged in a willful and

1

knowing pre-judgment violation of chapter 93A.  What was left to be tried was whether these acts of bad faith were willful or knowing.

Additionally, the Court initially ruled that Sedgwick could not avail itself of the "safe harbor" provision, finding that applying the provision would essentially eviscerate the 1989 amendment by failing to punish and deter pre-judgment misconduct (See Memorandum Order April 25, 2017 at p. 12, Docket No. 86).  However, on September 6, 2007, after extensive briefing on the issue of due process, the Court reconsidered its "safe harbor" ruling and found that Sedgwick's $2,000,000.00 offer was reasonable.  Sedgwick was allowed "safe harbor" (Docket No.132).

However, during a Final Pre-Trial Conference held on October 11, 2017, this Court recognized that, in regards to the statutory language of G.L. c. 93A, § 9(3), "any fix will have to come from the legislature, not the Court[,]" and that a trial would be necessary (Docket No.132 at P.6 & 8).  The trial took place between October 30, 2017 and November 3, 2017, to determine whether the acts of bad faith were willful or knowing.

## PROPOSED FINDINGS AND CONCLUSIONS

### B.  SUMMARY OF EVENTS

1.  Genevieve Calandro, the decedent in the underlying litigation to the instant matter, was a resident of a Danvers, Massachusetts nursing home, which was then owned and operated by five Radius Entities (Radius) (joint pre-trial memorandum stipulated fact No. 4).  During the time that she was a resident of that facility, and while the said Radius location was unquestionably responsible for her care, protection, and safety, Ms. Calandro was the victim of serious, and reprehensible, neglect.  The Administrator of Ms. Calandro's Estate, Mr. Garrick Calandro, sued and alleged that the conduct and

inactions of Radius and its employees were responsible for injuries and damages suffered by Ms. Calandro and for her wrongful death.   Mr. Calandro's Complaint alleged that Radius was directly and/or indirectly liable for: (1) conscious pain and suffering experienced by Ms. Calandro prior to her death; (2) the wrongful death of Ms. Calandro; and (3) gross negligence in Radius' failure to properly care for Ms. Calandro. That action was filed on August 16th, 2011, against only the Radius Entities.   The factual allegations contained in Mr. Calandro's Complaint were characterized, in part, as the following:

> "while a resident of  defendant's nursing home plaintiff's decedent developed a bed sore described as 'coccyx wound draining moderate amount of purulent, foul smelling drainage.' Bed sore got infected and substantially contributed to her death."

At the time of the filing of the lawsuit, Mr. Calandro, by his attorney, plead damages "in excess of $500,000.00."  (Marked for Identification C at Trial - Civil Action Cover Sheet and Complaint; Judicial Notice taken).

Several months after the original Complaint had been filed with the Court, and served upon Radius, Dr. Wahl was added as a Defendant.   Prior to trial, the claims asserted against Dr. Wahl were settled.

**2.**   The underlying case went to trial in Middlesex County before the Honorable Peter Krupp on July 16, 2014.   Ms. Calandro's son, and also his wife, both testified during that trial.   The Radius entities admitted that they:

> (1)     failed to follow each resident's individual care plan by failing to keep Mrs. Calandro properly hydrated;

(2)     failed to properly monitor Mrs. Calandro's intake and output in accordance with her care plan, resulting in her severe dehydration and fecal impaction;

(3)     failed to follow physician's orders;

(4)     failed to keep Mrs. Calandro properly hydrated;

(5)     failed to properly monitor Mrs. Calandro's intake and output in accordance with her care plan, resulting in severe dehydration and fecal impaction;

(6)     failed to monitor residents for substantial changes in their conditions and properly notify Dr. Wahl her primary care physician of her deteriorating blood oxygen levels;

(7)     failed to assess, diagnose, and treat in a timely manner Mrs. Calandro's urinating tract infection, appendicitis, and decubitus ulcer, which is a pressure bed sore;

(8)     failed to properly report lab results to physicians;

(9)     failed to notify Dr. Wahl of the lab results published at 12:02 a.m. on July 4th as ordered;

(10)     failed to contact Dr. Wahl, M.D., as ordered, with the culture results which were published on July 6th;

(11)     failed to notify the medical director of the facility or send the resident to the hospital if the resident's condition worsened and the primary care physician is either unavailable or non-responsive;

(12)     failed to get the medical director involved or take independent action to transfer Mrs. Calandro to the hospital faced with her symptoms of infection, dehydration, and worsening pressure ulcer, dangerously elevated glucose levels and no orders from Dr. Wahl for a four day period between July 3rd and July 7th of 2008;

(13)     failed to get the medical director involved or take independent action to transport Mrs. Calandro to the hospital, when by July 10th Mrs. Calandro had gone over a week with no antibiotics, no hospitalization, experienced dangerously elevated blood glucose levels and received no specialized wound care during that period;

(14)     failed to keep accurate and complete documentation of important aspects of the resident's clinical condition as necessary for proper diagnosis and treatment by failing to take the record, vital signs between July 3rd and July 7th of 2008; and

(15)     failed to properly maintain patient records as required by Massachusetts and federal regulations.

These admissions were read to the jury at trial. (marked for Identification 'D'; Judicial Notice taken).

**3.**   On July 21, 2014 a reasonable and impartial jury returned a verdict for the Plaintiff in the amount of $1,425,000.00 as compensatory damages, and returned a finding of gross negligence on their verdict slip.  On July 22, 2014, the same impartial jury returned a verdict for the damages on the gross negligence claim in the amount of $12,514,605.00.

Judgment on these claims was entered on August 1, 2014 for $1,933,301.40, representing the compensatory damages, with interest and costs, and an additional $12,514,605.00 as the amount attributable to Radius' gross negligence. The compensatory portion of that judgment, including interest, was later amended to reflect the $250,000 settlement paid by Dr. Wahl (Trial Exhibit No.64).  No appeal was taken from this judgment.

4. The Hartford insured Radius.  The Hartford employed Radius as a third party administrator to stand in Hartford's shoes to administer the claim against Radius.  On July 31st, while Sedgwick was still in control of the claim as a third party administrator for Hartford, Radius' defense counsel Lawrence Kenney, Jr. made a settlement offer in the amount of one million dollars ($1,000,000.00) based on the advice and recommendation given to Hartford by Sedgwick's claims adjuster, Ms. Mary Blair (Trial Exhibit No. 57; note that Mary Blair and Sedgwick's legal counsel, Peabody & Arnold are copied on this letter).  This offer was made notwithstanding the fact that the jury had reached a compensatory damages verdict in the amount of $1,933,301.40 (including interests and costs) and a punitive damages verdict in the amount of $14,447,906.00.

5. On September 30, 2014, the Plaintiff sent a demand letter to Sedgwick, pursuant to G.L. c. 93A, § 9, alleging violations of G.L. c. 176D and G.L. c. 93A. (Joint Pre Trial Memorandum, Stipulated Fact No. 24)  Sedgwick was first put on notice of alleged violations of G.L. c. 176D and G.L. c. 93A regarding its pre-judgment handling of the claim on April 8th, 2014, via letter by David Hoey, Plaintiff's counsel (Trial Exhibit No.25).

6.  On October 30, 2014, after the judgment in the underlying case was final and no longer subject to appeal and, in response to the Plaintiff's 93A demand letter, Sedgwick made an offer of $1,990,197.00 pursuant to the requirements of G.L. c. 93A, § 9(3) (Joint pre-trial memorandum stipulated fact No. 20).    This offer was later amended to $2,018,772.00 (Marked for Identification 'E'; Plaintiff's timeline).

7.  On December 5, 2014, pursuant to a Settlement Agreement between Plaintiff and Hartford, Hartford paid the Plaintiff a total of $16 million in light of the judgment entered against its client Radius, which represented the full amount of the judgment plus an additional amount. (Joint Pre-Trial p. 4, Stipulated Fact No. 26). That Settlement Agreement expressly did not release Sedgwick from any potential outstanding liability. (Trial Exhibit No. 66; joint pre-trial memorandum stipulated fact No. 26).

8.  Plaintiff rejected the $2,018,772.00 offer by Sedgwick, and on December 9, 2014 filed the instant lawsuit in Suffolk Superior Court, alleging knowing or willful unfair claims settlement practices and bad faith (Joint Pre-trial Memorandum, stipulated fact No. 29). Sedgwick subsequently removed the action to this Honorable Court.

9.  The substantial sums awarded through the compensatory and punitive verdicts of the jury in the underlying action have no relevance in determining whether Sedgwick committed knowing or willful unfair claims settlement practices, and/or bad faith. Whether the Plaintiff has already received a substantial amount of money is similarly irrelevant.   However, the amounts of the underlying verdicts have relevance solely to whether Sedgwick's offers are reasonable and as a basis for the multiplication of

damages under c. 93A § 9(3).  The jury has punished Radius for its conduct; Sedgwick, however, has not been punished for its conduct.  Punishment of Sedgwick's conduct is at issue here, and will be detailed below.  Had Sedgwick settled, they would not be in this position.  A large verdict in the underlying case does not absolve Sedgwick from punishment for its involvement in any unlawful engagement in unfair claims settlement practices.

10. An award of $16 million in compensation and punishment for the death of a 91 year-old woman is not within the range of top awards granted in other nursing home cases across the country for this kind of neglect suffered by our most vulnerable community, the elderly.  A $1,000,000.00 offer post-verdict against a judgment for $1,933,301.40 in compensatory damages simply cannot be deemed reasonable, much less can it be deemed reasonable against the verdict on all claims, then valued at $14,447,906, particularly considering the Defendant's decision to not appeal. Neither can an offer of $2,018,772.00 against a final judgment of over $16 million be deemed reasonable. This is particularly so considering the size and wealth of the defendant Sedgwick, which has been in business since 1969 and is the largest third party administrator (hereinafter "TPA") in the United States, valued at more than $2.4 billion. (Docket 131, Letter August 17, 2017). In Rhodes v. AIG Domestic Claims, Inc., 961 N.E. 2 1067 (Mass. 2012) the defendant offered $7 million post judgment against a secured judgment of $11.3 million. Flatly, the trial judge labeled this offer as "insulting." The Supreme Judicial Court affirmed, concluding that the plaintiff there was entitled to recover damages under G.L. c. 93A on account of the defendants' post-judgment violation – i.e., the insultingly-low post-judgment offer of settlement in relation to a much higher

judgment amount. The amount of money that has already been received by the Plaintiff here bears no relationship to the determination of fault against Sedgwick for engaging in unfair claims settlement practices.  It is solely relevant for multiplication purposes upon a finding of a knowing or willful violation, or bad faith violation.

11. "c. 93A, s. 9(3) is "a 'penal statute' akin to other statutes designed to enforce the law by punishing offenders, rather than simply by enforcing restitution to those damaged." Anderson v. National Union Fire Ins., 476 Mass. 377, 385 (2017).

12. "The Legislature's manifest purpose" in enacting c. 93A was to deter misconduct, Commonwealth v. Fall River Motor Sales, Inc., supra at 316, and to "encourage vindictive lawsuits."

13. Chapter 176D was "enacted to encourage settlement of insurance claims and to discourage insurers from forcing claimants into unnecessary litigation to obtain relief." Bingham v. Supervalu, Inc., 806 F. 3rd 5, 9 (1st Cir. 2015), quoting Hopkins, 434 Mass. 556.

