# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                    )
GARRICK CALANDRO, AS                )
ADMINISTRATOR OF THE ESTATE OF      )
GENEVIEVE CALANDRO,                 )
                                    )
                   Plaintiff,       )
v.                                  )      Civil Action
                                    )      No. 15-10533
SEDGWICK CLAIMS MANAGEMENT          )
SERVICES,                           )
                                    )
                   Defendant.       )
_____ )
```

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

November 21, 2017

Saris, C.J.

### INTRODUCTION

Plaintiff Garrick Calandro, as administrator of the estate of Genevieve Calandro, alleges that Sedgwick Claims Management Systems, Inc. ("Sedgwick") violated Massachusetts General Laws Chapter 176D ("Chapter 176D") and Massachusetts General Laws Chapter 93A ("Chapter 93A") by failing to make any reasonable attempt -- both pre-verdict and post-verdict -- to settle the negligence and wrongful death claims involving his mother who died at a nursing home in Danvers, Massachusetts.

After a four-day bench trial, the Court finds that Sedgwick did not violate Chapters 176D and 93A. The evidence presented at

1

trial showed that, although both sides engaged in tough litigation tactics, the element of causation on Calandro's wrongful death claim was never reasonably clear. Even though causation was reasonably clear on Calandro's conscious pain and suffering claim, Sedgwick made two reasonable settlement offers when causation on that claim was reasonably clear. Sedgwick also attempted to engage in negotiations one month before trial, but was rebuffed by Calandro's attorney. Calandro also alleges statutory violations stemming from post-verdict or post-judgment settlement offers. For the reasons set forth below, Sedgwick's conduct at those times did not violate Chapters 176D and 93A.

Therefore, the Court finds that Sedgwick did not violate Chapters 93A and 176D. Judgment shall enter for Defendant.

**FINDINGS OF FACT**[1]

## I. **Background**

### A. **The Parties**

The plaintiff, Garrick Calandro ("Calandro"), is the administrator of his mother Genevieve Calandro's estate. Sedgwick Claims Management Services, Inc. ("Sedgwick") is a third-party administrator ("TPA") of insurance claims. Hartford Insurance Company, through its subsidiary, Pacific Insurance

---

[1]     The Court states its findings of facts and conclusions of law separately, as required by Federal Rule of Civil Procedure 52(a)(1).

Company ("Hartford"), issued a liability insurance Policy No. 2Y0004802 naming four out of five of the "Radius Entities" as insureds excluding Roush & Associates, Inc. The policy was an occurrence policy in the amount of $1 million, covering the period June 1, 2008 to June 1, 2009.

There were five "Radius Entities":  Radium Management Services, Inc., Radius Management Services II, Inc., Roush & Associates, Inc., Radius Danvers Operating, LLC, and Radius BD. For convenience, the Court refers to the entities collectively as "Radius". In connection with its healthcare line of business, Hartford engaged Sedgwick as a TPA pursuant to written contract(s). Under the terms of those written contracts, Sedgwick must undertake certain actions in adjusting claims, and has contractual reporting requirements vis-à-vis a claim involving a fatality. The operative contract at the time of Calandro's claim set forth a list of standards for handling and adjusting that claim and others similar to it.

Dr. David Wahl was Ms. Calandro's personal physician at all times relevant to Calandro's underlying negligence claims.

### B.  Genevieve Calandro's Death

Genevieve Calandro died on August 16, 2008 at age 91, five weeks after she last resided at Radius Danvers, a long-term

3

skilled nursing facility where Ms. Calandro had lived for a six-month period between late December 2007 and July 10, 2008.

On July 10, 2008, at the Radius Danvers facility, Ms. Calandro fell from her wheelchair, hit her head, and was taken by ambulance to Beverly Hospital. Upon her admission to Beverly Hospital, Ms. Calandro was dehydrated, had undiagnosed acute appendicitis, renal failure, uncontrolled diabetes, a severe bed sore, a urinary tract infection ("UTI"), and a high white blood cell count. She also had dementia. She was discharged from Beverly Hospital on July 22, 2008 and admitted to a different nursing home. Ms. Calandro died on August 16, 2008. Her death certificate lists congestive heart failure and acute renal failure as the causes of death, along with various other conditions that contributed to her death.