14. To proceed against an insurer who has violated G.L. c. 176D, sec. 3(9), a plaintiff must bring a claim under G.L. c. 93A, sec. 9 or 11. Silva v. Steadfast Ins. Co., 87 Mass. App. Ct. 800, 803 (2015). Here, the Plaintiff has met this requirement (Joint pre-trial memorandum stipulated fact No. 24). A violation of G.L. c. 176D, sec. 3(9), itself establishes a *per se* violation of G.L. c. 93A. Boyle v. Zurich, 472 Mass. 649, 661 (2015).

**15.** On November 25, 2015, Hartford filed suit in New York against Sedgwick for negligent claim handling, indemnification, breach of contract, fiduciary duty, and mismanagement of the Calandro Estate's claims against the Radius entities.   Specifically, Hartford's verified complaint asserts:

a. Sedgwick did not reserve rights on behalf of The Hartford with respect to any issue and did not inform the Radius entities that the Policy did not cover the punitive damages alleged in the Calandro suit.  Hartford Complaint at ¶ 33.

b. On April 8, 2014, the Estate issued a joint demand of $1 million to the Radius Entities and the co-defendant.  "I don't care who pays, you or him or both," the Estate's Attorney wrote.  Hartford Complaint at ¶ 47.

c. Sedgwick failed to inform either The Hartford or the Radius Entities about the Estate's new demand, despite the fact that it was a demand for the policy limit. Nevertheless, on April 26, 2014, at Sedgwick's direction, attorney Kenney wrote to the Estate's counsel, "Hartford is left with no alternative but to reject your most recent demand." Hartford Complaint at ¶ 48.

d. Sedgwick was aware, but failed to include in its July 7, 2014 email, that both of the Estate's experts opined that the Radius entities' neglect *caused* the death of Ms. Calandro. Hartford Complaint at ¶ 50.

e. Neither Sedgwick's July 7, 2014 email status report nor Kenney's enclosed June 30, 2014 pre-trial report addressed the Estate's claim for punitive damages. Hartford Complaint at ¶ 54.

f. Sedgwick never offered the $300,000 that the Hartford authorized to settle the Estate's claims and never informed The Hartford of its failure to do so.  Hartford Complaint at ¶ 56.

g. On July 15, 2014, just before the trial was set to begin, the Estate's attorney wrote to Kenney stating, "I have given three different demands with no offer from your client."  He asked for an offer to take to his client and stated, "Right now I have nothing to offer him.  If Hartford's re-evaluation is no pay, then let me know that too."  Sedgwick received the Estate's attorney's email to Kenney on that same date, yet Sedgwick never advised The Hartford or the Radius Entities of this communication.  Hartford Complaint at ¶ 58.

h. Moreover, despite Sedgwick's July 7 representation that the Stipulation had been filed, it had not.  At  trial, a *different* stipulation containing numerous specific concessions of the Radius Entities' breaches of the standard of nursing home care

10

was read to the jury (the "Trial Stipulation"), including that the Radius staff had "failed to take and record vital signs between July 3 and July 7, 2008, despite Genevieve Calandro's clinically compromised condition: and had failed to take action despite Ms. Calandro's worsening symptoms of 'infection, dehydration, and worsening pressure ulcer, [and] dangerously elevated blood glucose levels.'" Hartford Complaint at ¶ 61.

i.  Sedgwick knew of the Stipulation and, later, the Trial Stipulation, and that a verdict against the Radius Entities was a virtual certainty.  Hartford Complaint at ¶ 63.

j.  Sedgwick made no separate settlement offers for the Radius Entities after February 6, 2014, despite the fact that The Hartford had authorized $300,000 for settlement.
Hartford Complaint at ¶ 64.

k.  Sedgwick's failure to settle the case violated Massachusetts Law, which provides that failure to effect prompt, fair and equitable settlements in cases where liability is reasonably clear is an unfair claims practice prohibited by Section 3(9)(f) or G.L. 176D.   A violation of this provision is a *per se* violation of the Massachusetts Consumer Protection Act, G.L. c.93A ("93A"), which can give rise to double and treble damages.  ~ Hartford Complaint at ¶ 66.

(Marked Identification B at trial; Judicial notice taken by the Court)

16. In determining the sufficiency of the Plaintiff's case in the Court's summary judgment Order, the Court outlined several facts that indicate bad faith on the part of Sedgwick. All of these facts were proven at trial, through the admitted documentary evidence and sworn testimony of the live witnesses.

a.  On August 16, 2013, Mary Blair informed Hartford that she was having trouble locating witnesses and a portion of Ms. Calandro's medical chart. (p. 12 of Summary Judgment Order and Trial Exhibit No. 4).

b.  On August 21, 2013, Ms. Blair discussed the pending claim on a call with Kenney. Ms. Blair's handwritten notes from the phone call suggest Defendant was planning to withhold the identity of two nurses involved in the underlying wrongful death case because "of their conflicting versions and the lack of the incident report and internal investigation report." (Docket No. 73, Ex. 15 and Trial Exhibit No. 1).

c.  On November 13, 2013 Plaintiff made a second demand for $500,000. No immediate response was made to this demand. (p. 13 of Summary Judgment Order and Trial Exhibit No. 50).

d.  On December 20, 2013 Mary Blair sends email to CFO of Radius that liability is "problematic." (Trial Exhibit No. 71).

e.  On January 14, 2014 codefendant doctor contacts Kenney concerning joint contribution. (Trial Exhibit No. 23).

f.  On January 30, 2014 Kenny responds via Mary Blair, suggesting a 50/50 contribution. (Trial Exhibit No. 52).

g.  On February 7, 2014 Kenney's trial analysis report stated, "defending this case on liability will be very difficult," and estimated the likely verdict range to be $300,000-$500,000. (p. 13 of Summary Judgment Order and Trial Exhibit No. 51). Kenney specifically states, "We will likely have no choice but to admit liability and try the case **solely on the issue of damages**." Page 4 of Trial Exhibit No.51 (emphasis added).   Attorney Kenney reiterated his opinion:  "It is therefore very likely that we will be left with little alternative but to admit liability and **accept a jury verdict on damages**." Page 5 of Trial Exhibit No. 51 (emphasis added)

h.  Mary Blair does not request any additional authority at this time (trial testimony Mary Blair P.2-62, Lines 2-4), although attorney Kenney undeniably concedes that is almost certain, a concession that unequivocally indicates that liability was reasonably clear for purposes of the statute (Trial Exhibit No.51, 13 & 27).

i.  On April 4, 2014 the Plaintiff received a copy of the Defendant's insurance policy for the first time, which confirmed a policy limit of $1,000,000 per occurrence for covered claims. (Marked for Identification A.) Policy (Trial Exhibit No. 41).

j.  On April 8, 2014, in a written letter to defense counsel, Plaintiff made a demand for the $1,000,000 policy limit, informing Defendant's counsel, "….**that the adjusters here may not have all the information (or have not fully investigated these claims and the possible outcomes) and their offers may amount to unfair settlement practices (in violation of chapters 176D and 93A)…….[leaving the Plaintiff with] no choice but to include Sedgwick [in said claim]** …" (Trial Exhibit No. 50).  Plaintiff's Counsel put a floor of $500,000.00 "If you and your clients truly would like to resolve this matter outside of trial, as chapter 176D requires, then I await a new, serious, and at the appropriate level (in excess of $500,000.00) offer by April 18, 2014".  (Trial Exhibit No. 50).  This policy limit demand was never forwarded

to the Hartford or the insured, nor was Sedgwick Legal put on notice (Trial testimony Mary Blair & Becky Shingleton).

k. On July 7, 2014 Mary Blair requested an increase to $300,000 for the Calandro claim reserve, which Hartford authorizes. (Trial Exhibit No. 32). But, Mary Blair never offers it. (Trial testimony Mary Blair P.2-63, lines 22-24).

l. On July 15, 2014 Mary Blair informs Hartford that she is, "not attending the hearing, don't want to have settlement authority available." (Trial Exhibit No. 72). Mary Blair appearance at trial, according to observations made by Garrick Calandro, was that she seemed disinterested and bored; spent her time reading the Boston Herald (Trial testimony of Garrick Calandro P.27, Lines 8-15).

In addition to the facts hereinabove, which demonstrate bad faith on the part of the Defendant in its handling of the Calandro claim and the existence of unfair claims settlement practices, additional, substantial evidence elicited at trial established Sedgwick's engagement in unfair claims settlement practices in violation of  176D and G.L. c. 93A.

## C. SEDGWICK, AS A THIRD PARTY ADMINISTRATOR, IS IN THE BUSINESS OF INSURANCE FOR PURPOSES OF G.L. C. 176D

17. G.L. c. 176D, sec. 3(9), is applicable to third party administrators who are, as claims negotiator and potential settler, interposed between the insurer and the claimant. Miller v. Risk Mgmt. Foundation, 36 Mass. App. Ct. 411, 418 (1994).

18. Mary Blair was employed by Sedgwick at all times relevant to this action and was the Claims Manager for the Calandro case.  She was employed until March 2017, when she retired. (Trial testimony Mary Blair P.2-24, Lines 1-8).

**19.** Janie Hanna was employed by Sedgwick as Ms. Mary Blair's manager during the relevant time period between 2011 and 2014. (Trial testimony Jane Hanna P.38, Line 3).

**20.** The Defendant is a third party administrator (hereinafter "TPA") (Trial Transcript, p. 36 at 3; testimony of Janie Hanna).   Sedgwick was hired by Hartford specifically to negotiate and settle claims on its behalf; Sedgwick's role was clearly to interpose itself between the insurer and the claimant, and investigate and administer claims on behalf of The Hartford.  (Trial Transcript, p. 36 at 3; testimony of Janie Hanna).

**21.** As a third party administrator, Sedgwick is engaged in the business of insurance.  "It was hired by Hartford to negotiate and settle claims on its behalf, and its role was to interpose itself between the insurer and the claimant. As such, it is subject to Chapter 176D" (Document 86, p. 17, Order of this Court on Summary Judgment.).

**22.** Furthermore, Mary Blair testified at trial that Sedgwick (as third party administrator) and she, herself (as claims adjuster assigned to the Calandro claim), step into the shoes of The Hartford, the insurer in this case.   Again, Sedgwick is in the business of insurance for purposes of Chapter 176D and Chapter 93A:

> Q:     And you in essence, when operating the Calandro file, are stepping into the shoes of Hartford for negotiating, possibly settling, investigating, adjusting, and managing that file, correct?
>
> A:     Yes.

(Trial Transcript, p. 2-24 at 13-17)

**23.**  Becky Shingleton was employed by The Hartford as a TPA consultant.  Beginning in February of 2014, Ms. Shingleton was the liaison for The Hartford who communicated

with Sedgwick regarding the Calandro v. Radius claim that underlies this action.  Ms. Shingleton was also the Rule 30(b)(6) representative designated to speak on behalf of the Hartford.  Ms. Shingleton testified that Sedgwick, as a TPA to The Hartford, acted "like an independent adjuster", whose responsibility was to control claims and to continue with the investigation of claims on behalf of Hartford and through its clients (Trial Exhibit No. 63, p. 28 at 15-24).  Ms. Shingleton testified further that, "the role of the, of Sedgwick is to, not only investigate, but adjust and resolve the claim."  (Trial Exhibit No. 63, p. 53 at 9-11).

24. The Court has found that Sedgwick was engaged in the business of insurance for purposes of Chapter 176D and Chapter 93A, as a matter of law (Summary Judgement Order April 25, 2017, Docket No.86, P.16 & 17).