## II.  Timeline of Sedgwick's Pre- and Post-Judgment Conduct

### A.  The Underlying Lawsuit

On August 16, 2011, Calandro filed suit against Radius alleging negligence, gross negligence, and wrongful death. The complaint included a prayer for punitive damages. Calandro served the summons and complaint on Radius in October 2011. In

July 2012, the plaintiff amended the complaint to add Dr. Wahl as a defendant. Calandro's lead trial counsel was David Hoey.[2]

**B.    Sedgwick Claims Management Services**

The terms under which Sedgwick acted as a TPA for Hartford are set out in a Third Party Administrator Agreement and the Service Requirements in that Agreement. After Radius received service of the summons and complaint in October 2011, Sedgwick assigned Mary Blair ("Blair"), an experienced claims adjuster at Sedgwick who had previously worked at Hartford, to adjust the claim. Blair engaged Bistany Adjustment Service ("Bistany") to investigate the claim. Hartford, via Blair, hired attorney Lawrence Kenney ("Kenney") to serve as counsel for the insureds in the litigation.

Bistany filed two investigative reports. At the time of its investigation, Radius, including the Danvers facility, was winding up operations or in the process of sale. This fact made the investigation difficult, both in terms of securing documents and identifying witnesses. Indeed, no incident report of Ms. Calandro's fall from her wheelchair was ever found.

Bistany conducted interviews with two nurses who worked at the Danvers facility at the time of Ms. Calandro's fall, one of

---

[2]    Hoey also served as lead Plaintiff's counsel in this matter. He did not testify in the trial before this Court.

whom told him that she remembered the fall and stated that a contemporaneous incident report was prepared. Bistany found the names of the two nurses in Ms. Calandro's clinical chart, which Calandro's attorney already had in his possession.

Although Bistany conducted interviews with the two nurses, Radius -- via Blair and Kenney -- did not disclose their names in response to Calandro's very-late filed interrogatories in the underlying case. Instead, Kenney objected to the interrogatories as untimely (they were), separately writing a letter to Hoey advising him of the difficulty of obtaining responsive information in light of the winding up of Radius entities. Calandro filed a motion to compel, but that motion was never granted. The discovery period was, however, extended.

The nurses' identities and contact information were never disclosed to Calandro before or during the underlying trial. The nurses were not called as witnesses. Defendant (Blair and Kenney) made a strategic decision to not disclose the information about the nurses.

### C.   Calandro's Demands and Insureds' Offers of Settlement

In October 2011, when the summons and complaint were received, the plaintiff demanded $500,000 to settle the case against Radius. No settlement activity happened for two years.

In November 2013, at the deposition of Dr. Wahl, Hoey demanded $500,000 total to settle with all defendants. There were just two notable intervening events between when Radius was served and this demand. First, Dr. Wahl was added as a co-defendant in July 2012. Second, the plaintiff's put forward an offer of proof at the medical malpractice tribunal in May 2013. See Trial Ex. 64 (state court docket sheet); Trial Tr. at 2-39 (Blair testimony on outcome of medical malpractice tribunal). The offer of proof may have included an outline of Calandro's medical-expert opinion, but Sedgwick did not receive the full medical-expert opinion from Dr. Paul Genecin of Yale Health until late April or early May of 2014. See Trial Ex. 32 at 2 ("Plaintiff served his expert disclosures on April 27th . . . which we were waiting for."); Trial Tr. at 2:199 (Kenney testimony). Dr. Genecin opined that Radius breached its duty of care and that its breach caused Ms. Calandro's death, as well as conscious pain and suffering due to an undiagnosed UTI, and a stage IV bedsore, among other ailments.

On February 6, 2014, the defendants (Radius and Wahl) made a joint settlement offer of $275,000, with $150,000 attributed to Wahl and the remainder to Radius. Joe Pacheco ("Pacheco"), a claims adjuster for Coverys, Dr. Wahl's malpractice insurer conveyed the offer to Hoey. At that point, Blair had settlement

authority of $125,000. Plaintiff's counsel rejected the offer on February 17, 2014, indicating that the $500,000 demand was non-negotiable.