### D.  SEDGWICK'S CONDUCT DURING ITS HANDLING OF THE CALANDRO CLAIM CONSTITUTED UNFAIR CLAIMS SETTLEMENT PRACTICES, IN VIOLATION OF CHAPTER 176D

#### a.  Chapter 176D – generally

25. "Chapter 176D was 'enacted to encourage settlement of insurance claims and to discourage insurers from forcing claimants into unnecessary litigation to obtain relief." Bingham v. Supervalu, Inc., 806 F. 3d 5, 9 (1st Cir. 2015), quoting Hopkins, 434 Mass. 556 (2001).

26. G.L. Chapter 176D § 3 states, in pertinent part:

The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:--

…

(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:

(a)     Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b)     Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c)     Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d)     Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e)     Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(f)     Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(g)     Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

(h)     Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

(i)     Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

(j)     Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

(k)     Making known to insured or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements of compromises less than the amount awarded in arbitration;

(*l*)     Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

16

(m)    Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; or

(n)    Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

…

**b.  Sedgwick failed to effectuate a prompt, fair and equitable settlement of the Calandro claim after the liability of the insured (Radius) became  reasonably clear or, at a minimum, after it became highly likely**

27. For purposes of Chapter 176D, the duty to settle does not arise until liability is reasonably clear, or *highly likely*.  Parker v. D'Avolio, 40 Mass. App. Ct. 394, 395-396 (1996) (emphasis added).

28. The purpose of the statutory scheme of G.L. 176D is "not to require the insurer to extend an initial offer that must be accepted by the claimant but, rather, to initiate the process of settlement negotiations promptly and thereby facilitate out-of-court resolution."  Rhodes v. AIG, 78 Mass. App. Ct.299, 309 (2010), affirmed, 461 Mass. 486 (2012).

29. The test as to whether an insured's liability is 'reasonably clear' or highly likely is objective.  McLaughlin v. American States Ins., 90 Mass. App. Ct. 22, 29 (2016); O'Leary Alison v. Metropolitan Prop, 52 Mass. App. Ct. 214, 217 (2001).  "An insurer is required to analyze the legal issues objectively to determine if liability and damages [are] reasonably clear and must ensure that no improper motivations color the decisions with respect to settlement."  Scott v. Vermont Mut. Ins., 2011 WL 4436984 at *7 (D. Mass. 2011) (Woodlock, J.) (internal quotations and citations omitted).

30. Violations of G.L. c. 176D occur when an insurer has made a liability inquiry, determined that it is liable, and then fails to promptly effectuate an equitable settlement, or otherwise takes some further step to avoid making a settlement offering. Federal Ins. Co. v. HPSC, Inc., 480 F.3d 26, 36 (1st Cir. 2007).

31. Regarding the inquiry as to whether liability is "reasonably clear," the question to be decided is whether a reasonable person, with knowledge of the facts and law, would probably have concluded, for good reason, that the insured was liable to the plaintiff. Demeo v. State Farm Mut. Auto Ins., 38 Mass. App. 955, 956-57 (1995); Nyer v. Winterthur Int'l, 290 F.3d 456, 461 (1st Cir. 2002).

32. For purposes of 176D, § 3(9)(f), liability encompasses both fault and damages. Clegg v. Butler, 424 Mass. 413, 421 (1997). Furthermore, good faith on the part of the insurer or adjuster requires that any settlement decision be made without regard to the policy limits and that the insurer exercise common prudence to discover the facts as to liability and damages upon which an intelligent decision may be based. First State v. Utica, 870 F.Supp. 1168, 1175-76 (1994) (Stearns, J.), quoting Hartford v. New Hampshire, 417 Mass. 115, 119 (1994).

33. A defendant bears the burden of proof that its settlement offer was reasonable and made in good faith, in light of the demand and attendant circumstances. Parker v. D'Avolio, 40 Mass. App. Ct. 394, 395 (1996). Good faith requires that an insurer keep its insured informed of facts material to his exposure, including information relating to coverage and settlement negotiations. Peckham v. Continental Cas., 895F.2d 830, 834 (1990).

*The possession of a plausible defense to a coverage claim does not automatically preclude a finding of Chapter 93A violation.  The defense must be clearly articulated and asserted in good faith*.  <u>Southern Worcester</u> v. <u>Utica Mut.</u>, 2010 WL 3222015 at *11 (D. Mass. 2010) (Saylor, J.) (emphasis added), citing <u>Commercial Union Ins.</u> v. <u>Seven Provinces Ins. Co.</u>, 217 F.3d 33, 40-41 (1st Cir. 2000).

**34.** Since the time that Sedgwick was notified of the underlying Calandro claim, the evidence adduced at trial shows not only that Radius' liability for the underlying Calandro claim [including damages] was reasonably clear or, at a minimum highly likely.  Most importantly, the evidence also shows that Sedgwick and defense counsel both consistently and repeatedly interpreted Radius' liability as being reasonably clear at various stages of the litigation.

**35.** Despite trial testimony indicating that internal documents of Sedwick did not include causation in their usage of the term 'liability', substantial, consistent documentary evidence renders those assertions unbelievable, as the documents consistently state and clearly establish that liability was considered a foregone conclusion, that the case could be defended on "damages only," and that a verdict would be returned in an amount estimated at $300-500,000.  The content of these documents are further supported by the consistent testimony of Mary Blair and Becky Shingleton at trial.

**36.** At trial, Sedgwick repeatedly attempted to obscure and obfuscate the common understanding for which elements of negligence are included in the definition of 'liability."  When it was convenient for it to do so, Sedgwick argued that 'liability', as it had been understood and used by the Defendant itself and the defense counsel of the insured throughout the underlying claim, did *not* include causation.  Even if the term is

so used at times in the industry, Sedwick's own documents preclude any conclusion that it was used that way in Mr. Kenney's own actual assessments of liability and in his discussions with Ms, Blair.  For example, attorney Kenney disclosed to Sedgwick in his February 7, 2014 and his February 14, 2014 pre-trial reports and again in his June 30, 2014 PRE-TRIAL REPORT AND TRIAL BUDGET that "**the defense is extremely difficult….we will have no alternative but to concede liability and try the case on damages only. Defending this case on liability will be very difficult. We will likely have no choice but to admit liability and try the case solely on the issue of damages.**" (Trial Exhibits No. 13, 27 and 51) (emphasis added). It was only after Mr. Kenney received Attorney Hoey's April 8, 2014, letter putting Sedgwick on notice of a potential 93A/176D claim (Trial Exhibit No. 25) that Mr. Kenney first adopted, in an email from Mr. Kenney to Mr. Hoey on April 26, 2014, a formulation of "liability " that excluded causation. ("[I]f necessary and at the appropriate time, stipulate and concede duty and a breach of the standard of care and try the case on proximate cause and damages only.") (Trial Exhibit No. 24).

37. Although Sedgwick and Lawrence Kenney both used the term 'liability' in a consistent manner throughout the various letters, e-mails, and notes that were written from the time the Radius lawsuit was served to the Defendants in October 2011, at *no* time prior to April 8, 2014 did either Sedgwick or attorney Kenney ever indicate that causation was excluded from their definition of the word.  Rather, up until a few weeks before the trial *all* of the references to Radius' liability made by Mary Blair and attorney Kenney indicated that causation was, in fact, included in their usage of the word "liability."   Mr.

Kenney and Ms. Blair consistently communicated to Radius, Hartford, and Sedgwick that the sole function at trial of the Calandro claim would be contesting damages.

**38.** Notwithstanding attorney Kenney's testimony at this trial that medical causation was always contested and never reasonably clear, Kenney had neither retained nor disclosed Dr. O'Malley until late May 2014.  As the Defendant's only expert opinion in this case, that the first source of any legitimate evidence contesting medical causation.  Despite this late arrival of evidence,   in June of 2014 Larry Kenney **still**, yet again, took the position that the defendants "[l]ikely have no choice but to admit liability and try the case solely on the issue of damages." That letter also stated:

> **"We will have no alternative but to concede liability and try the case on damages only."**

> **"Defending this case on liability will be very difficult."**

> **"Likely have no choice but to admit liability and try the case solely on the issue of damages."**

> **"Middlesex County generally recognized as one of the more Plaintiff friendly counties in Massachusetts."**

> **"The Defense of the Radius Defendants is extremely difficult."**

 (Trial Exhibit No. 13: June 30, 2014).

Again, this is even *after* he had received his expert opinion on medical causation in May 2014.  (Trial Exhibit No.75).  Though attorney Kenney's expert disclosure to opposing counsel could be seen as support for attorney Kenney's claim at trial that he did not believe causation of Ms. Calandro's death to be reasonably clear, this testimony is disturbingly undermined by the language contained in the above communication—a private, internal letter to Mary Blair, the claims adjuster and the **only** person in the position to obtain and authorize settlement authority.  As of February 14, 2014, the

communications between Sedgwick and defense counsel confirm that their intention remained proceeding on damages only.

39. It was not until after attorney Kenney had received a letter written by attorney Hoey, dated April 8th, 2014 and which alleged potential violations of Chapter 176D and Chapter 93A, that either attorney Kenney or Mary Blair ever indicated to the Plaintiff or its counsel that they intended to defend the wrongful death action on medical causation *in addition* to damages.

40. Evidence indicating Radius' liability on the Calandro claim can be seen as early as October 24, 2011, less than two weeks after the Complaint was served upon Radius. Phil Bistany, an independent investigator hired by attorney Kenney, wrote in his investigative report that **"[m]y review of the patient file with Ms. Shaw and Ms. Picardy was basically in line with the allegations made by Atty. Hoey in his letter of October 12, 2011[,]"** (Trial Exhibit No. 74 at p. 1) and on page two, Bistany reports:

> "One problem is the fact that it appears that the results of lab work done on July 9, 2008 were received at the insured facility the evening prior to July 11, 2008; however, for some reason, they were not reported to the attending physician promptly and as a matter of fact were not reported at all prior to her departure to the hospital."

But, despite this, and well before any reasonable or thorough investigation had been completed, Kenney states in a letter to Plaintiff's counsel: "Radius Danvers little choice but to vigorously defend this claim."; "[s]poke with d/c before he wrote to p/c." (Trial Exhibit No. 43 October 14, 2011).

22

**41.** In a December 5, 2011 letter to Mary Blair, attorney Kenney remarks, in regard to plaintiff's counsel, "<u>if he is serious</u>, this will be a time consuming and tough and expensive fight" and unusually dangerous. (Trial Exhibit No. 59 at p.3).

**42.** Next, in a handwritten document dated January 30, 2014, Mary Blair noted: "Co-Deft they have not been able to get an expert." (Trial Exhibit No. 30) Radius also did not have any expert at that time. (Trial Exhibit No. 75).  As previously mentioned, defense counsel did not obtain an opinion on medical causation from Dr. O'Malley until the last week of May, 2014.  The co-defendant doctor's difficulty in procuring an expert medical opinion severely undermines the claims made by attorney Kenney and Mary Blair at trial regarding their position that medical causation was never reasonably clear.  Even when O'Malley's opinion was finally produced, it was only **1 (one)** page and significantly lacked evidentiary support, (Trial Exhibit No.75), notably weak in comparison to the Plaintiff's factually-detailed, ten-page expert report. (Trial Exhibit No.79).