On February 7, 2014, Kenney sent Blair a pre-trial report which attached a verdict value to the case of between $300,000 and $500,000. This value was attributable pro rata to Radius and Dr. Wahl. Kenney described the case as involving the "usual wrongful death damages." Trial Ex. 51 at 4. At that time, Kenney was preparing to admit to breach of the standard of care (which he and Blair generally referred to as "liability") and to try the case on proximate cause and damages, although no formal stipulation or admission had yet been filed. Going forward from mid-February 2014, Radius, via Kenney, Sedgwick, and Hartford, never changed its valuation of the case.[3] As late as July 10, 2014, Blair told Becky Shingleton, who was supervising the claim for Hartford, that, "[w]e are fairly confident that we have a strong argument for causation and injuries." Trial Ex. 31 at 2.

On February 18, 2014, Pacheco again contacted Hoey indicating that the $275,000 was an initial offer and that the

---

[3]     There is no evidence that Blair independently valued the case. Kenney is an experienced insurance defense litigator in Massachusetts and defended numerous claims against nursing homes including Radius entities. Calandro's own expert on insurance practices, Arthur Kiriakos, admitted that a claims adjuster can rely on seasoned defense counsel's expertise, so long as the adjuster does not abrogate her duties.

defendants had room to move but would not bid against themselves. On March 27, 2014, the plaintiff withdrew the $500,000 demand.

On April 8, 2014, the plaintiff demanded $2 million total in settlement of the entire case collectively against the Radius Entities and Dr. Wahl. Radius and Dr. Wahl each carried $1 million insurance policies. Thus, this demand constituted a "policy demand" on each defendant.

In May 2014, Radius and Wahl extended a joint offer of $300,000 -- a $25,000 increase over their prior joint offer. Hoey rejected this offer in a letter to Pacheco dated June 4, 2014. Hoey expressed frustration with the tenor of settlement negotiations and suggested that the adjusters (Pacheco and Blair) may be engaging in conduct that violated Chapter 176D.[4]

On May 27, 2014, Radius disclosed its medical expert opinion. Dr. Terrence O'Malley of Massachusetts General Hospital and Harvard Medical School wrote an expert opinion that Radius' conduct did not cause Ms. Calandro's death. Kenney testified that Radius did not seriously dispute that its conduct caused

---

[4]    In the letter, Hoey acknowledged that his disappointment and frustration stemmed, at least in part, from the Thomas case, which appears to have also involved a Coverys insured defendant. See Trial Ex. 50 at 1. Hoey also references disappointment in Pacheco's handling of the Thomas case in a February 17, 2014 email rejecting the defendants' joint $275,000 settlement offer. See Trial Ex. 21 at 2.

Genevieve Calandro conscious pain and suffering before her death. See Trial Tr. at 2:182.

In mid-June 2014, while attending a mediation on another matter, Blair told Kenney that she wanted to settle the Calandro suit. Kenney gave Hoey's office phone number to Blair. Kenney observed Blair make the phone call, and heard her end of the conversation in which she told Hoey that she wanted to settle the Calandro case. Hoey refused to hear the amount of her settlement offer until he spoke with his client.[5] Hoey never got back in touch with Blair to hear her settlement offer before trial began.

Emails between Pacheco and Blair in early June suggest that both defendants' adjusters remained hopeful for a joint settlement. However, in early July 2014, unbeknownst to Sedgwick, Dr. Wahl separately settled with Calandro for $250,000. On July 3, 2014, Hoey's associate sent Kenney an email renewing a $1 million demand on Radius. The associate said that unless an offer in excess of $500,000 was made by July 9 all settlement discussions would cease. Kenney was out of the office from July 3 through July 7 taking family vacation. He did not

---

[5]     This hearsay evidence was admitted without objection at trial. See Trial Tr. 2:175–76.

10

see the email until the morning of July 8, when he forwarded the message to Blair.

That day, Blair contacted Shingleton. At that time, Blair requested settlement authority of $300,000 and recommended a reserve of $350,000. Shingleton assented to the request.[6] However, on July 10, when Blair followed up to confirm the amount of her settlement authority, Shingleton responded in an email that Blair only had $250,000 in settlement authority and could make an offer if the opportunity arose. There is no evidence that the parties conversed directly in the brief period during which Blair believed she had $300,000 in settlement authority.

On July 14, Kenney made an oral offer of settlement of $250,000 to Hoey. Kenney also relayed that, although he did not have higher settlement authority at that time, he thought that Blair could get more -- perhaps up to $350,000 -- if needed.