**43.** Shortly thereafter, in a letter dated February 7, 2014 from attorney Kenney to Mary Blair, Kenney made <u>*no* mention of *any* plausible defense on medical causation</u>; to the contrary, he clearly and unequivocally stated: (1) **"[i]t is very likely if this case goes to trial that we will have no alternative but to concede liability and try the case on damages only."**  (Trial Exhibit No. 51 at p. 3) (emphasis added) **;** (2) **"it is very likely if not assured that there will be an award against our insured at least and probably against both your insured's and the defendant physician."** (Trial Exhibit No. 51 at p.5) (emphasis added); (3) **"*[i]t is therefore very likely that we will be left with little***

*alternative but to admit liability and accept a jury verdict on damages*." (Trial Exhibit No. 51 at p.5) (emphasis added); (4) "[d]efending this case on liability will be very difficult (Exhibit 51 at p.4); (5) "[i]t appears that **our only defense** at this point, if allowed, will be a reference to the chart by an expert who can opine as to compliance with the standard of care.  **How effective that might be…is questionable**.   Before [plaintiff's attorney moves to default us on liability for failure to produce documents] ***we will likely have no choice but to admit liability and try the case solely on the issue of damages.***" (Trial Exhibit No. 51 at p.4) (emphasis added)  Although attorney Kenney testified at trial that he had always disputed causation, and that causation was never reasonably clear, and that he was never aware of the opinion of the Plaintiff's expert until April, 2014, that is belied by not only the evidence above, but by the fact that his February 7, 2014 "PRE-TRIAL REPORT AND TRIAL REPORT" also expressly acknowledges the substance of the opinion expected to be given at trial by the Plaintiff's expert: "[i]t is alleged by plaintiff's expert that the staff at Radius Danvers failed…all of which contributed to her death…"   (Trial Exhibit No. 51 at p.4)   Finally, attorney Kenney's own skepticism of the effectiveness of a medical causation defense is glaringly apparent in the document; "including expert witness preparation (**if allowed**) … I would anticipate that our expert's fees, **assuming that such testimony is permitted** …" (Trial Exhibit No. 51 at p.5) (emphasis added).   Lastly, he puts a value, (Trial Exhibit No. 51) "Assuming full liability, we would think that an award of $300,000.00 to $500,000.00 is possible."   Even the bottom estimate of liability was never offered in settlement.

**44.** The Court's findings are supported further by portions of the trial testimony of Mary Blair and Becky Shingleton.  During a colloquy between the Court and Ms. Blair regarding Ms. Blair's understanding of Radius' liability in February of 2014, the Court asked clearly: "All right.  So in February [2014] you decided, "[t]here's no chance we're going to win this," **either with respect to negligence or causation?**"  To which Ms. Blair unequivocally replied, "[y]es."  (Trial Transcript, p. 2-36 at 5-9)  Ms. Shingleton was asked what her basis was for extending the settlement reserve to $300,000 several months later, even after attorney Kenney supposedly had gotten his expert's opinion on medical causation but before trial,. Ms. Shingleton replied in part, credibly, "[w]e didn't have any defenses on liability.  **I was told that we had no choice but to admit liability and try the case on damages**…[t]hat was what I was, the information I was given from Sedgwick and defense counsel …" (Exhibit 63, p. 44 at 1-24) (emphasis added).  Post-verdict, Shingleton voiced her concerns regarding her understanding of what had been communicated to her prior to trial, (Trial Exhibit 57, July 22, 2014) "How can we be hit so hard when we admitted liability and we were trying the case on damages only?" (Exhibit 57, July 22, 2014)

**45.** In sum, after considering the totality of evidence, especially in particular the internal documentary evidence, the Court cannot find attorney Kenney's testimony at trial to be credible.  The Court also finds, as a matter of law, Radius Defendants' liability on both the conscious pain and suffering and the wrongful death claims was reasonably clear as of May 2013 when Plaintiff disclosed the detailed opinions of its medical experts in connection with the medical malpractice Tribunal.  As evidenced by the documentary

evidence, liability was *crystal* clear to the Defendant and defense counsel by no later than February 7, 2014.

46. While no single factor is dispositive, factors important to whether the defendant was negligent in its handling of a claim include: the diligence of the investigation of the claimant's claim; ***the reasonableness of the defendant's assessment of the insured's liability***; the reasonableness of the defendant's reliance (or failure to rely) on the advice of its counsel; whether a firm settlement demand within the primary limits was rejected; whether the defendant apprised the insured and the insurer of significant developments in the case and particularly of any settlement opportunities; whether the possibility of settlement was fairly and sufficiently explored; and whether any decision to resist settlement was motivated by the defendant's self-interest rather than the interests of the insured.  First State v. Utica, 870 F.Supp. 1168, 1175-76 (1994) (Stearns, J.) (emphasis added)

47. The inquiry of whether liability was "reasonably clear" may turn on what the insurer knew on the relevant date to warrant the complainant's conclusion of reasonably clear liability.  Chiulli v. Liberty Mut. Ins. 87 Mass. App. Ct. 229, 236 (2015); Van Dyke v. St. Paul Fire & Marine.

48. Importantly, an insurer's statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer.  And, "a last minute offer does not cure a previous violation of Chapter 176D."  MT Baltic Commander Schiffahrtsgesellschaft MBH & Co. KG v. Massachusetts Port Authority, 918 F.Supp.2d 105 (D.Mass.2013) (appeal dismissed).  Thus, any evidence suggesting the Plaintiff's

unwillingness to accept the communication of an offer or whether or not there was in fact an offer of $250,000 made on the final days preceding trial is simply irrelevant to whether Sedgwick engaged in unfair claims settlement practices as defined by chapter 176D.

49. Several points of evidence lend substantial support to the likelihood that the defense counsel's strategy of contesting medical causation was something which was conceived *post hoc*, after having received a 93A demand letter, in order to divert attention from the fact that Sedgwick and defense counsel had always understood liability to have been reasonably clear, as they themselves had consistently communicated in internal e-mails and letters. Only after receiving the April 8, 2014 letter alleging possible 93A/176D violations by Sedgwick did attorney Kenney changed his evaluation, and definition of liability.

   c. **Sedgwick failed to conduct a reasonable investigation before denying the Calandro claim, in violation of G.L. c. 176D, § 3(9)(d). And, specifically, <u>the defendants engaged in conduct intended to withhold witnesses from the plaintiff's counsel. The act of withholding is a violation of 93A/176D.</u> The acts or omissions that followed are not relevant. Specifically, including but not limited to when a motion to compel was filed or whether that motion ever got addressed by the trial court.**

50. An insurer must conduct a reasonable investigation before denying a claim. <u>Cytosol Laboratories, Inc.</u> v. <u>Federal Ins. Co.</u>, 536 F.Supp.2d 80, 94 (D. Mass, 2008) (Tauro, J.); G.L. c. 176D § 3(9)(d). Sedgwick alleges to have always intended from the outset to defend and the Calandro v. Radius claim on the issues of both causation and damages. Even if that were true, evidence demonstrates many failures to properly investigate the Calandro claim. This is especially true of Sedgwick's failure to adequately explore its

purported medical causation defense, and particularly of its failure to engage *any* qualified expert to provide any opinion in support of its theory of a lack of medical causation defense until May 27th, 2014, 2 years 9 months after suit was filed and just weeks before trial.  As such, and where medical causation was purportedly the defense counsel and Sedgwick's main defense at trial, Sedgwick failed, as a matter of law, to promptly conduct a proper and reasonable investigation into the Calandro claim,  thus failing to discharge its statutory duty and violating of G.L. c. 176D,  § 3(9)(d). Although there is evidence to suggest that defense counsel, Sedgwick, and thereby Hartford, first received notice of the Calandro claim at the time the Plaintiff filed its lawsuit on August 16, 2011, it is undisputed that, at the latest, Sedgwick became aware of the claim when it received service for the suit in the middle of October, 2011.  At that time,  Plaintiff's initial settlement demand was $500,000.00 to the nursing home only (Trial Exhibit No.44 October 12, 2011).

51. Once service was made on Radius and its counsel, a private investigator named Phil Bistany was hired by attorney Kenney at the direction of Sedgwick's adjuster, Mary Blair, to do a preliminary investigation into the Calandro claims.  (Trial Exhibit No.45) Mr. Bistany provided his first report to attorney Kenney via a letter dated October 24, 2011.  (Trial Exhibit No.74)  Notably, Bistany's report notes that his "review of the patient file with Ms. Shaw and Ms. Picardy was basically in line with the allegations made by Atty. Hoey in his letter of October 12, 2011."  (Trial Exhibit No.74 at p. 1) Most importantly, Bistany's report recommends that Ms. Calandro's patient file and reports from Beverly Hospital and Cedar Glen, when located, "should be ***forwarded to an independent physician for review and opinion in response to the allegations made***

28

*by Atty. Hoey.*"   (Trial Exhibit No.74, at p. 6) (emphasis added)   Nevertheless, the first date as to which there is *any* evidence suggesting that the Defendant actually consulted with a qualified expert regarding the medical likelihood of the wrongful death causation is May 27, 2014, less than two months before trial.   (Trial Exhibit No.75).

52.   At the absolute latest, Sedgwick and defense counsel received evidence supporting the Plaintiff's theory of medical causation from Dr. Paul Genecin's expert disclosure as part of the Plaintiff's Offer of Proof prior to the May 1st, 2013 tribunal, nearly 15 months prior to trial (Trial Exhibit No.79).   This is further confirmed by Mary Blair's handwritten note, dated April 25, 2013, "TRIBUNAL SCHEDULED FOR 5/1/13. PLTF'S OFFER OF PROOF GIVES SOME INSIGHT INTO THE PLTF THEORIES AND EXPERT REPORTS.   EXPERTS – MEDICAL – GENECIN…AS PER D/C – LITIGATION CAN BEGIN" (Trial Exhibit No.8)   Despite this, and likely in an attempt to justify his failure to promptly engage a medical expert, on numerous instances at trial attorney Kenney testified that Plaintiff's counsel had not provided him with the opinion of the Plaintiff's medical expert until May of 2014, nearly a year later:

(1)   "And more importantly, Dr. O'Malley had provided me an opinion—keep in mind that I had not seen, been provided with a copy of the plaintiff's expert opinion until sometime in early May, and within a few weeks—I had spoken to Dr. O'Malley prior to that to get his general sense of the case.   And after I received the opinion from Mr. Hoey with respect to Dr. Jenison (sic), I forwarded that along with the records to Dr. O'Malley, . . . , and basically Dr. O'Malley said that there was no causal relationship from anything that was done that caused her death."   Trial Transcript, p. 3-36 at 12-22, testimony of Lawrence Kenney;

(2)   Referring to his valuation of the case between $300,000 and $500,000 written in a pre-trial report by attorney Kenney himself on February 7, 2014 (Exhibit 51), attorney Kenney testified, "…and we hadn't seen any expert reports by this time, so it was kind of shooting in the dark…"   Trial Transcript, p. 3-43 at 18-19, testimony of Lawrence Kenney;

(3)    Attorney Kenney also testified, "[t]his is on Page 9 of an expert disclosure from Mr. Hoey.  I think it was sent to me in May before the trial."  Trial Transcript, p. 3-67 at 11-13, testimony of Lawrence Kenney; and

(4)    Q: Now, when did you say you got the medical opinion from the plaintiff?  It may be an exhibit; it may not.

A: I saw it here someplace.  It was in early May of 2014, approximately two and a half months before trial, something like that.

Q: Up to that point, you didn't even have an opinion from the plaintiff there was any causation?

A: That's correct.

Trial Transcript, p. 3-97 at 17-24, testimony of Lawrence Kenney.

Moreover, the report outlined the difficulties presented by the apparent sale of the facility, coupled by an inability to locate both records from the Radius facility and witnesses with knowledge of Ms. Calandro or the incident and who were still employed at the facility.  (Trial Exhibit No.73 & 74)  Mr. Bistany was, however, able to obtain the names of two nurses, though the nurses were no longer employed by the facility, and that "it appear[ed] that at least one or two of them have left under less than amicable circumstances."  (Trial Exhibit No. 73 & 74).