---

[6]     In her email, Blair stated that Kenney had filed a stipulation to try the case only on damages. Trial Ex. 32 at 2. Blair misstated the stipulation in her email. Kenney attempted to stipulate to a breach of the standard of care, but instead was forced to admit breach at trial. However, Radius contested wrongful death causation and damages throughout. Blair's misstatement appears to have been incorporated into an internal Hartford post-verdict synopsis, see Trial Ex. 34 at 1, compounding the confusion. However, later in that email, the report makes clear that causation was contested at trial. Id. at 2 ("Our expert testified well with respect to causation and injuries leaving us with the expectation that a defense verdict was possible.").

There is no evidence that Hoey replied at all, and he never made a counteroffer on July 14 or any date thereafter.

Jury selection began on July 16 and the trial commenced on July 17. Blair told Shingleton that she would not attend empanelment because she did want to be present with settlement authority before trial began, given how well she knew Hoey. In a July 16 email, Blair asked Shingleton if she still had $250,000 in settlement authority going in to the first day of trial. Shingleton confirmed that she did. However, no further settlement negotiations took place after Kenney's July $250,000 offer to Hoey on July 14.

Over the course of negotiations among these repeat players, tempers flared on both sides, whether it be from tactics deemed hardball, lack of progress in other cases, or other grudges. Regardless, Radius, via Sedgwick, made reasonable offers at key points leading up to trial, all of which Calandro rejected. Throughout, causation and damages were hotly contested, especially as to Calandro's wrongful death claim.

### D.    The Underlying Trial

The compensatory portion of the trial took place on July 17, 18, and 21. The jury received a verdict form that required a finding on causation (not differentiated between wrongful death and conscious pain and suffering) and damages. Radius admitted

to a breach of the duty of care on a number of facts.[7] <u>See</u> Trial
Ex. 81. On July 21, 2014, the jury returned a verdict for
Calandro, finding Radius was grossly negligent, and awarding
compensatory damages of $1,452,000. The punitive phase of the
trial took place on July 22, 2014. The jury awarded Calandro
$12,514,605 in punitive damages. Blair and Kenney were shocked.

### E.    Post-Verdict Conduct and Post-Judgment Demands

After the verdict, Hartford took control of the claim away
from Blair. Shingleton reached out to Blair with a series of
questions, including asking whether she thought Calandro would
accept a policy limit ($1 million) settlement offer to release
all claims despite the verdict. Blair responded that she thought
Calandro would, noting that it would be time consuming and
expensive to collect on the judgment. Whatever Blair may have
counseled, the Court finds that Sedgwick no longer controlled
the claim on a day-to-day basis. Instead, Hartford handled the
claim from that point forward. <u>See</u> Trial Ex. 57 (Shingleton

---

[7]    At times in the documentary evidence and in testimony,
various witnesses, including Blair and Kenney, used the term
"liability" to refer to a breach of a duty of care, excluding
causation. This loose legal talk created some confusion. However
two facts make clear that Radius always contested causation on
the wrongful death claim. First, the transcript excerpt from the
underlying trial shows that the only admissions made at trial
related to breach of the duty of care, and not causation. <u>See</u>
Trial Ex. 81. Second, the Court took notice of the state court's
verdict form, which put the question of causation to the jury.

email to Blair gathering information for Hartford to manage next steps). On July 31, 2014, Kenney, with Hartford's direct authorization and without Blair or Sedgwick as an intermediary, offered Calandro $1 million in exchange for a release of Radius. See Trial Tr. at 2:133–34 (Hartford directly authorized Kenney to make the $1 million). Calandro rejected the offer.

On September 30, 2014, Calandro sent a demand letter under Chapter 93A, §9 to Hartford, Pacific Insurance Company, and Sedgwick alleging violations of Chapter 176D and demanding $40 million. Sedgwick received the demand on October 2, 2014 and responded on October 30, 2014. In its response, Sedgwick made a settlement offer of $1,990,197, reflecting the compensatory damage award, as well as costs and pre- and post-judgment interest. Calandro rejected the settlement offer and filed this lawsuit. At the time of the offer, Kenney advised Radius to appeal on a number of issues including the gross negligence finding against Radius and the punitive damages award, see Trial Tr. at 2:203–04; 3:70–71; Trial Ex. 57 at 1–2 (listing four issues for appeal). Hartford did not settle with Calandro until December 5, 2014. Trial Ex. 66 at 8.