**53.** Subsequently, in his second report to attorney Kenney dated January 13, 2012, Bistany writes that he had been able to interview both nurses.  (Trial Exhibit No. 73)  Although the report indicates that the nurses versions of the story differed in slight respects, both witnesses recalled having a memory of the decedent, Ms. Calandro.  Whelan, LPN "had some slight memory of Ms. Calandro and the incident of July 11, 2008" "Ms. Cribbs, LPN states that she recalls Ms. Calandro quite well." (Trial Exhibit No. 73).  One nurse, Ms. Whelan-Horne, provided detailed information regarding the circumstances of Ms.

Calandro's fall; in fact, Ms. Whelan-Horne was the nurse who completed the Incident Report subsequent to the event in question—that Incident Report, however, was claimed to have not been located and was never produced in discovery.   Regarding the importance of Ms. Whelan-Horne's account, Bistany noted: "[o]f great importance is the fact that Ms. Horne states that it was she herself who completed the Incident Report and she is absolutely positive that an Incident Report was completed by her at the time of the incident."  (Trial Exhibit No. 73 at p. 8)  Ms. Whelan-Horne stated further that she was interested to see the Incident Report because it would refresh her memory as to whether Ms. Calandro was left on floor after the fall, among other details.  (Trial Exhibit No. 73 at p.8).

54.  Trial Exhibit No. 5 which is an email between Mary Blair and Larry Kenney dated August 1, 2013, verifies the identity of two witnesses; Mary Cribbs, LPN, Gloucester, MA, and Jeane Whelan-Horne, Deerfield, NH.  Mary Blair says to Larry Kenney:

> "these are 2 nurses… who he [Phil Bistany] spoke with in person" ; and

> "both were interviewed by Phil, did have recollection of Calandro…LPN [Whelan] says there was an investigation by former DON [Director of Nurses]"

55.  At trial, and in spite of the facts contained in both of Bistany's reports to him, attorney Kenney specifically testified that, "[Bistany] located two nurses and took statements from them, ***but they really didn't have anything specific with respect to this particular resident.  They remembered her but not very much more than that***."  (Trial Transcript, p. 3-20 at 10-13, testimony of Lawrence Kenney)  In light of the thoroughly-detailed documentary evidence above, this Court simply cannot find Lawrence Kenney's testimony to be credible.

**56.** Of the more egregious affirmative acts by Sedgwick to consciously, and intentionally delay settlement of the Calandro claim Mary Blair and attorney Kenney together decided to conceal the knowledge of the two nurse witnesses from the Plaintiff and its counsel.

**57.** In a document handwritten by Mary Blair dated August 21, 2013, and in reference to a conversation she had with defense counsel ("SPOKE WITH D/C"), Blair writes: "***AS FAR AS THE TWO LPN'S ARE CONCERNED, WE DO NOT WANT TO OFFER THEM AS WITNESSES BECAUSE OF THEIR CONFLICTING VERSIONS AND THE LACK OF THE INCIDENT REPORT AND INTERNAL INVESTIGATION REPORT***." (Trial Exhibit No. 1, Mary Blair claims file note) Consistent with her written words, Blair testified at trial that she and attorney Kenney had jointly decided to conceal the identity of the nurses from the Plaintiff:

> THE COURT:      Do you know whether [the nurses] were then disclosed in any way in the litigation?
>
> THE WITNESS:    They were not disclosed.
>
> THE COURT:      Whose decision was that?
>
> THE WITNESS:    ***That was a joint decision by myself and Mr. Kenney.***

Although that testimony was consistent with her handwritten note in the claim file from August of 2013, any doubt as to whether Ms. Blair may have misspoken or misunderstood the question was unmistakably eliminated by her response to Plaintiff's counsel shortly thereafter (Trial Transcript, p. 2-34 at 18-21, testimony of Mary Blair):

> Q:      And you mentioned that Mr. Kenney was in agreement with you to not want to offer these two LPNs as witnesses in the case, correct?
>
> A:      **<u>Yes</u>**.

**58.** Again, Mr. Kenney's testimony at trial to the contrary is simply not credible.

> Q:    And let me ask you, was there ever a conscious decision on your part to conceal the identities of these two witnesses?
>
> A:    No. No, absolutely not.

(Trial Transcript, p. 3-22 at 5-7).

**59.** Although the Plaintiff requested, through interrogatories, the identity of any person having knowledge of the alleged events, attorney Kenney at no time provided the identity of the nurses to Plaintiff or its counsel.  In fact, attorney Kenney stated the opposite to Plaintiff's counsel in an August 21, 2013 letter (Trial Exhibit No. 2 at p. 2, letter to David Hoey):

> "To further complicate things none of the significant people who were employed at the facility in 2008 are still there, or have been there for some time, long before this discovery was served, including the administrator, who has changed several times and the DON.  ***So getting anybody who knows anything has been and will continue to be a problem***."

As additional justification for his failure to provide discovery responses in that same letter, and as he similarly testified to at this trial, attorney Kenney objected to the Plaintiff's interrogatories on the grounds that their untimeliness was in violation of Superior Court Rule 30.  However, Kenney appears to have deliberately misled Plaintiff's counsel, by expressing some intention of providing further information in the future (Trial Exhibit No. 2 at p. 2, letter to David Hoey):

> "Because of that, I am forced to object to your interrogatories ***for the time being*** pursuant to Superior Court Rule 30 as untimely ***simply to allow time to sort the matter out***.  ***I intend to answer at least those related to the facility and the***

> ***administrator to the extent that I can, but it appears that such answers may ultimately solely be answered by reference to the records***,

…

> ***We still have someone out trying to track down former employees.  I'll give you a call to discuss this further***."

Once again, attorney Kenney's credibility is undermined by his live testimony at trial:

> Q:    Did you develop some kind of strategy to try to deal with [a potential default]?
>
> A:    Well, the answers to interrogatories I did because I objected to them, and I objected on a good-faith, legitimate basis; and ***if Mr. Hoey had done something to compel answers, then I would have dealt with that, but that never happened***.

Not only did defense counsel never produce responses in good faith as he had indicated to Plaintiff's counsel, a motion to compel was filed with the Court by Mr. Hoey (Marked for Identification at this Trial as Letter G is a copy of the Motion to Compel with the **Opposition by Attorney Kenney**), and that the period for discovery was twice enlarged by the Court, *and* with attorney Kenney's agreement. (Trial Exhibit No. 76 Court's Order allowing **Assented** Motion to extend discovery to April 28, 2014). Plaintiff's counsel used his best efforts to obtain the information. The notion by defense counsel at trial that he ultimately had a good-faith legal justification for his refusal to respond (a technicality) is nothing more than a red herring, and is seriously overshadowed by the bad faith demonstrated by counsel in his continued and overt attempts to induce the acquiescence of Plaintiff's counsel. During this whole time counsel had someone from Radius available to him who was able to sign answers to interrogatories. (See Trial Exhibit No. 1 Mary Blair's file note dated 8/21/13 "Spoke with D/C. He and Bistany went to Radius Danvers and met with "Temporary Administrator" Steve Burke……**Burke will sign Ints and P/D.**"

**60.** In sum, the efforts by defense counsel and Ms. Blair to conceal the identity of the two

nurses (with firsthand knowledge relevant to the claim) were made in bad faith, both

objectively and subjectively, and also demonstrate yet further that liability was

reasonably clear to Sedgwick and the defense counsel from a very early stage of the

claim and litigation.  For more than one reason, the Court notes that it is also deeply

concerned with the propriety of this type of behavior from counsel with decades of

experience, and who is a partner at a well-established insurance defense firm.

**61.** If an insurer has "a ***reasonable*** and ***good faith*** belief that it is not obligated to make a

payment to a claimant ***and takes active steps to resolve any dispute***, it is not liable even

if its action is "ultimately held to be based on a misinterpretation of the law."

FundQuest Inc. v. Travelers, 715 F.Supp.2d 202, 211 (D. Mass. 2010) (Stearns, J.)

(emphasis added), quoting Premier Ins. Co. of Mass. v. Furtado, 428 Mass. 507, 510

(1998).  Factors relevant to whether an insurer's investigation is *reasonable* include:

"insurance industry practices in similar circumstances, expert testimony that the insurer

violated sound claims practices, the defendant's own evaluation of the plaintiff's claim,

and advice given to the insurance company on the probability of success at trial."

O'Leary-Alison v. Metropolitan Prop. & Cas. Ins. Co., 52 Mass. App. Ct. 214, 217 n. 3

(2001).

**62.** "An insurer violates s. 3(9)(d) by purposefully and strategically failing to pursue a line

of inquiry because it would uncover favorable evidence."  Capitol v. Higgins, 203

F.Supp.3d 200, 210 (D. Mass. 2016), quoting <u>Bohn</u> v. <u>Vermont</u>, 922 F. Supp. 2d 138, 149 (D. Mass. 2013).

### d.  $250,000 was not an offer for purposes of 93A/176D

63. Though it was hotly contested at trial, no offer of $250,000 was ever made to the claimant despite the Defendant's duty to attempt to effectuate a prompt and reasonable settlement.  Especially in light of the significant and numerous affirmative duties the Massachusetts legislature has placed upon insurers through chapter 176D, and although it is not dispositive to the resolution of this case.

64.  Regarding the promptness of the $250,000 alleged to have been made in July 2014 by the Defendant on behalf of The Hartford and the insured, Mary Blair was unable to provide *any* reason during her testimony, much less any justifiable reason, as to why she and attorney Kenney waited so long to obtain authority in the amount of $250,000.

| | |
|---|---|
| THE COURT: | So that was in June you got – did you ask for the $250,000 in early June? |
| THE WITNESS: | No.  I think it was in July. |
| THE COURT: | So why did you wait so long? |
| THE WITNESS: | Uhm…I don't know.  I can't surmise right now. |

Attorney Kenney testified about his memory of a July 14th conversation with David Hoey, Plaintiff's counsel: "[a]nd I said, 'Mary Blair has $250,000 and she's been *trying* to offer it to you.'" (Trial Transcript, p. 2-165 at 10)  Though the choice of words alone indicates that Mary Blair had not yet been able to offer $250,000, and though Kenney

claims to have himself made the offer of $250,000 in that very conversation, it is clear that no offer was made and that Plaintiff's counsel did not understand any offer to have been made. In his e-mail to attorney Kenney the following day, July 15th, Plaintiff's counsel wrote, "[n]onetheless, I've given three different demands with no offer from your client…I wanted to know if Mary/Hartford has an offer I can bring to my client that is more than $250,000?  Right now I have nothing to offer him."  (Trial Exhibit  No. 37). There was no testimony or evidence offered by the Defendant concerning any response or reply by Mr. Kenney or by Ms. Blair to the email admitted as Trial Exhibit No. 37. Any reasonable attorney who has made a settlement in an attempt to settle a case 3 days before trial would certainly seek to eliminate perceived confusion after receiving a communication from opposing counsel stating they have received "no offer from your client[.]"  A reasonable attorney would either correct the misimpression that there had been no offer made and/or reiterate the existence of an offer. The failure of Mr. Kenney to do either or register any other response to an affirmative statement that there was no settlement bolsters the conclusion that Lawrence Kenney did not make any settlement offer on July 14, 2014 or any other time. Rather, all he did was notify plaintiff's counsel that the adjuster, Mary Blair had $250,000 in authority.