In November 2014, Hartford and Calandro mediated the case. At the mediation, Hartford settled by paying the full amount of the judgment plus an additional amount, totaling $16 million.

Hartford obtained releases of the Radius Entities and itself. It did not obtain a release for Sedgwick.

The Court does not credit Plaintiff's expert testimony that Sedgwick's conduct was below insurance industry standards. In fact, Kiriakos's opinion and credibility were undermined by his failure to include, despite his admitted knowledge, Blair's attempt to make an offer to Hoey in June 2014, and Kenney's offer to Hoey three days before the underlying trial. Trial Tr. 4:44–45; 4:84–85. Therefore, the Court does not adopt Kiriakos's opinion that Sedgwick's actions deviated from acceptable insurance adjustment practices.

**CONCLUSIONS OF LAW**

## I.   **Applicable Law**

Chapter 176D was "designed to remedy a host of possible violations in the insurance industry and to subject insurers committing violations to the remedies available to an injured party under G.L. c. 93A." Hopkins v. Liberty Mut. Ins. Co., 750 N.E.2d 943, 948 (Mass. 2001). Among other acts, an insurance company commits an unfair claim settlement practice if it "[f]ail[s] to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f). The word "liability" as used in the statute "encompasses both fault and damages." Clegg v.

<u>Butler</u>, 676 N.E.2d 1134, 1140 (Mass. 1997); <u>see</u> <u>also</u> <u>Bobick v.</u>
<u>U.S. Fidelity & Guar. Co.</u>, 790 N.E.2d 653, 659 (Mass. 2003)
(finding insurer not statutorily required to make fair and
reasonable offer until liability and damages were apparent).

Liability is not reasonably clear if the elements of the
claim are "still the subject of good faith disagreement." <u>Clegg</u>,
676 N.E.2d at 1138. Although Chapter 176D places a duty to
settle upon insurers, that duty does not arise until "liability
has become reasonably clear" because "[i]nsurers must be given
the time to investigate claims thoroughly to determine their
liability." <u>Id.</u> at 1140. In short, Chapter 176D "in no way
penalize[s] insurers who delay in good faith when liability is
not clear and requires further investigation." <u>Id.</u>

"[A]ny person whose rights are affected by another person
violating the provisions of [Chapter 176D, § 3(9)(f)]" is
entitled to bring an action to recover for the violation under
Chapter 93A section 9. <u>Rhodes v. AIG Domestic Claims, Inc.</u>, 961
N.E.2d 1067, 1075 (Mass. 2012) (citing Mass. Gen. Laws ch. 176D,
§ 3(9)(f)). Chapter 93A section 9(3), in turn, was amended in
1989 in response to state caselaw which "limited those damages
subject to multiplication under c. 93A to loss of use damages,
measured by the interest lost on the amount the insurer
wrongfully failed to provide the claimant. This amendment

greatly increased the potential liability of an insurer who wilfully, knowingly or in bad faith engages in unfair business practices." <u>Clegg</u>, 676 N.E.2d at 1142 (citations omitted).

## II. **Analysis**

### A. **Pre-Verdict Conduct**

Based on the Court's findings of fact during the trial and recounted above, there was no Chapter 176D violation.[8] Liability on the wrongful death claim was not reasonably clear at any point in the litigation because causation was fairly disputed. Furthermore, to the extent that causation was reasonably clear on Calandro's conscious pain and suffering claim, Sedgwick made reasonable settlement offers at key stages of the litigation, including in early February 2014 ($275,000 joint offer with Dr. Wahl) and on July 14, 2014 ($250,000 offer extended from Kenney to Hoey). Additionally, Blair attempted to engage in settlement negotiations one month before trial, but Hoey rebuffed her.

To the extent Calandro alleges a Chapter 176D violation based on failure to investigate, it has not shown that Sedgwick's actions constitute an unfair practice. Sedgwick

---

[8]    For purposes of this analysis, the Court assumes without deciding that Sedgwick is in the business of insurance as the term is used in Chapter 176D. <u>See</u> <u>Calandro v. Sedgwick Claims Mgmt. Svcs.</u>, No. 15-10533, 2017 WL 1496915, at *6 (D. Mass. Apr. 25, 2017) (denying defendant's motion for summary judgment on ground that it was not engaged in the business of insurance).