In the same vein, Mr. Kenney testified that he overheard Ms. Blair attempt to make an offer of settlement in a telephone conversation that took place on June 13, 2014 during the mediation of a different that case that both were attending. (Transcript, P.  2-175, l. 3-P. 2-176, l. 12). This testimony is not credible because it is contradicted by both Ms. Blair's testimony and the contemporaneous documentary evidence. Ms. Blair testified

that she did not obtain authority from Hartford to make any offer in excess of her standing authority until July, 2014. When asked by the Court why she waited so long, her response was "Uhm…I don't know. I can't surmise right now." (Transcript, P. 2-122, l. 16-25). Exhibit 32 is an email exchange between Ms. Blair and Ms. Shingleton. (SED01162-SED01164). Ms. Blair submitted a case summary on July 7, 2014, advising Ms. Shingleton for the first time that the defense was conceding liability at the trial scheduled for July 17 and that she would attempt to settle the case at a Court conference set for July 9. Ms. Blair ended this report with the following request: "Therefore, I recommend posting a reserve of $350K and proceeding the Court Conference this Wednesday with $300K in authority to attempt settlement." Ms. Shingleton responded the following day, July 8, 2014 as follows: "Wow...unfortunately, I have nothing more profound to say. You are authorized to proceed as recommended. Please keep me closely advised."

65. Lending further support to the conclusion that, in fact, no offer was extended to the Plaintiff by Mary Blair or attorney Kenney, Mary Blair had acknowledged on at least one prior occasion that the only offer ever extended to the Plaintiff was a joint offer with co-defendant Dr. Wahl of $275,000 (Radius contributing $125,000):

> Q:     Other than that joint offer, has any other offers on behalf of Sedgwick, Hartford ever been made?
>
> A:     No.
>
> ….
>
> Q:     The only offer made, that one joint offer with Converys which was 275?
>
> A:     Yes.

Q:      That's because that included your 125?

A:      That's right.

(Mary Blair's deposition testimony as Exhibit to the Opposition to Summary Judgment)

66. Finally, on July 16th Mary Blair asked The Hartford via an e-mail to Becky Shingleton, "(Do I still have $250K?)"  (Trial Exhibit No. 57 at p. 5, July 15 e-mail from Mary Blair to Becky Shingleton)  It simply defies all rational logic to believe that Mary Blair would actually be asking the insurer at this point in time whether she still has $250,000 if attorney Kenney had, in fact, himself offered the $250,000 on July 14th.  In other words, it is difficult to imagine why Ms. Blair would be seeking assurances one day later that she still had the same authority in an amount that was allegedly **already** offered the day prior. In light of the above, the Court cannot find that an offer of $250,000 was ever extended to the Plaintiff by Sedgwick or The Hartford, on behalf of the Radius entities, the insured.

67. Even more damaging to the credibility of Mary Blair and Larry Kenney is when Mary Blair was communicating with her "manager" Jane Hanna and Jane Hanna and Mary Blair are discussing conversations they had with Jane Hanna's manger Kathleen Conway were it is acknowledged that a concern of Conway's was that Mary Blair **"never made any offers."** Mary Blair never corrects the record or informs her managers that Larry Kenney made a $250,000 offer. This took place in October 1, 2014 just two and a half months after the verdict. Hanna to Blair:

"a bit concerned that you stipulated to liability of the case but did not seek the client's approval before doing so…….plus you had $300K in authority and **never made any offers."**

Blair to Hanna
"Yes I did stipulate **to try case on damages only**."
"I have never had a case go south like this one did and I certainly don't want Sedgwick to pay anything."

Hanna to Blair
"there will be lessons to learn from this. First and most importantly, don't agree to anything without client approval, especially regarding stipulated liability. We will need to be able to pull out any documents, references or times we let them know and they either agreed or at least did not object…….I wouldn't say anything to anyone and certainly keep things very professional between you and the Hartford."

e.  **Animosity towards Hoey**

68. Evidence revealed a non-objective animosity toward Plaintiff's counsel David Hoey. This lack of objectivity violated Sedgwick's duty to adjust the claim.  In Trial Exhibit No. 11,in a note from Mary Blair to Hartford on Sedgwick Claims letterhead ,Blair states "First notice was received on 10/21/11 from Law Office of David J. Hoey, who is a well-known, in Massachusetts for trying to 'ring the bell' on nursing home cases and to date has been unsuccessful."

69. In Trial Exhibit No. 4 Mary Blair is communicating with Larry Kenney on October 12, 2011. She writes "he continues to name Roush, etc. in spite of all your attempts to educate him.  He will never change and because of this I will **NEVER** authorize accepting service for his office." However, had she read the policy that applied she would have known that Roush & Associates, Inc. was a named additional insured under the policy and plaintiff's counsel had a good faith basis for including them as a defendant. (Trial Exhibit No. 41 at Page SED00080)(emphasis in original)

70. On July 10, 2014 Larry Kenney writes to Mary Blair "**Ha Ha Ha turn the table on Hoey**."

71. This is evidence that represents exactly what a TPA or insurer (Sedgwick) *is not* supposed to do.  Furthermore, such departures from objectivity run contrary to

Sedgwick's own written internal policies. (See Trial Exhibit 68 at page 4) (keep "personal reasons" out of the process).

   f.   **There is evidence of low-balling and Strong Arm Tactics**

72. Early on, attorney Kenney recognized that the Calandro case wasn't a normal, run of the mill nursing home case. He wrote On December 5, 2011 to Mary Blair that "this case is **unusually dangerous** even though the claim itself seems to be nothing more than a pretty ordinary nursing home liability case."

73. Sedgwick realized that the case had significant value. "Efforts are being made to have Plaintiff return to his original demand of $500k globally." *Exhibit 8*

74. Sedgwick conditioned its willingness to offer settlement on affirmative action from Plaintiff.  "Mary is understandably reluctant to propose anything further unless and until we have clearer indication that it can get done at that level." *Exhibit 18*

75. Sedgwick contemplated making a settlement offer reflecting only half of the lowest liability it projected for it and it's co-defendant, knowing that it would individually liable for virtually all damages for conscious pain and suffering. "I was thinking of a joint $300k offer ($150k a piece) and see what David does." *Exhibit 23*:

76. Sedgwick did not even contemplate making an offer that even approximated its own markedly low projection of liability.  "She would be willing to contribute up to $200k if necessary but would prefer to start at something lower and see what Hoey's response is."

   g.  **There is evidence that Sedgwick sought to cover their tracks**

   *Exhibit 31:*  July 7, 2014 "We are conceding to liability for a breach of the standard of care and will try the case on the injury and causation issues."

*Exhibit 33 & 55:* July 31, 2014 "In return for such payment we would require a full release of all claims or potential claims against the named defendants and all our their agents, servants, employees, insurers, parent or affiliated companies or persons, subsidiaries, predecessors, successors and all other persons of every kind and nature in the customary and usual manner."

*Exhibit 49:* April 17, 2014 "We intend to stipulate to fault on behalf of these corporations and to try this case solely on the issue of causation and damages."

*Exhibit 56:* July 25, 2014 "We want to lay the ground work for putting out the policy limits with a release. Although I doubt that plaintiff will accept the limits at this time, it will be a good protection for Hartford against the insured and plaintiff."

*Exhibit 68:* Sedgwick 93A and Sec. 176D training Page 29 "Add language to the release that releases Sedgwick for any and all claims arising out of the incident and the investigation in handling thereof."

*Exhibit 78:* October 1, 2014 Mary Blair to Jane Hanna "I have never had a case go south like this one did and I certainly don't want Sedgwick to pay anything."

October 1, 2014 Jane Hanna to Mary Blair "there will be lessons to learn from this. First and most importantly, don't agree to anything without client approval, especially regarding stipulation liability. We will need to be able to pull out any documents, references or times we let them know and they either agreed or at least did not object. I wouldn't say anything to anyone and certainly keep things very professional between you and the Hartford."

77. Sedgwick had some special reporting obligations to Hartford under their Agreement with Hartford. The Agreement specified certain "trigger events" which would require Sedgwick to submit notice by phone or email to Hartford within 24 hours of the event. These included:

> (4) "Alleged bad faith and extra contractual Claims, including Claims that (i) name The Hartford as a defendant; (ii) allege extra contractual causes of action; (iii) allege bad faith, negligent Claim handling, violation of an unfair claims practices act; or deceptive trace practices act; or any similar extra contractual Claim; or (iv) demand punitive damages."
> …
>
> (7) Claims where there was a "potential verdict or loss exposure in excess of the Policy limit."

**78.** In a letter sent to attorney Kenney, dated April 8, 2014, Plaintiff's counsel put both Sedgwick and defense counsel on notice that their handling of the claim was in violation of chapter 176D and chapter 93A, remarking, "their offers may amount to unfair settlement practices (in violation of chapters 176D and 93A).  This is not something I wish to pursue since I value my relationship with you and Mary, but I will certainly pursue it against Joe Pacheco, which will then leave me no choice but to include Sedgwick [and The Hartford.]" (Trial Exhibit No.25 at p.1: April 8, 2014 letter) "**If you and your clients truly would like to resolve this matter outside of trial, as chapter 176D requires, then I await a new, serious, and at the appropriate level (in excess of $500,000.00) offer by April 18, 2014.**"  (Trial Exhibit No.25 at P.2: April 8, 2014) (emphasis added)

**E.  SEDWICK REMAINED INVOLVED AND ADVISED THE HARTFORD TO MAKE A $1 MILLION OFFER AGAINST A JUDGMENT FOR $1.9 MILLION IN COMPENSATORY DAMAGES, WITH INTERESTS AND COSTS, AND A TOTAL VALUE OF $14.4 MILLION, INCLUDING PUNITIVE DAMAGES**

**78.** On July 22, 2014, immediately after the gross negligence verdict, Becky Shingleton is asked Mary Blair "I need to know whether or not it is even possible for us to pay the $1M for a full release and be done with this?" (Trial Exhibit No. 57).

**79.** On July 23, 2014 Mary Blair responded to Becky Shingleton's inquiry. "**Before doing so, I need to know whether or not it is even possible for us to pay the $1M for a full release and be done with this?** YES. We are fairly confident that it will come down to this and that this is the only way to fairly resolve this matter. The deciding factor as to whether this will occur rests with plaintiff and how much <u>time</u> and <u>expense</u> he wants to put into pursuing the judgment over policy limits." Sedgwick was bargaining against the

costs of litigation, using transactions costs as a weapon against settlement value.   This violates 176D and 93A. (Trial Exhibit No. 57)

80. On July 24, 2014 Becky Shingleton was communicating with her superiors based on information fed to her by Mary Blair. Becky Shingleton informed her superiors "The Hartford's policy is $1,000,000.00, an **appeal will be filed immediately in an attempt to achieve a result closer to what was originally anticipated**." Shingleton then emails Mary Blair and says "let's get this one settled for a FULL and FINAL release of all claims within the policy limit so that this matter will be completely behind us!" (Trial Exhibit No. 34).

81. Then on July 31, 2014 Larry Kenney wrote to David Hoey, "I have been authorized to tender the full amount of the insurance coverage available to the Defendants in the above referenced matter in full settlement of your client's claims.   The coverage available to the Defendants is $1,000,000.00." (Trial Exhibit No's: 33 & 55). Mary L. Blair  mary.blair@sedgwickcms.com is copied on the offer letter. (see page two of Trial Exhibit No. 55; Sedgwick's legal counsel, Peabody & Arnold, is also cc'd)

82. At the time this offer was made it was against a $1,425,000.00 compensatory exclusive of costs and interest and a gross negligence amount of $12,514,605.00. Judgment was entered the very next day for $1,933,301.40 compensatory with the interest and costs and the $12,514,605.00 for a total judgment of $14,447,906.00. As a matter of and law $1,000,000.00 is a bad faith offer, insulting in precisely the same as was the judgment involved in <u>Rhodes</u>. Also, this offer was not, in actuality, "the full amount of the

coverage available to the Defendants" as claimed by attorney Kenney's letter, as the Hartford policy also provided coverage for (a) all costs taxed against the insured; and (b) postjudgment interest accrued on the full amount of the judgment up to the point that the insurer paid, offer to pay or tendered into court the full amount of the judgment that was within the applicable limits. (Exhibit 41).

83. Sedgwick's decision to contest liability of causation of death was not made in good faith and both its decision and its failure to investigate and evaluate that issue violated 176D and 93A and unreasonably delayed settlement of the claim. Plaintiff was not required to prove that Radius' negligence was the *sole cause* of death, rather, that the negligence was a *substantial factor*. Sedgwick and Kenney were holding the plaintiff to a higher standard of proof – an incorrect standard. Had they conducted an early investigation into Mrs. Calandro's death, with an open and not a dismissive mind, and had they obtained an early expert opinion from a credible expert, and had they applied the correct standard they would have realized that acute renal failure was caused by her uro-sepsis and dehydration. Acute renal failure was a cause of death on her death certificate. They would have understood that her diabetes was under control up until she was neglected Radius. Diabetes Type 2 was a significant condition contributing to death. Her co-morbidities of Parkinsons, congestive heart failure, dementia, and diabetes were maintained without complication until she was neglected.

84. A seasoned attorney with 38 years experience and an experienced Adjuster who manages claims in 40 states all nursing home claims should have been able to put these

pieces of the puzzle together. They also should have acted according and as required by law to make a reasonable offer of settlement in a timely manner.

85. All this could have been determined early on in the case had they chosen to depose the doctor who filled out the death certificate. A death certificate is prima facie evidence of the facts recorded. G.L. c. 46 § 19.

86. Larry Kenney and Mary Blair went to trial on a defense that essentially was "we hurt her, but we didn't kill her. She died of causes unrelated to our care." That defense falls apart in a bad faith case because their own internal evaluation of the case exceeds the amount of any offer they ever made. Irrespective of whether they reasonably believed that they had a good causation defense to the wrongful death claim, their internal admissions of liability and the damages assessments pretrial belie the "causation" defense they have raised to show that their conduct was reasonable. They had a statutory duty to make a reasonable settlement offer in the portion of the case they believed was undefensible on liability and damages. They failed to satisfy that duty. Their own internal documents say so. This is bad faith.

87. Mary Blair's case assessment to the insured in December, 2013 stated that liability was "problematic" and damages were assessed at $500,000.00. (Exhibit 71). Mr. Kenney's Pre-Trial Report and Trial Budget of February 7, 2014 states "assuming full liability we would think that an award of $300,000 to $500,000 is possible." (Exhibit 51).  On July 7, 2014 from Mary Blair told Becky Shingleton "we do not believe that a jury will award more than $500K + $200K interest for a total of $700K worst case scenario. Attempt to settle out separately on the best figure up to $300K. Therefore, I recommend posting a reserve of $350K and proceeding to Court Conference this Wednesday with

$300K in authority to attempt settlement. Let's see what Plaitiff will do." (Trial Exhibit No. 57 at p. 9 SED01368). For reasons to this day known only to herself, Ms. Blair never made this or any other settlement offer at trial.

88. She then states "I am not going to attend tomorrow's motion hearing or the impaneling but I will however attend the trial proceedings. Plaintiff's counsel has known me for many years and I do not want to be available with settlement authority (Do I still have $250K?) until after the trial starts." (Trial Exhibit No. 36). These are acts of bad faith. Any action beyond the fact that the claims manager, Mary Blair, did not attend the hearing for the reasons set forth above, is irrelevant. Specifically but not limited to the fact that the claims adjuster attended the trial the next day and particularly in light of trial testimony that the observations of Mary Blair at trial were that she seemed bored, disinterested and occupied by reading the Boston Herald. ( Trial Testimony of Garry Calandro).

89. 93A and 176D impose duties on those in the business of insurance, like Sedgwick, unilaterally. These statutes impose no corresponding duties of the plaintiff. The legislature has required that parties in the business of insurance must act fairly, and to avoid and streamline litigation.  Here, Sedgwick multiplied and prolonged litigation in violation of 176D and 93A.

## F.  SEDGWICK'S POST JUDGMENT OFFER OF $2 MILLION WAS MADE IN BAD FAITH AND CANNOT BE DEEMED REASONABLE

The Court found Sedgwick's post-judgment settlement offer of $1,990,197 in response to the Chapter 93A demand letter was reasonable and therefore cabins its chapter 93A liability under the safe harbor provision. Defendant's argument rests on its view of section 9(3) that

47

an offer is reasonably related to the "injury actually suffered", if it reflects the plaintiff's loss of use of the money awarded. Because it made its offer within thirty days of receipt of the demand letter, Defendant argues that its liability is limited to the amount offered.

> After judgment had entered against the Radius entities, but *before* the Plaintiff's claim with Hartford was settled, Sedgwick had made an offer of settlement to the Plaintiff in the amount of $1,990,197.00.  In light of the indisputable fact that this offer was made in comparison to a *judgment* in excess of $14 million, Sedgwick's offer of $1,990,197.00 is unreasonable, as matter of both law and fact.

**90.** Plaintiff responds that if an insurer commits a willful or knowing Chapter 93A violation either pre- or post-judgment, it is liable for damages calculated by multiplying the amount of the full judgment in the underlying litigation, not by calculating the injury actually suffered under the loss-of-use of money standard. The underlying judgment, he argues, is the benchmark for evaluating the reasonableness of the settlement offer in the separate Chapter 93A litigation. Thus, in his view, the safe harbor protects Defendant only if it offered the full amount of the underlying judgment of $14 million.

**91.** Defendant's argument presents a novel question. In this case, judgment entered in the underlying litigation, thus triggering the 1989 amendment. As such, in the typical case involving insurers' unfair settlement practices, "actual damages" are "taken to be the amount of the judgment for the purpose of the bad faith multiplication." R.W. Granger & Sons v. J&S Insulation, Inc., 754 N.E.2d 668, 682 (Mass. 2001). Defendant argues that it is entitled to the more limited loss of-use-of money measure of damages because it offered a settlement within the statutory safe harbor of thirty days of the demand post-judgment which provides a

separate standard for evaluating "injury actually suffered." However, that interpretation would essentially vitiate the 1989 amendment to the same statutory section by failing to punish an insurer for pre-judgment misconduct in claims settlement practices. It is also inconsistent with the holdings in Rhodes and Auto Flat that the actual injury suffered for the purpose of calculating damages post-judgment is taken to be the amount of the judgment. If Defendant's interpretation were correct, insurers could engage in egregious claims settlement practices and simply wait until after judgment to offer the amount of judgment plus interest. Thus an insurer would have an incentive to delay settlement to force a claimant to take a lower offer. Here Defendant cites no cases that the settlement offered in the "safe harbor" must be reasonable under a loss-of-use standard measure once judgment has entered. That said, even though the judgment is the appropriate benchmark, it is unclear whether in the safe harbor period an insurer need only offer the portion of the judgment that reflects compensatory damages, costs, and interest. Must the offer also include the punitive damages portion of the judgment? That issue is addressed next.

**92.**   The appropriate amount of the judgment to be used for safe harbor and damages computation purposes.

§9(3) states in relevant part:

"Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by

the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or non-existence of insurance coverage available in payment of the claim."

### G.  THE SAFE HARBOR PROVISIONS OF CHAPTER 93A § 9

**93.  The Court found Sedgwick's post-judgment settlement offer of $1,990,197 in res**ponse to the Chapter 93A demand letter was reasonable and therefore cabins its chapter 93A liability under the safe harbor provision. The Court now recosiders and reverses its interlocutory ruling.

**94.** The damages subject to multiplication in a 93A action are "taken to be the amount of the [underlying] judgment." R.W. Granger & Sons v. J&S Insulation, Inc., 754 N.E.2d 668, 682 (Mass. 2001). Defendant argues that it is entitled to the more limited loss of-use-of money measure of damages because it offered a settlement within the statutory safe harbor of thirty days of the demand post-judgment which provides a separate standard for evaluating "injury actually suffered." That interpretation is inconsistent with the holdings in Rhodes and Auto Flat that the actual injury suffered for the purpose of calculating damages post-judgment is

taken to be the amount of the judgment. If Defendant's interpretation were correct, insurers could engage in egregious claims settlement practices and simply wait until after judgment to offer the amount of judgment plus interest. Thus an insurer would have an incentive to delay settlement to force a claimant to take a lower offer. Here Defendant cites no cases that the settlement offered in the "safe harbor" must be reasonable under a loss-of-use standard measure once judgment has entered.

**95.** Similarly, in Clegg v. Butler, 424 Mass. 413, 676 N.E.2d 1134 (1997), the Court ruled that ***a settlement*** for policy limits was not a 'judgment' for purposes of applying a multiplier under § 9(3).  However, the Court's, and the Defendant's, reliance with Clegg during the summary judgment stage of the proceedings is misplaced for two reasons: first, Clegg is a case in which there was no judgment, only a settlement, and as such the court had to use the "costs and expenses directly resulting from the insurer's conduct."  There was no other measure.  That is not the case here and, second, there is a canon of statutory interpretation that suggests that a later provision prevails over an earlier one.  The clear provisions of the 1989 amendment should prevail.

**96.** Black's law dictionary defines judgment as used in the sense of an act by a Court as follows: "The official and authentic decision of a court of justice upon the respective rights and claims of the parties to an action or suit therein litigated and submitted to its determination." This definition obviously encompasses both the compensatory and punitive damages verdicts in the underlying case. There was but a

single judgment entered and it included both compensatory and punitive damages components.

**97.** The specific language used by the Legislature in §9(3) also lends support to the conclusion that the word judgment includes both compensatory and punitive damages components if present. The Legislature specifically included the phrase "the amount of the judgment **on all claims**" (emphasis supplied). The Legislature was certainly cognizant of the fact that some claims which an insurer might be called upon to adjust would include a punitive damages component. If the Legislature intended to exclude punitive damages from the amount of the judgment to be utilized in computing either a safe harbor offer or the multiplier for the bad faith unfair settlement practices, it would have been a simple matter to do so. Instead the Legislature did the opposite, using the inclusive "all claims" language. This conclusion is further reinforced by the Legislature specifically providing that the nonexistence of insurance coverage available for payment of the claim did not constitute a defense when the unfair settlement practices had resulted in a judgment. The Court therefore concludes that in order to take advantage of the safe harbor provision, Sedgwick was required to offer the full amount of the final, non-appealable judgment, including both compensatory and punitive damages. The failure to do so means the offer of the compensatory damages with pre and post judgment interest was insufficient to be a defense..

**98.** There is ample evidence that the Sedgwick engaged in a willful and knowing pre-judgment and post judgment violations of Chapter 93A and the Court so finds. This evidence was recited a length above and need not be repeated in detail here.

Suffice it to say that over a lengthy course of litigation, Sedgwick never even offered their own internal best case scenario level of damages in an effort to settle the case. It recognized almost from the outset that the Calandro claim was not defensible and that a recovery against Radius was a near certainty. They also very quickly came to the conclusion that the probable level of damages had a floor of $300,000.00 plus an additional 35% for pre-judgment interest yet they never made a settlement offer that was sufficient to reach this floor. They even told the insured Radius 19 months before trial that the probable level of recovery in the case was $500,000.00 at a time when the Plaintiff was demanding precisely that amount to settle the case. Even when Sedgwick obtained authority from Hartford to offer $300,000.00 on the eve of trial to settle the claim, it made no offer of settlement. Liability was "reasonably clear" where the insurer's own assessment of the likelihood of recovery and the amount of that recovery was exactly the same as the amount of the demand made by the claimant. The conclusion is inescapable that Sedgwick was engaged in a willful and knowing violation pre-judgment violation for purposes of Chapter 93A. No reasonable insurer or TPA would have failed to settle the Calandro claim within the policy limits.

**99.** Sedgwick additionally engaged in a willful and knowing post judgment violation. On July 31, 2014, Mr. Kenney tendered an offer for $1,000,000.00 which was represented in the offer to be "the full amount of the insurance coverage available to the defendants…." ***GL c. 176D, § 3(9)(a) makes is an unfair settlement practice to "(a) Misrepresent[ing] pertinent facts or insurance policy provisions relating to coverages at issue;…"*** (emphasis added)

That sum did not in fact represent the full amount of insurance coverage available to Radius because the policy also covered costs included in any judgment and post judgment interest even to the extent those sums were in excess of the limits of liability. This is not a situation like Silva v. Norfolk & Dedham Mutual Fire Insurance Company, 91 Mass. App. Ct. 413, 2017 Mass. App. LEXIS 48 (Mass. App. 2017)  where the claim was that the failure to offer interest in addition to the amount of the judgment was a violation. It is not the failure to offer interest but the representation that it was not covered by the policy that makes the conduct a violation of the law. Likewise, this conduct was under the circumstances was a willful and knowing violation when it is considered the tender was planned and prepared by both an experienced and knowledgeable adjustor with the assistance of counsel.

**100.**   Additionally, in making this tender, more than just a release of the Radius defendants was requested. A release of Sedgwick and Hartford was also a condition for payment of these funds. In making this a condition of payment, Sedgwick was engaged in an unfair or deceptive act or practice under G. L. c. 93A.  Sterlin v. Commerce Insurance Company, 25 Mass. L. Rep. 124; 2009 Mass. Super. LEXIS 17 (2009). (see also Bertassi v. Allstate Ins. Co., 402 Mass. 366, 370-371 (1988) (insured's insistence that its insured execute an agreement protecting the insurer's subrogation rights as a condition to the insurer's payment of under insurance benefits to him violated G.L. c. 93A, where the policies did not require any such agreement); Bithoney v. Pilgrim Ins. Co., 20 Mass. L. Rep. 372 (Mass. Super. 2006) (Troy, J.) (the insurer's failure to eliminate unwarranted and misleading "settlement" language or to advise the injured person, in response to two letters, to disregard that language, violated Mass. Gen. Laws ch. 176D, § 3(9)(f).

**101.** The conduct of Sedgwick with respect to Calandro claim is precisely the type of conduct the Legislature intended to put an end to by enacting the penalty provisions in 1989. Sedgwick subverted the administration of justice by conspiring to fail to disclose material witnesses. Sedgwick wasted the resources of the Calandro family – and caused them great pain -  by forcing them to pursue litigation through judgment on a case that clearly could and should have been settled without the necessity of a trial. They similarly wasted scarce judicial resources for the same reason. They put at risk the assets of both Hartford and Radius to the tune of millions of dollars. Their conduct deserves the full measure of punishment that the law allows. (See Anderson v. American International Group, Inc., 2014 WL 187882 (Mass. Super. April 8, 2014), affd. 88 Mass. App. Ct. 1117, WL 9263925 (2015), vacated, 476 Mass. 377, 67 N.E.3d 1232 (2017)). The conduct of Sedgwick in this case was "so gross or obvious" that the fact-finder reasonably can infer wrongdoing based upon his or her "common knowledge". Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co. 439 Mass. 387; 788 N.E.2d 522 (2003)

## H.  THE APPROPRIATE LEVEL OF DAMAGES.

**102.** The Court finds that Sedgwick has waived any defense that Chapter 93A is unconstitutional as applied under the circumstances of this case by the failure to raise that claim as an affirmative defense at any time during the pendency of the case. This finding is amply supported by precedent in this Circuit requiring that defenses in mitigation of the damages claimed by affirmatively pled in a responsive pleading. Jakobsen v. Massachusetts Port Authority, 520 F.2d 810 (1st Cir. 1975) (failure to plead state statute capping damages as an affirmative defense waived benefit of statute); Knapp Shoes, Inc. v. Sylvania Shoe

Mfg. Corp., 15 F.3d 1222 (1st Cir. 1994), (failure to raise statutory limitation of remedies defense was waiver of the defense); Society of the Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29 (1st Cir. 2012) (failure to raise statutory defenses prior to summary judgment motion was waiver of those defenses).

**103.** First, the Legislature has declared that the measure of actual damages for a willful and knowing violation which resulted in entry of judgment in the underlying case is the full amount of the judgment on all claims. This legislative judgment is a reasonable measure of actual damages for unfair settlement practices. It clearly represents a reasonable measure of the loss that occurs when a carrier exposes its insured to a judgment in excess of the insureds limits of liability. It similarly represents a reasonable measure of the loss that occurs when a third party administrator exposes either the insured or the insurer to a judgment in excess of policy limits through unfair settlement activity. In either of those events, regardless of whether a portion of the excess judgment is composed of punitive damages or some other type of damages, the nature of the excess damages is irrelevant to the loss sustained which is simply payment of money that might have been avoided appropriately handling the adjusting of the claim. It is therefore a reasonable legislative judgment to state simply that in all situations where willful unfair settlement practices have taken place that result in the entry of judgment, the amount of the judgment is the measure of actual damages in a subsequent action against the insurer for unfair settlement practices. It really is of no consequence in punishing the insurer or third party administrator in a subsequent bad faith action whether those excess damages represent special damages incurred by plaintiff, intangible damages incurred by plaintiff or punitive damages. The

point is that it was the wrongful conduct by the insurer and/or TPA which caused that judgment to come to pass in the first instance. If that entity had performed as required by law, the case would have potentially been settled.

**104.** Secondly, it bears noting that Sedgwick was not a defendant in the underlying case and had no liability in that case for payment of any of the judgment, whether it be actual damages or punitive damages. For Sedgwick to suggest that they are somehow being subjected to a double penalty in violation of their due process rights is simply not accurate. Sedgwick has yet to pay any sums arising out its handling of the Calandro claim. Sedgwick is not being punished for the conduct of Radius, it is being penalized for its willful misconduct in adjusting the Calandro's claim. In the underlying case it was the Radius entities who were punished for their gross negligence in their lack of caring for Mr. Calandro's mother and causing her death.

**105.** Therefore, there is no impediment to imposing a multiplier of the judgment in the underlying case of up to three but not less than two times the full amount of the judgment entered against Radius including the punitive damages component.

**106.** As with many aspects of this case, there is little in the way of appellate court guidance from the Massachusetts state courts. In Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486; 961 N.E.2d 1067 (2012) the Supreme Judicial Court affirmed a judgment by the Trial Court which employed the minimum multiplier of 2 where the Trial Court found that the TPA's conduct pre-judgment was not in violation of the statute but it's post judgment

conduct did violate the statute. When the case reached the SJC, that Court assumed without deciding that the Trial Court correctly determined the issues regarding pre-judgment violation. It was not necessary to decide whether that question was correctly decided because the Trial Court did find a post-judgment violation and the Plaintiff would not in any event be entitled to a double recovery for both pre-judgment and post judgment violation.

**107.** The post-judgment violation in <u>Rhodes</u> consisted of the failure of the carrier and TPA to make a reasonable settlement offer to pay a judgment entered in the case on September 28, 2004 until June 2, 2005 and during which time the defendant/carrier/TPA was pursuing post judgment remedies in both the trial and appellate courts. There was an initial post judgment settlement offer made which the Trial Court in the subsequent bad faith case termed as "not only unreasonable, but insulting." From this factual finding, the SJC reversed a damages computation based on loss of use of funds with a multiplier of 2 as found by the Trial Court and ordered entry judgment in two times the amount of the jury verdict in the underlying case. Is so ordering the Rhodes Court stated the following which is equally applicable to the present situation:

> "We recognize that $22 million in c. 93A damages is an enormous sum, but the language and history of the 1989 amendment to c. 93A leave no option but to calculate the award of double damages against AIGDC based on the amount of the underlying tort judgment. The Legislature may wish to consider expanding the range of permissible punitive damages to be awarded for knowing or wilful violations of the statute to include more than single, but less than double, damages; or developing a special measure of punitive damages to be applied in unfair claim settlement practice cases brought under c. 176D, § 3 (9), and c. 93A that is different from the measure used in other types of c. 93A actions."

In the ensuing five years since <u>Rhodes</u> was decided, the Legislature has chosen to leave the language c. 93A alone. This presumably represents a legislative judgment that they are

satisfied with the damages classifications that have been drawn for punishing willful unfair settlement practices.

**108.** The second instructive case on the appropriate multiplier is <u>Anderson v. American International Group, Inc.</u>, 2014 WL 187882 (Mass. Super. April 8, 2014), affd. 88 Mass. App. Ct. 1117, WL 9263925 (2015), vacated, 476 Mass. 377, 67 N.E.3d 1232 (2017). <u>Anderson</u> is much more analogous to what transpired with the Calandro claim than is <u>Rhodes</u>. In <u>Anderson</u> the Trial Court's factual findings regarding unfair settlement practices were that the insurer failed to "conduct a reasonable investigation … based on all available evidence," including by suppressing unfavorable evidence and offering fictitious evidence; failing to "effectuate prompt, fair and equitable settlement of claims in which liability … ha[d] become reasonably clear"; and pursuing an unreasonable appeal of the underlying personal injury judgment." Based upon these findings, the Trial Court stated the "maximum available sanction" was warranted. The Court therefore imposed damages in the amount of three times the judgment in the underlying personal injury case including trebling the post-judgment interest which had accrued on the judgment. On appeal, the Appeals Court affirmed the judgment in all respects. The Supreme Judicial Court then granted review limited to a single issue-whether post judgment interest was subject to being multiplied in the unfair settlement practices case. The Court ruled it was not. In all other respects, including the treble damages, the Supreme Judicial Court left the judgment in place.

Given the similarity between the cases, both in terms of how long a period of time the unfair practices extended over (years as opposed to months) as well as the suppression of evidence, <u>Anderson</u> supports use of treble damages. The Court should therefore award Plaintiff between two to three times the amount of the judgment of 14,196,427.04. That range is between

$28,392,854 to $42,589,281.12. Whether this violates Due Process is not a consideration at this time in determining whether between double to treble calculation.

Respectfully Submitted,
For the plaintiff,
By his attorney,

*/s/ David J. Hoey*

_____

David J. Hoey, Esq. BBO # 628619
*Law Offices of David J. Hoey, P.C.*
352 Park Street, Suite 105
North Reading, MA 01864
T: (978) 664-3633
F: (978) 664-3643
E: dhoey@hoeylaw.com

*/s/ Don C. Keenan*

_____

Don C. Keenan, Pro Hac Vice
Allan L. Galbraith, Pro Hac Vice
The Keenan Law Firm
148 Nassau Street, N.W.
Atlanta, GA 30303
T: (404) 523-2200
E: agalbraith@keenanlawfirm.com

*/s/ John Vail*

_____

John Vail, Pro Hac Vice
John Vail Law PLLC
777 6th Street NW Suite 410
Washington, DC 20007

Dated: this  17th  day of November, 2017

**CERTIFICATE OF SERVICE**

I, David J. Hoey, hereby certify that I have this 17th day of November, 2017, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).

*/s/ David J. Hoey*_____
David J. Hoey