retained an investigator promptly, and investigated the claim to the extent possible given the sale and dissolution of the various Radius entities. The failure to disclose the two nurses Bistany interviewed did not display a cooperative approach to pretrial discovery, but Kenney's timeliness objection was in good faith, and Calandro's motion to compel was not allowed.

With the two major prongs of Calandro's claim foreclosed by the facts found above, his closing argument focused on one newly raised toehold to a Chapter 176D violation: Radius' failure to respond with an offer of settlement after receipt of plaintiff's offer of proof to the medical malpractice tribunal in May 2013.[9] Calandro argues that at the point his expert opinion was generally outlined Sedgwick had an affirmative duty under Chapter 176D to make a settlement offer. During closing arguments, Calandro's counsel cited <u>Gore v. Arbella Mut. Ins. Co.</u>, 932 N.E.2d 837 (Mass. App. Ct. 2010), and <u>Clegg</u> for this

---

[9]     In closing argument, Plaintiff's counsel referred to this as the plaintiff's medical expert opinion disclosure. That is not the case. Plaintiff's medical expert opinion is dated May 18, 2012, <u>see</u> Trial Ex. 79, but Kenney testified that Sedgwick did not receive the opinion until May 2014. <u>See</u> Trial Tr. 2:199. Blair's report to Hartford stated that Kenney received the opinion on April 27, 2014. Trial Ex. 32 at 2. The Court finds Kenney's testimony credible, uncontested as to the timing of the expert disclosure, and supported by documentary evidence. Thus, the Court adopts that timeline. It was only in closing argument that Calandro's counsel asserted that Sedgwick received Dr. Genecin's expert disclosure in May 2013, around the time of the medical malpractice tribunal. <u>See</u> Trial Tr. at 4:111.

proposition. In his post-trial briefing, Calandro did not cite Gore, but cited numerous other cases for related propositions. See Docket No. 168 at 25–26.

But Calandro's Hail Mary falls short. First, Gore and Clegg do not place an affirmative duty on insurance companies to make an offer of settlement before liability is reasonably clear nor when the insured is continuing to conduct an investigation. Clegg, 676 N.E.2d at 1140. To be sure, an insurer must act reasonably, and must respond to demands in good faith and without delay. See Gore, 932 N.E.2d at 846 (describing insurers obligation to respond and inform claimant of the status of the claim). Clegg and Gore both highlight the duty to act in good faith, and the duty to make a fair settlement offer when liability is reasonably clear.

Plaintiff's offer of proof to the medical malpractice tribunal in May 2013 did not make liability, as the term is defined in Chapter 176D, reasonably clear. Sedgwick's investigation was ongoing, and after Calandro's expert disclosure in late April 2014, Sedgwick obtained its own expert opinion in May 2014, which kept causation in dispute for wrongful death.

Beyond the lack of an affirmative duty to make a settlement offer before liability is reasonably clear, Calandro's own

behavior shows his offer of proof to the medical malpractice tribunal was not the game changer his attorney would have the Court believe. Five months after the offer of proof to the medical malpractice tribunal, in November 2013, Hoey made a joint settlement demand of $500,000 -- exactly the same demand he made at the time the suit was filed in October 2011.[10] As the facts show, the plaintiff's offer of proof to the medical malpractice tribunal did not change his own attorney's valuation of the case. It cannot be said, then, that the offer of proof established wrongful death liability to a reasonable certainty for Sedgwick.

**B.  Post-Verdict Conduct**

Calandro has not presented evidence of a Chapter 176D violation after the verdict. The evidence at trial was that Hartford directed and authorized the $1 million post-verdict settlement offer complained of. Therefore, even if that offer constituted a Chapter 176D violation, Sedgwick is not liable. Furthermore, Sedgwick's separate post-judgment settlement offer of $1,990,197 was reasonable considering the likelihood of an appeal on the basis for and amount of the punitive damage award.

---

[10]    Arguably, the November 2013 demand was less than the initial demand, as the former was to Radius only, whereas the latter was a joint demand upon Radius and Dr. Wahl.

**ORDER**

For the reasons stated above, the Court finds that Sedgwick did not violate Chapters 176D and 93A. Judgment for Defendant.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge